STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE

COUNTY OF ROBESON              SUPERIOR COURT DIVISION

―――――――――――――――――――――――――――――――――――――――――――――――――――――――

STATE OF NORTH CAROLINA        )    M.A.R. HEARING
                               )    TRANSCRIPT
vs.                            )
                               )    ROBESON COUNTY FILE NOS.
HENRY LEE MCCOLLUM,            )    83 CRS 15506, 15507
                               )    CUMBERLAND COUNTY FILE NO.
          Defendant.           )    91 CRS 40727
                               )
and                            )
                               )
STATE OF NORTH CAROLINA        )
                               )    ROBESON COUNTY FILE NOS.
vs.                            )    83 CRS 15822, 15823
                               )    BLADEN COUNTY FILE NO.
LEON BROWN                     )    92 CRS 241-2
                               )
          Defendant.           )
―――――――――――――――――――――――――――――――――――――――――――――――――――――――

Volume 1 of 1
Pages 1 through 139

The above-captioned case coming on for hearing at the
September 2, 2014, criminal session of the Superior Court of Robeson
County, Lumberton, North Carolina, before the
Honorable Douglas B. Sasser, Superior Court Judge presiding, the
following proceedings were had, to wit:


APPEARANCES BEGIN ON NEXT PAGE


Monday, September 2, 2014


            REPORTED BY:    JULIE R. RYAN, CVR-CM-M, CCR
                            OFFICIAL COURT REPORTER

For the State:

L.J. Britt, III
District Attorney
Robeson County Courthouse Box 19
Lumberton, NC  28358


For the Defendant,
Henry McCollum:

Vernetta R. Alston, Esq.
Ken Rose, Esq.
Center for Death Penalty Litigation, Inc.
123 W. Main St., Ste. 700
Durham, NC  27701

Richard A. Johnston, Esq.
60 State St.
Boston, MA  02109


For the Defendant,
Leon Brown:

W. James Payne, Esq.
4434 Main St.
Shallotte, NC  28470

Ann Kirby, Esq.
P.O. Box 8047
Greenville, NC  27835


Also present:

Kendra Montgomery-Blinn
Executive Director
North Carolina Innocence Inquiry Commission
P.O. Box 2448
Raleigh, NC  27602

# I N D E X

## WITNESSES

ALL WITNESSES:                                             PAGE:

For Defendant:

  SHARON STELLATO:
    Direct Examination by MS. ALSTON          5:14
    Cross-Examination by MR. PAYNE            80:22
    Cross-Examination by MR. BRITT            108:13

Arguments                                                 119
Adjudication                                              127

## EXHIBITS

NO.:        DESCRIPTION:                                  PAGE:

For Defendant:

1           1984 Trial Transcript, *State v. McCollum and
            Brown*
            Received                                      4:24

2           1991 Trial Transcript, *State v. McCollum*
            Received                                      4:24

2-A         1991 Trial Transcript Excerpt, *State v.
            McCollum*
            Received                                      4:24

3           1992 Trial Transcript, *State v. Brown*
            Received                                      4:24

3-A         1991 Suppression Hearing Transcript
            Received                                      4:24

4           Allen crime scene sketch
            Received                                      4:24

5           1983.09.28 Henry McCollum Statement
            Received                                      4:24

6           1983.08.28 Leon Brown Confession
            Received                                      4:24

*State v McCollum and Brown*

i

| | | |
|---|---|---|
| 7 | 1983.09.30 Louis Moore Interview Report<br>Received | 4:24 |
| 8 | 1983.12.06 Daryl Suber Investigative Report<br>Received | 4:24 |
| 9 | Geraldine Brown Transcript Excerpt<br>Received | 4:24 |
| 10 | Sabrina Buie Autopsy Report<br>Received | 4:24 |
| 11 | 1983.09.27 Henry McCollum Statement<br>Received | 4:24 |
| 12 | 1984 Garth Locklear Testimony<br>Received | 4:24 |
| 13 | 1992 Garth Locklear Testimony in *Brown*<br>Received | 4:24 |
| 14 | 1983.09.28 Ethel Furmage Statement<br>Received | 4:24 |
| 15 | 1983.10.03 Ethel Furmage Statement<br>Received | 4:24 |
| 16 | Allen Crime Scene Report<br>Received | 4:24 |
| 17 | Aerial Photo of Red Springs<br>Received | 4:24 |
| 18 | 2005.01.26 LabCorp Report<br>Received | 4:24 |
| 19 | 2010.12.31 LabCorp Report<br>Received | 4:24 |
| 20 | 2011.08.01 LabCorp Report<br>Received | 4:24 |
| 21 | 2014.05.21 Cellmark Report<br>Received | 4:24 |
| 22 | 2014.07.10 Report of CODIS Hit<br>Received | 4:24 |

*State v McCollum and Brown*

| 23 | 2014.07.29 Cellmark Report | |
| | Received | 4:24 |

| 24 | Commission Forensic Chart | |
| | Received | 4:24 |

| 25 | Video of Red Springs | |
| | Received | 4:24 |

| 26 | *State v. Artis* NC Supreme Court Opinion | |
| | Received | 4:24 |

| 27 | 2014.08.26 Commission Memo on Artis | |
| | Received | 4:24 |

| 28 | SBI Record of Fingerprint Testing Request for Sinclair and Artis | |
| | Received | 4:24 |

| 29 | L.P. Sinclair Police Interviews and Polygraph Report | |
| | Received | 4:24 |

| 30 | *State v McCollum* 1993 NC Supreme Court Opinion | |
| | Received | 4:24 |

| 31 | Judge Carmical Transcript Excerpt 1991 | |
| | Received | 4:24 |

| 32 | 1995 Memo on Law Enforcement Files | |
| | Received | 4:24 |

| 33 | 2010.08.31 Letter from Capt. Kevin Locklear | |
| | Received | 4:24 |

| 34 | 2012.10.05 Sonny Craig Signed Affidavit | |
| | Received | 4:24 |

| 35 | 2014 Adam Stein Affidavit | |
| | Received | 4:24 |

| 36 | 2014 Dayan Affidavit | |
| | Received | 4:24 |

| 37 | Statistics on Artis DNA Hit | |
| | Received | 4:24 |

*State v McCollum and Brown*

iii

| | | |
|---|---|---|
| 38 | 2014.08.29 Cellmark Report | |
| | Received | 4:24 |
| | | |
| 39 | 2004.11.06 Consent Order for DNA Testing | |
| | Received | 4:24 |
| | | |
| 40 | McCollum 1991 Jury Issues and Recommendation Form | |
| | Received | 4:24 |
| | | |
| 41 | Map of Crime Scene Area | |
| | Received | 4:24 |
| | | |
| 42 | 2010.06.18 Order to Preserve and Produce Evidence | |
| | Received | 4:24 |
| | | |
| 43 | 2010.10.21 Order for Production of Law Enforcement Files | |
| | Received | 4:24 |
| | | |
| 44 | Documents related to the fingerprint comparison request: | |
| | Received | 48:19 |
| | | |
| 45 | Letter from Roscoe Artis to Commission: | |
| | Received | 74:12 |
| | | |
| 46-48 | Photographs of crime scene near Smith house: | |
| | Received | 92:21 |

*State v McCollum and Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 6 of 140

1                           PROCEEDINGS

2                  (COURT WAS CALLED TO ORDER ON TUESDAY,

3    SEPTEMBER 2, 2014 AT 10:11 A.M.)

4                  (DEFENDANTS AND ALL COUNSEL PRESENT.)

5                  THE COURT:  All right.  At this time turning our

6    attention to *State of North Carolina versus Henry Lee McCollum*

7    *and Leon Brown*.  Those are file numbers 83 CRS 15506 through

8    507 and the Cumberland County file number 91 CRS 40727, in

9    regards to Mr. McCollum.  And as to Mr. Brown, file numbers 83

10   CRS 1522 and 1520 -- excuse me -- 15822 and 15823 and Bladen

11   County file number 92 CRS 2491 and 2492.

12                 All right.  There's been a Motion for Appropriate

13   Relief filed on behalf of each defendant.  I have received the

14   motions.  Well, first of all, Judge Floyd reviewed the MARs;

15   ordered today's evidentiary hearing.  I have reviewed the

16   motion, supporting briefs, and the State's response as to the

17   motions.  And at this time, if everyone is ready to proceed,

18   I'll turn the matter over to the defense.

19                 MS. ALSTON:  First, Your Honor, we'd move to

20   have Defense Exhibits 1 through 43 admitted into evidence.  And

21   if I may approach, I can distribute your copy.

22                 THE COURT:  If you'll just identify yourself for

23   the record, please.

24                 MS. ALSTON:  I apologize.  Vernetta Alston on

25   behalf of Henry McCollum.

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 7 of 140

1          THE COURT:  All right.  Yes, ma'am.  You may

2  approach.  All right.  And moving to introduce those at this

3  time?

4          MS. ALSTON:  I'm sorry, Your Honor?

5          THE COURT:  You're moving to introduce all at

6  this time or?

7          MS. ALSTON:  Correct, and I can read those into

8  the record.

9          THE COURT:  Okay.  And let you proceed.

10          MR. BRITT:  For the record, there's no

11  objection.

12          THE COURT:  Okay.  Thank you, sir.

13          MS. ALSTON:  Exhibit 1 is the 1984 trial

14  transcript in *State versus McCollum and Brown*.  Exhibit 2 is

15  the 1991 transcript in *State versus Henry McCollum*.  2A is an

16  excerpt of the 1991 trial transcript in *State versus McCollum*.

17  Exhibit 3 is the 1992 trial transcript of *State versus Brown*.

18  Those exhibits are contained on the disc behind Tab 1.  3-A is

19  the 1991 suppression hearing transcript in *State versus Brown*.

20  Exhibit 4 is a crime scene sketch by SBI Agent Leroy Allen.

21  Exhibit 5 is the September 28th, 1983, signed statement of

22  Henry McCollum.  Exhibit 6 is the September 28th, 1983, signed

23  statement of Leon Brown.  Exhibit 7 is the September 30th,

24  1983, interview report related to Louis Moore.  Exhibit 8 is

25  the December 6th, 1983, interview -- investigation report

*State v. Henry McCollum and Leon Brown*

1 related to Darryl Suber.  September 6th -- excuse me.  Exhibit

2 9 is a 1984 transcript excerpt that contains the testimony of

3 Geraldine Brown.  Exhibit 10 is the Sabrina Buie autopsy

4 report.  Exhibit 11 is a September 27th, 1983, statement of

5 Henry McCollum.  Exhibit 12 is the 1984 excerpt of Garth

6 Locklear's testimony.  Exhibit 13 is the 1982 testimony of

7 Garth Locklear.  Exhibit 14 is the September 28th, 1983,

8 statement of Ethel Furmage.  Exhibit 15 is an October 3rd,

9 1983, statement of Ethel Furmage.  Exhibit 16 is a crime scene

10 report drafted by Agent Leroy Allen.  Exhibit 17 is an aerial

11 photo of Red Springs.  Exhibit 18 is the January 26th, 2005,

12 LabCorp report.  Exhibit 19 is the December 31st, 2010, LabCorp

13 report.  Exhibit 20 is an August 1st, 2011, LabCorp report.

14 Exhibit 21 is a May 21st, 2014, Cellmark report.  Exhibit 22 is

15 a July 10th, 2014, report of a CODIS hit.  Exhibit 23 is a July

16 29th, 2014, Cellmark report.  Exhibit 24 is a forensic testing

17 chart generated by the Innocence Inquiry Commission.  They have

18 today delivered an updated version of that report which is in

19 the front pocket of that notebook.  So, it should replace that.

20            THE COURT:  Okay.

21            MS. ALSTON:  Exhibit 25 is a video of Red

22 Springs.  Exhibit 26 is a copy of the *State versus Roscoe Artis*

23 North Carolina Supreme Court opinion.  Exhibit 27 is an August

24 26th, 2014, memo generated by the Commission related to Roscoe

25 Artis.  Exhibit 28 is an SBI record of the fingerprint testing

*State v. Henry McCollum and Leon Brown*

1 request for Roscoe Artis and L.P. Sinclair.  Exhibit 29 are

2 police interviews and polygraph results for L.P. Sinclair.

3 Exhibit 30 is the 1993 North Carolina Supreme Court opinion in

4 *State versus McCollum*.  Exhibit 31 is a transcript excerpt from

5 the 1991 trial in *State versus McCollum* for Judge Carmical.

6 Exhibit 32 is a 1995 memo on the status of law enforcement

7 files.  Exhibit 33 is an August 31st, 2010, letter from Captain

8 Kevin Locklear.  Exhibit 34 is the October 5th, 2012, signed

9 affidavit of Sonny Craig.  Exhibit 35 is a 2014 affidavit by

10 Adam Stein.  Exhibit 36 is a 2014 affidavit from Marshall

11 Dayan.  Exhibit 37 is a report listing statistics on the Roscoe

12 Artis DNA hit.  Exhibit 38 is the August 29th, 2014, Cellmark

13 report.  Exhibit 39 is the November 6th, 2004, consent order

14 for DNA testing in *State versus McCollum*.  Exhibit 40 is the

15 1991 Issues and Recommendations Form in *State versus McCollum*.

16 Exhibit 41 is a map, a Google map of the crime scene area.

17 Exhibit 42 is a June 18th, 2010, order to preserve and produce

18 evidence.  And Exhibit 43 is an October 21st, 2010, order for

19 the production of law enforcement files.

20          THE COURT:  All right.

21          MS. ALSTON:  And also --

22          THE COURT:  And each of those exhibits are

23 allowed into evidence without objection.

24             (DEFENDANT'S EXHIBITS NUMBER 1-43

25             RECEIVED INTO EVIDENCE.)

*State v. Henry McCollum and Leon Brown*

1          All right.  And any additional evidence to be

2  presented by the defense?

3                    MS. ALSTON:  Yes.  We will call Sharon Stellato.

4                    THE COURT:  All right.  And, ma'am, if you'll

5  step up, please.  Do you mind being sworn or would you rather

6  affirm?

7                    THE WITNESS:  I don't mind being sworn.

8                    (WHEREUPON,

9                    **SHARON STELLATO**

10  WAS CALLED AS A WITNESS, DULY SWORN, AND TESTIFIED AS FOLLOWS:)

11                    THE COURT:  Step around and have a seat.  You

12  may proceed when ready.

13                    <u>DIRECT EXAMINATION</u>                    10:19 AM

14          BY MS. ALSTON:

15     Q.   Good morning, Ms. Stellato.

16     A.   Good morning.

17     Q.   Could you state your name for the record?

18     A.   Sharon Stellato.

19     Q.   And where do you work, Ms. Stellato?

20                    COURT REPORTER:  Would you spell your name,

21  please?

22                    THE WITNESS:  Sure.  S-T-E-L-L-A-T-O.

23          BY MS. ALSTON:

24     Q.   Where do you work?

25     A.   The North Carolina Innocence Inquiry Commission.

*State v. Henry McCollum and Leon Brown*

1    Q.   How long have you worked with the Innocence Inquiry

2    Commission?

3    A.   Six years.

4    Q.   And what's your position with the Innocence

5    Commission?

6    A.   Associate director.

7    Q.   And in your six years with the Innocence Commission,

8    roughly how many cases have you reviewed?

9    A.   Approximately a thousand.

10   Q.   What exactly is the Innocence Inquiry Commission?

11   A.   The Commission is an independent neutral and

12   fact-finding State agency that's charged with investigating and

13   evaluating postconviction claims of actual innocence.

14   Q.   And how was the Innocence Commission established?

15   A.   We were created by General Assembly in 2006.  Our

16   statute is North Carolina General Statute 15A-1460 through

17   1475.

18   Q.   And does the Commission -- the Innocence Commission

19   -- operate under the authority of any other State agency or

20   office?

21   A.   No, we are an independent government agency.  We do

22   not represent the State, and we do not represent the claimant.

23   Q.   Just to clarify, what is the purpose of the Innocence

24   Commission?

25   A.   To investigate and review credible, verifiable claims

*State v. Henry McCollum and Leon Brown*

1  of factual innocence that have not been previously heard by a

2  judge or a jury.

3      Q.   How does someone apply to the Innocence Commission?

4      A.   Under 15A-1467 the Commission can receive a claim

5  directly from a claimant or a claim can be referred by a court,

6  a state or local agency, or claimant's counsel.

7      Q.   Can you describe for us how a claim progresses with

8  the Commission --

9      A.   Sure.

10     Q.   -- once it's established?

11     A.   Once a claim is received, the Commission will send a

12  claimant a questionnaire and a consent form.  We then wait

13  until those forms are received.  At that time the Commission

14  staff will pull public records and review all those documents

15  together to create a case memo.  That case memo and entire file

16  is then reviewed in detail by either myself or our Executive

17  Director and a decision is made about whether or not the case

18  meets statutory criteria.  If it does meet statutory criteria

19  after that initial review, it's assigned to a staff member for

20  either further review, investigation, or formal inquiry, and

21  those are all different stages.

22          During further review the Commission staff is

23  gathering documents that are public record and reviewing them.

24  During investigation the staff is in the field.  This often

25  means witness interviews, testing evidence, obtaining law

*State v. Henry McCollum and Leon Brown*

1  enforcement and prosecutorial files.  And then during the

2  formal inquiry phase, that's defined by statute at the point in

3  which the Commission has a claimant waive their procedural

4  safeguards and privileges, the claimant has a right to counsel,

5  and the crime victim is then notified.

6       During each phase of review the case is considered by

7  the director and/or myself, and a determination is made at that

8  point whether it continues to meet the statutory requirements.

9  If it does not -- a case meet the criteria, the case is closed.

10     Q.   And what are some typical reasons why a claim might

11 be rejected by the Innocence Commission?

12     A.   If the claimant is not living, if they're not

13 convicted of a felony in the State of North Carolina; if

14 they're not asserting complete factual innocence -- for

15 example, if they were claiming some responsibility, like an

16 accessory; if the evidence had already been presented at trial,

17 available at plea, or heard on an MAR; or if the new evidence

18 is not credible or verifiable.

19     Q.   And approximately how many claims are initiated with

20 the Innocence Commission each year?

21     A.   On average 237 claims a year.  We've had 1,661 since

22 we began.

23     Q.   So, you've described the Commission's work generally,

24 so I want to turn specifically to Leon Brown's case.  In 2009

25 Leon Brown wrote the Commission and a claim was initiated in

*State v. Henry McCollum and Leon Brown*

1   his case.  In that -- in that time what has your role been in

2   that investigation?

3       A.    I've been lead investigator on the case.  That means

4   that I've been the one conducting interviews, the field

5   investigation, obtaining and reviewing the files; working with

6   law enforcement, state agencies, government agencies, defense

7   attorneys; locating evidence; managing DNA testing.

8       Q.    And as of right now what stage is Mr. Brown's case at

9   with the Innocence Commission?

10      A.    It is in formal inquiry.

11      Q.    Could you explain what that means for Mr. Brown

12  specifically?

13      A.    Mr. Brown has waived all of his procedural safeguards

14  and privileges, including confidentiality.  He has a right to

15  counsel and has been assigned counsel.  He has agreed to full

16  disclosure during the process, and the victim's family has been

17  notified of the Commission's procedure.

18      Q.    And generally, of the 1,661 total Innocence

19  Commission claims, what percentage of those are accepted for

20  this formal inquiry stage?

21      A.    Approximately one percent.  Right now it's 1.08

22  percent of the Commission's cases are in formal inquiry.

23      Q.    And what are the specific criteria for accepting a

24  case for formal inquiry?

25      A.    There's a two-part decision-making process.  It does

*State v. Henry McCollum and Leon Brown*

1  require a judgment call.  The first part of the decision

2  question is, are the unique powers of the Commission required

3  in order to properly complete the investigation and/or is the

4  current review or investigation starting to uncover new

5  evidence of innocence that wasn't previously heard by a judge

6  or a jury?

7      Q.    And why -- specific to Mr. Brown, why did the

8  Innocence Commission select his case for formal inquiry?

9      A.    It was moved into formal inquiry in 2010.  Mr. Brown

10  wrote the Commission in 2009.  After it was assigned to me and

11  I did an initial review in the case, I met with our Executive

12  Director, and that decision was based on the Commission's

13  review of the case, the inconsistencies that were in Brown and

14  McCollum's statements to police, and as well as our decision to

15  pursue DNA and forensic testing in the case.

16      Q.    And at the time that you made the decision to move

17  Mr. Brown's case into formal inquiry, were you aware of what

18  the State's theory of this case had been at trial?

19      A.    Yes, we were.

20      Q.    Could you tell us what that theory was?

21      A.    The State's theory was that there were five boys,

22  Henry McCollum, Leon Brown, Chris Brown, Darryl Suber, and

23  Louis Moore, and that they had lured the victim into a field;

24  that the killer had smoked a cigarette at the crime scene and

25  raped and murdered the victim, suffocating her by forcing the

*State v. Henry McCollum and Leon Brown*

1  panties down her throat and then dragged her body across the

2  field.

3      Q.   And was that theory consistent with the evidence in

4  this case?

5      A.   No.

6      Q.   And you said that there were inconsistencies in

7  Mr. Brown and Mr. McCollum's statement.  Mr. McCollum's

8  statement has been admitted as Exhibit 5 and Brown's is Exhibit

9  6.  So I'd like you to walk us through, first, the

10 inconsistencies between those two statements and the evidence

11 in this case, and I'd like you to -- you mentioned the name

12 Louis Moore.  I'd like you to start with that and tell us why

13 that name is significant here.

14     A.   Okay.  Mr. McCollum on page 1, the second paragraph

15 of his confession mentions Louis Moore.  Louis Moore's mother

16 was interviewed by police.  Louis Moore lives in Kentucky with

17 his grandmother at the time and had been there since June and

18 was in school in Kentucky.  So, he could not have participated

19 in the crime.

20     Q.   Earlier you also mentioned the name Darryl Suber; can

21 you explain why that name is significant?

22     A.   Sure.  Also on page 1 in the second paragraph it

23 talks about Darryl Suber and Chris Brown went and got some

24 Schlitz beer.  Darryl Suber was a friend and the cousin of the

25 victim.  He was interviewed by police on September 26th.  He

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 17 of 140

1  stated to police that he found -- that he had seen the victim

2  on the afternoon that she went missing.  On the night that he

3  -- the victim went missing, he stated he was in Maxton, North

4  Carolina, that evening.

5      Q.   Was Mr. Suber interviewed again?

6      A.   Yes, he was interviewed again on September 28th,

7  1983.  His statement was consistent.  He stated that he

8  returned to Red Springs at 11:00 p.m. and that he was woke by

9  his parents at approximately 3:30 a.m. that night; they were

10  looking for the victim.

11      Q.   Does Mr. McCollum's statement mention anything about

12  -- or excuse me.  In the interviews with Darryl Suber on

13  September 28th, is it noted what he smoked and drank?

14      A.   Yeah.  They asked McCollum in this interview what

15  brand of cigarettes he smoked, and he answered Salem Lights.

16  Mr. McCollum answered Salem Lights.

17      Q.   Mr. Suber?

18      A.   Excuse me.  Mr. Suber answered Salem Lights, and what

19  kind of beer he drank, and he answered Budweiser.

20      Q.   And can you just briefly explain why those -- the

21  brand of cigarettes and the brand of beer is significant?

22      A.   Sure.  These are different than the brands that were

23  named in McCollum's statements.  In McCollum's statements the

24  brands that were named were Newport cigarettes and Schlitz

25  beer, and also McCollum had named Darryl Suber as the one who

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 18 of 140

1  was smoking the Newport cigarette.

2      Q.    Could you continue explaining why Mr. McCollum's

3  implication of Darryl Suber isn't consistent with the evidence

4  in this case?

5      A.    Sure.    He was again interviewed on September 29th

6  after Mr. McCollum had implicated Suber.    At that time he was

7  polygraphed and his home was searched, with negative results.

8  Mr. McCollum had stated that there was blood on Suber's

9  clothing.    The police never located this clothing.    The

10  Commission interviewed Mr. Suber in Texas on February 19th,

11  2014.    At that time Mr. Suber consented to a DNA sample, and we

12  later tested the cigarette against Mr. Suber, and he did

13  not match.

14          During that interview Mr. Suber also stated he was in

15  another town on the night of the crime and he was with other

16  people.    Suber stated that he did not think Brown and McCollum

17  did the crime because they had all lived in the same

18  neighborhood together.

19      Q.    Was Darryl Suber's alibi that he was in another town

20  corroborated by other witnesses?

21      A.    Yes, during the original investigation.

22      Q.    Aside from who participated, did you find any

23  inconsistencies between Mr. McCollum's statement and the

24  physical evidence in this case?

25      A.    Yes, we did.

*State v. Henry McCollum and Leon Brown*

1    Q.   What inconsistencies did you find related to the

2  victim, Sabrina Buie's, underwear?

3    A.   Mr. McCollum's statement, page 3, he refers to

4  Sabrina Buie's underwear as pink panties.

5    Q.   And what does the autopsy report in this case reveal

6  about the color of Sabrina's underwear?

7    A.   That her panties were white nylon.

8    Q.   Were there additional inconsistencies related to a

9  knife being found at the scene?

10    A.   Yes.  On page 3 of Mr. McCollum's confession, it

11  states that Darryl Suber had brought a knife and that he had

12  stabbed the victim.

13    Q.   And how was that fact inconsistent with the physical

14  evidence in this case?

15    A.   The autopsy report, the medical examiner did not

16  identify any stab wounds on the victim's body.

17    Q.   I want to move from Mr. McCollum's statement to

18  Mr. Brown's statement.  In Mr. Brown's statement it says that

19  he confessed to his sister, Geraldine Brown.  Were you able to

20  investigate whether or not Leon did, in fact, confess to

21  Geraldine Brown?

22    A.   Yes.

23    Q.   And based on that investigation were there

24  inconsistencies related to that part of the statement and the

25  evidence?

*State v. Henry McCollum and Leon Brown*

1     A.    Yes.

2     Q.    Can you explain?

3     A.    Ms. Brown testified at the 1984 trial for both

4  McCollum and Brown.

5     Q.    It's at Exhibit 9.

6     A.    Excuse me?

7     Q.    I'm sorry.  It's at Exhibit 9.

8     A.    Thank you.  And she stated that neither Brown or

9  McCollum had made any statements to her that implicated them in

10  the Sabrina Buie murder.

11    Q.    Again, were there further inconsistencies between

12  Mr. McCollum's and Mr. Brown's statements between those two?

13    A.    There were inconsistencies related to the initial

14  encounter of where the boys met up with Sabrina Buie, how the

15  events actually took place, where the victim's body was

16  disposed of, how it was disposed of, the evidence at the crime

17  scene, and who participated in the crime.

18    Q.    Could you first describe the inconsistencies between

19  these statements and -- these statements regarding the initial

20  encounter between the boys and Sabrina starting with

21  Mr. McCollum's statement, page 1?

22    A.    On McCollum's statement, page 1, it reads that

23  Sabrina and Darryl Suber came out of his house together and

24  that they walked toward McCollum on Richardson Street.

25  However, on Leon Brown's statement it states that Leon Brown

*State v. Henry McCollum and Leon Brown*

1  met Henry McCollum, Chris Brown, and Darryl Suber out in front

2  of his home.

3      Q.   Were there additional inconsistencies related to the

4  planning and -- of the rape and the murder?

5      A.   Yes.

6      Q.   Could you describe those, starting with Mr. Brown's

7  statement?

8      A.   On page 2 of Leon Brown's statement, Darryl Suber

9  states, quote, "We're going to get Sabrina and rape her, and

10  we're going to kill her after we rape her," while on McCollum's

11  statement, page 1 and 2, it describes the boys as planning to

12  rape Sabrina, but there's no talk of murdering her until later.

13      Q.   And could you just restate again the inconsistencies

14  between the two statements as to who was involved in Sabrina's

15  rape and murder?

16      A.   Henry McCollum mentions Louis Moore.  Leon Brown does

17  not mention Louis Moore.

18      Q.   You also mention that the evidence referenced in the

19  statements differed; can you describe those differences,

20  starting with the reference to the plywood board in

21  Mr. McCollum's statement?

22      A.   Yes.

23      Q.   On page 2 of Exhibit 5?

24      A.   Henry McCollum's statement mentions that Darryl Suber

25  and Chris Brown picked up a board and they carried it into the

*State v. Henry McCollum and Leon Brown*

1  woods.  Leon Brown's statement does not mention a board.

2      Q.   Were there other instances related to beer cans?

3      A.   Yes.

4      Q.   Can you describe those, starting with Mr. McCollum's

5  statement?

6      A.   Uh-huh.

7      Q.   Page 1.

8      A.   On pages 1 and 2 of Henry McCollum's statement, he

9  states that Chris Brown and Darryl Suber got a six-pack of

10  Schlitz beer and that they later drank the beer with Sabrina

11  Buie.  Leon Brown's statement does not mention any beer.

12      Q.   Were there additional inconsistencies in how Sabrina

13  was suffocated?

14      A.   Yes.  Henry McCollum's statement states that Chris

15  Brown put a stick down Sabrina Buie's throat with her panties

16  on the end of the stick.  Leon Brown's statement does not

17  mention a stick.

18      Q.   Were there additional inconsistencies in how the

19  statements described how Sabrina's body was disposed?

20      A.   Yes, on McCollum's statement, page 3, he states that

21  Sabrina -- Sabrina Buie's body was dragged across a field.

22  Leon Brown's statement is that Sabrina's -- Sabrina Buie's body

23  was picked up and moved across the field.

24      Q.   And related to the statement, Mr. Brown's statement,

25  that the boys picked Sabrina up and carried her across a field,

*State v. Henry McCollum and Leon Brown*

1  was that statement consistent with the physical evidence?

2      A.   No, the autopsy report indicates that Sabrina Buie's

3  body had been dragged.  In addition, the law enforcement notes

4  indicate that there were drag marks in the field where the body

5  was located.

6      Q.   So, I will direct you to Exhibit 10, which is Sabrina

7  Buie's autopsy report, and it's going to be posted on the

8  screen as well.  Could you describe the markings that are noted

9  on the back of Sabrina Buie's body?

10     A.   The marks indicate shallow linear scratches and

11 abrasions.

12     Q.   And what did the Medical Examiner then report about

13 those scratches and abrasions?

14     A.   It states that the scratches were consistent with

15 being dragged along the field -- along the ground.  Excuse me.

16     Q.   And finally, you described inconsistencies related to

17 the beer cans; were there additional inconsistencies related to

18 a cigarette butt?

19     A.   Yes.  Henry McCollum says that Darryl Suber smoked a

20 Newport cigarette.  Leon Brown's statement does not mention any

21 cigarette.

22     Q.   On what day did this crime take place?

23     A.   September 24th, 1983.

24     Q.   And Mr. McCollum and Mr. Brown both signed their

25 statements four days later on September 28th?  29th?

*State v. Henry McCollum and Leon Brown*

1      A.   Correct.

2      Q.   Based on your investigation of these two statements,

3  could you describe the circumstances of Mr. Brown's September

4  28th interview with law enforcement?

5      A.   Sure.  SBI Agents Leroy Allen and Ken Snead as well

6  as Red Springs Police Detective Ken Sealey went to McCollum's

7  home at 104 Malpass Street.  They interviewed him there for

8  approximately 10 to 15 minutes.  They then took him to Red

9  Springs Police Department.  That was approximately 9:10 p.m.

10 The interview began at 9:20.  At that time Snead requested

11 fingerprints and McCollum consented.  Snead then reduced

12 McCollum's statement to writing after McCollum gave two oral

13 statements.  After the statements McCollum started to leave and

14 was told by Snead that he was under arrest.  The entire process

15 ended at 1:37 a.m.

16     Q.   And how old was Mr. McCollum at the time that he gave

17 the statement?

18     A.   19.

19     Q.   Now, moving to Mr. Brown.  Mr. Brown was also

20 questioned that night?

21     A.   Correct.

22     Q.   Can you describe the circumstances of his interview

23 with law enforcement?

24     A.   He was interviewed by Detective Garth Locklear of the

25 Robeson County Sheriff's Department, who was on duty that

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 25 of 140

1  night.  Locklear took a statement from Leon Brown.  They went

2  into a room at 2:35 a.m.  He took an oral statement and then

3  reduced that statement to writing.  Red Springs Police

4  Department Chief Haggins was also present.  Detective Locklear

5  wrote the statement while Leon Brown sat next to him.

6  Detective Locklear read the statement line by line asking Brown

7  if each line was correct.  There was then a second statement

8  taken by Detective Locklear regarding what Brown told his

9  mother about the crime.  That statement was also reduced to

10 writing.

11     Q.   And how old was Mr. Brown at the time that he gave

12 the statement?

13     A.   15.

14     Q.   During your investigation did you find any indication

15 that either Mr. McCollum or Mr. Brown were interviewed before

16 the September 28th interview?

17     A.   Mr. McCollum was interviewed by Detective Garth

18 Locklear on September 27th, 1983.

19     Q.   And in that interview what does Mr. McCollum say

20 about Sabrina Buie?

21     A.   He says, quote, "The only time he saw Sabrina

22 Saturday she was walking to the Short Stop, and it was around

23 12:00 noon."

24     Q.   Now, Garth Locklear, Deputy Garth Locklear, who took

25 that -- who conducted that interview -- testified at these

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 26 of 140

1  trials?

2      A.   Correct.

3      Q.   Did he mention the September 27th interview of Mr.

4  McCollum?

5      A.   During his testimony?

6      Q.   During his testimony.

7      A.   No.

8      Q.   Did anyone mention this prior September 27th

9  interview of Mr. McCollum?

10     A.   During their testimony?

11     Q.   During their testimony.

12     A.   No.

13     Q.   So, no one said anything about Mr. McCollum's prior

14  September 27th statement to Garth Locklear during -- during

15  their trial testimony?

16     A.   No.

17     Q.   So, can you explain why; why did the -- why did law

18  enforcement question Henry a second time?

19     A.   After the September 27th interview?

20     Q.   Right.

21     A.   Agent Snead and Detective Sealey received Henry

22  McCollum's name from a confidential informant that they had

23  interviewed on September 28th, 1983, at approximately 6:20 p.m.

24     Q.   And that's the next day?

25     A.   Correct.

*State v. Henry McCollum and Leon Brown*

1     Q.    And who was that confidential informant?

2     A.    Ethel Furmage.

3     Q.    And what did Ms. -- so, Ms. Furmage's statement is at

4  Exhibit 14; could you read what Ms. Furmage told the officers

5  that day?

6     A.    Sure.  Furmage stated she heard that Geraldine

7  Brown's brother, Buddy, from New York, was the man that killed

8  Sabrina.  Furmage stated she heard that Buddy tried to rape

9  Juliette McRae this summer -- last summer.  Furmage further

10 stated that she heard that Buddy killed the girl, and she heard

11 this at school.  Furmage further stated that she had seen

12 Sabrina and Buddy talking last summer and that she also heard

13 that David Murray and Chris Brown had something to do with

14 Sabrina's death.

15    Q.    I'll stop you there.  In that first interview, this

16 interview that Ethel Furmage gave to law enforcement, does she

17 say who at school she heard this from?

18    A.    No.

19    Q.    And how old was Ethel Furmage at the time she gave

20 that interview?

21    A.    17.

22    Q.    After she gave that interview on September 28th, was

23 Ethel Furmage interviewed a second time?

24    A.    Yes.  On October 3rd, 1983.

25    Q.    And who conducted that interview?

*State v. Henry McCollum and Leon Brown*

1    A.    Agents Lee Parker -- excuse me.  Lee Sampson and Dan

2  Parker of the SBI.

3    Q.    So, that interview is at Exhibit 50.  Could you read

4  the second full paragraph that starts at the bottom of page 1

5  and goes over to page 2?

6    A.    When Furmage talked with other law enforcement

7  officers on a prior date, she did not have any personal

8  knowledge that Henry Lee McCollum was involved in the crime in

9  question, and she had not received any information that he was.

10 She suspected that he was involved because he was crazy, noting

11 that he just does not act right.  She noticed in the past that

12 he stares at people, mostly women, and that he rides up the

13 road on a bicycle looking.

14   Q.    Thank you.  Based on your investigation, is there any

15 indication that the evidence of these two interviews of Ethel

16 Furmage were introduced at any of the defendant's trials?

17   A.    No, not at trial.

18   Q.    And to clarify, Deputy Garth Locklear first

19 interviewed Mr. McCollum on September 27th?

20   A.    Correct.

21   Q.    And that interview was not introduced at trial?

22   A.    Correct.

23   Q.    So, after Ethel Furmage was first interviewed on the

24 28th, Mr. McCollum was interviewed again?

25   A.    Correct.

*State v. Henry McCollum and Leon Brown*

1    Q.    Who interviewed Mr. McCollum the second time?

2    A.    Agent Snead, Agent Allen, and Detective Sealey.

3    Q.    And who is Agent Leroy Allen?

4    A.    He is the SBI crime scene investigator.  He was.

5    Q.    So, was Agent Allen, in addition to being involved

6    with Henry's signed statement, was Agent Allen involved in this

7    case in any other way?

8    A.    Yes, he was.

9    Q.    Excuse me.  Can you explain?

10   A.    He was the mobile lab crime scene technician called

11   to the scene on the 26th, 1983.  He was called there

12   approximately 5:30, and he processed the crime scene.  He took

13   photographs of the victim, removed the jacket that was covering

14   her body, wrapped the body, and processed the physical evidence

15   that was collected in the crime scene.  He also prepared the

16   crime scene sketch.

17         On the 27th he also attended Sabrina's autopsy, and

18   on Wednesday the 28th he continued to search the wooded area

19   around the field, locating the victim's clothing.

20   Q.    Did he do anything else with the case?

21   A.    He collected specific items.  Would you like to know

22   what they are?

23   Q.    Not at this point.  So, after Agent Allen processed

24   the crime scene, he participated in Mr. McCollum's statement?

25   A.    Correct.

*State v. Henry McCollum and Leon Brown*

1     Q.   And Agent Allen also drafted a crime scene report

2  related to his work in this case?

3     A.   Yes, he did.

4     Q.   And based on that report were you able to determine

5  who first found Sabrina Buie's body?

6     A.   Yes, we were.

7     Q.   Can you tell us who that was?

8     A.   James Shaw, who was a family friend.

9     Q.   And what law enforcement officers were first involved

10 once James Shaw found Sabrina?

11    A.   Red Springs Police Officer Larry Floyd, followed by

12 SBI Agent Allen.

13    Q.   And that was on September 26th?

14    A.   Correct.

15    Q.   And Agent Allen's report not only contains that

16 information but also details of physical evidence that was

17 collected?

18    A.   As well as a crime scene sketch, correct.

19    Q.   So, going -- moving towards the physical evidence,

20 Exhibit 17 is an aerial photo of Red Springs.  Now, this was

21 introduced as an exhibit at trial without the markings.  And

22 was there trial testimony that this photo accurately reflected

23 the scene of the crime or at least reflected Red Springs at the

24 time that the crime --

25    A.   Yes.

*State v. Henry McCollum and Leon Brown*

1    Q.   -- was committed?  Can you use this photo to kind of

2 illustrate to us where the physical evidence was found by Agent

3 Allen?

4    A.   Well, I have the original trial exhibit with some

5 markings on it that might help.  If I can step down.

6              THE COURT:  Yes, ma'am.

7         BY MS. ALSTON:

8    Q.   If you want, there's also a laser pointer if you'd

9 like to point something out on the screen.

10    A.   We'll see how this works.  Okay.  Let's see how this

11 goes.

12    Q.   Okay.  Would you mind just pointing it so Judge

13 Sasser can view it?

14    A.   Oh, hi.

15              THE COURT:  I can see now.  Thank you.

16              THE WITNESS:  Would you like me to point out

17 physical evidence?

18         BY MS. ALSTON:

19    Q.   Right.  If you could first just let us know -- kind

20 of orient us to where we are.

21    A.   The area?  Okay.  This road right here is Old Maxton

22 Highway.  This pink dot is the convenience store.  This area

23 all through here is the field.  The green dot is where the

24 victim's body was located.  And then all of the other dots are

25 going to reference evidence or locations that I can go over.

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 32 of 140

1          This street running this way is Richardson Street,

2     and again, this is old Maxton Highway.

3          Q.   Okay.  Yeah, if you would now just walk through the

4     physical evidence and the locations?

5          A.   Okay.  I just have to refer to my notes.  Okay.

6     Where you see this tree line right here, this is actually a

7     ditch on the other side of the tree line.  So, there is a home.

8     That house that we'll talk about in a little while is Roscoe

9     Artis's home.  Then there's a tree line and a ditch and a

10    soybean field.  Again, that's where Sabrina Buie's body was

11    found.  This yellow dot is where a red hair bead and some drag

12    marks, dug area, was located at.  The hair bead was identified

13    as belonging to the victim.  This pink dot is where the

14    convenience store was located.  The light blue area is where a

15    plywood board; the beer cans; cigarette -- and I should say the

16    beer cans which were later compared and the victim's

17    fingerprint was found on one of the beer cans; the two sticks

18    with reddish brown stains; the cigarette butt; matches.

19          The purple dot is a shed.  Outside of the shed there

20    was a beer can.  Inside of the shed there was chewing gum -- a

21    chewing gum wrapper -- excuse me -- Vaseline and a brown paper

22    bag.

23          This blue dot is McCollum and Brown's home, and then,

24    this is just to illustrate where Sabrina Buie lived, a little

25    bit further over, but.

*State v. Henry McCollum and Leon Brown*

1      Q.    And I may have missed this, but did you point out the

2   plywood board?

3      A.    All of those are in the area of the light blue dot.

4   If you refer to the crime scene sketch, it gives you a little

5   bit -- you know, this is kind of a big photo, so they're all in

6   the same area.

7      Q.    Sure.  I do post that.

8      A.    Okay.

9      Q.    So, that's Exhibit 4.  So, if you would at the very

10  least point out where Sabrina's body was found?

11     A.    Sure.

12     Q.    In relation to the tree line.

13     A.    Sure.  So, her body was found right here.

14     Q.    What's the measurement noted?

15     A.    36 feet 9 inches.

16     Q.    From the tree line?

17     A.    From the tree line, which is a ditch.

18     Q.    Thank you.

19     A.    Right next to the tree line.

20     Q.    And what was the condition of Sabrina's body when she

21  was found in the field?

22     A.    According to the autopsy report she was very dirty.

23  She was wearing only a dirty beige bra that was fastened and

24  pulled up over her head, wrapped around her arms behind her

25  neck.  She had lacerations in her vagina and anus, linear

1  scratches and abrasions on entire back, back of arms, back of

2  legs, buttocks, apparently caused by being dragged.

3     Q.   And what does the autopsy report state about Sabrina

4  Buie's cause of death?

5     A.   It revealed the presence of panties and a stick,

6  which had apparently been forced down the decedent's throat and

7  lodged above the larynx where they obstructed the trachea and

8  caused suffocation.

9     Q.   So, kind of just to orient us, when in relation to

10 Henry -- excuse me -- Mr. McCollum and Mr. Brown's signed

11 statements was this evidence collected?

12    A.   The evidence was collected on the 26th and the 28th

13 prior to the statements.

14    Q.   And again, just to clarify your earlier testimony,

15 Agent Allen was involved in the evidence collection?

16    A.   Correct.

17    Q.   And then again in the recording of Mr. McCollum's

18 signed statement?

19    A.   Correct.

20    Q.   So, again, going back to the physical evidence.

21 Before the Commission got involved in Leon Brown's case in

22 2010, some forensic testing had already been conducted on some

23 of the physical evidence in this case?

24    A.   Yes.

25    Q.   Including a cigarette butt that was found; can you

*State v. Henry McCollum and Leon Brown*

1  explain why that cigarette butt was tested then?

2      A.    Sure.  One of the items that was tested at that time

3  was the Newport cigarette butt that was found near the

4  bloodstained sticks and the beer cans.  Based on the location,

5  the prosecution's theory was that one of the killers had

6  dropped or left the cigarette butt at the crime scene.

7      Q.    So, can you briefly explain the actual forensic

8  testing that took place, that was conducted on the cigarette

9  butt before 2010?

10     A.    In 2005 CDPL, who represented Henry McCollum, had the

11  cigarette butt tested pursuant to a court order that was

12  consented to with District Attorney Johnson Britt.  A partial

13  DNA profile was obtained from that cigarette butt.  The

14  partial profile was developed at seven locations.  The DNA

15  testing kit that was used was PowerPlex, which tested 14

16  locations.  And Henry McCollum was excluded as the source of

17  DNA at that time.

18     Q.    Now, could you -- now, the Commission also tested

19  that cigarette butt?

20     A.    Correct.

21     Q.    Could you walk us through the Innocence Commission's

22  testing of that cigarette butt, starting first in 2011?

23     A.    Sure.  But let me go back to 2010.

24     Q.    Please.

25     A.    For a second.  In 2010 the Commission had LabCorp

1  compare Leon Brown's DNA profile to the testing that had been

2  conducted by CDPL in 2005, and at that time Leon Brown was also

3  excluded from the cigarette.  Then in August of 2011 the

4  Commission had LabCorp reamplify the DNA extracts from the

5  testing that had been done by CDPL in 2005.  LabCorp

6  reamplified the extracts using a different testing kit called

7  Identifiler.  LabCorp then developed a partial profile at 11

8  locations.

9      Q.   And you mentioned the word reamplification; could you

10 just briefly explain what that means?

11     A.   I can try.  After DNA is extracted from a cell, it is

12 quantitated.  Quantitation tells an analyst how much human DNA

13 is present and how much male DNA is present.  After the DNA is

14 quantitated, it is then amplified.  Amplification is the

15 process of making multiple copies of the same DNA.  After

16 amplification, the DNA is separated, analyzed, and then

17 interpreted.  Reamplification is simply going back to the DNA

18 extracts and conducting the amplification again.  So, in other

19 words, making additional copies of the DNA for subsequent

20 testing.

21     Q.   Thank you.  Could you continue describing the 2011

22 testing of the cigarette butt?

23     A.   Sure.  The DNA kit -- the DNA kit that we used for

24 testing had 16 locations.  Leon Brown and Henry McCollum were

25 both excluded.  And at that time the Commission was informed by

*State v. Henry McCollum and Leon Brown*

1  LabCorp that the profile was likely not eligible for CODIS.

2      Q.   And what is CODIS?

3      A.   CODIS stands for the Combined DNA Index System, and

4  it's a State DNA database.

5      Q.   So, the cigarette butt was tested again in 2014;

6  could you walk us through the Innocence Commission's testing in

7  2014?

8      A.   Sure.  In May of 2014 we obtained Darryl Suber's

9  sample.  The Commission submitted that DNA standard of Darryl

10 Suber to Cellmark Forensics.  That was compared, and Suber was

11 excluded as a source of DNA from the cigarette.  Then in early

12 2014 the Commission began the process of attempting to get the

13 profile from the cigarette uploaded to CODIS.

14         In April of 2014 the North Carolina State Crime Lab

15 agreed to upload that profile.  The profile was uploaded to

16 CODIS in June of 2014, and it was only uploaded to the state

17 database because that was all it was eligible for.

18         On July -- in July of 2014 the Commission received

19 notification of a CODIS hit to Roscoe Artis.

20     Q.   Just to go back to the actual testing; that involved

21 STR testing?

22     A.   Correct.

23     Q.   Could you just briefly explain what that is?

24     A.   STR testing looks at the DNA that is found in the

25 nucleus of a cell.  It's the most discriminating type of DNA

*State v. Henry McCollum and Leon Brown*

1  testing because no two individuals, except for identical

2  siblings, have the same STR DNA profile.

3          A full STR profile will result in statistics that

4  state the probability of selecting an unrelated individual with

5  a DNA profile that is consistent with the DNA profile from an

6  evidentiary item is 1 in a number greater than the world's

7  population.  The world's current population is just over

8  7 billion.  If you were to get a partial STR profile, it may

9  give you lower statistics.

10     Q.   So, there was a CODIS hit on Roscoe Artis?

11     A.   Correct.

12     Q.   Why was Roscoe Artis's DNA profile in the CODIS

13  database?

14     A.   It was in there because he's been convicted of a

15  felony, and he's currently incarcerated in North Carolina, and

16  his DNA profile is in the databank.

17     Q.   And could you explain the process of obtaining the

18  DNA standard from Roscoe Artis?

19     A.   Sure.  After the CODIS hit came back, we interviewed

20  Roscoe Artis.  We went to visit Roscoe Artis at Warren

21  Correctional, and we requested that he voluntarily provide a

22  sample of his DNA.  He agreed to do so.  We took four oral

23  swabs from him, two for each kit.  One of those kits we sent to

24  the crime lab, the North Carolina State Crime Lab, on the same

25  day so that they could develop an STR profile from that swab to

1  compare directly to the cigarette butt.  Another one we sent to

2  Cellmark Forensics for Y-STR DNA testing.

3          We then requested that Cellmark conduct Y-STR testing

4  on the DNA extracts from the cigarette butt and also develop

5  the Y-STR DNA profile for Artis.  A partial Y-STR profile was

6  obtained from the cigarette butt extracts, and that Y-STR

7  profile was consistent with Roscoe Artis.  That partial profile

8  was developed at 11 locations.  The DNA testing kit that was

9  used was called Yfiler, and it tests 16 locations.

10  Q.   And you mentioned -- you described STR and you

11  mentioned Y-STR.  Could you just very briefly explain the

12  difference between the two and their significance?

13  A.   Sure.  Y-STR differs from STR testing in that it

14  looks at DNA that is found in males only.  It is paternally

15  inherited.  Therefore, every male in the same paternal lineage

16  should have the same Y-STR profile.  It's less discriminating

17  than STR DNA in that all males in the same paternal line would

18  have the same Y-STR DNA profile.

19  Q.   So, following the delivery of the DNA standards to

20  Cellmark and to the State Crime Lab, you sought additional

21  confirmation on that CODIS hit; what were the results of that

22  testing?

23  A.   At the Crime Lab the partial DNA profile obtained

24  from the cigarette butt is consistent with the DNA profile of

25  Roscoe Artis.  They used the term "is consistent with," and the

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 40 of 140

1  reason for that is the result of the world's population data

2  statistics did not -- it means that the result of the

3  population data statistics did not exceed the world's

4  population.  Therefore the term "match" cannot be used.

5      The probability of selecting an unrelated individual

6  with a DNA profile that is consistent with a partial DNA

7  profile obtained from the cigarette butt is approximately 1 in

8  25 billion in the North Carolina Caucasian population, 1 in

9  1.84 billion in the North Carolina black population, 1 in

10  12.6 billion in the North Carolina Lumbee Indian population.

11  And 1 in 89.9 billion in the North Carolina Hispanic

12  population.

13  Q.  And could you further explain the odds that the DNA

14  found on the cigarette butt belongs to anyone other than Roscoe

15  Artis?

16  A.  Sure.  The Commission was able to have Cellmark

17  Forensics calculate a statistic based on the results of both

18  the STR and the Y-STR testing.  The probability of selecting an

19  unrelated man who would match the two tests combined is 1 in

20  4.2 trillion for the African-American population.

21  Q.  Did Mr. McCollum or Mr. Brown mention Roscoe Artis in

22  their signed statements?

23  A.  No.

24  Q.  And again, just to clarify your earlier testimony, in

25  both Mr. Brown and Mr. McCollum's statements -- or in Mr.

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 41 of 140

1  McCollum's statement, who does that -- who does Mr. McCollum

2  state was smoking that Newport cigarette?

3      A.    Darryl Suber.

4      Q.    Now, going back to Mr. Artis.  Over the course of

5  your investigation have you learned more about Mr. Artis?

6      A.    Yes.  He's currently an inmate who's serving a life

7  sentence for an October 1983 rape and murder of Joann Brockman

8  in Red Springs, North Carolina.

9      Q.    And at the time of Sabrina Buie's murder in September

10 of 1983, where did Roscoe Artis live?

11     A.    He lived next door to the soybean field with his

12 sister, Pauline Smith.

13     Q.    If you don't mind, I'm going to repost the aerial

14 photo, Exhibit 17; can you just point out to us where --

15     A.    Uh-huh.

16     Q.    -- the arrow for Pauline Smith's house is in relation

17 to the body?

18     A.    It's on that little dot right there (indicating).  It

19 took one shot.  It's the arrow on the bottom there where you

20 have "Pauline" kind of cut off, but "Pauline Smith."

21     Q.    Okay.  Thank you.  During your investigation did you

22 have a chance to videotape the crime scene?

23     A.    Yes, we did.

24     Q.    And when did you do that?

25     A.    August 6th, 2014.

*State v. Henry McCollum and Leon Brown*

1      Q.    That video is at Exhibit 25, and it's now on the

2   screen.  Now, I moved it over about a minute into the video.

3   If you could just walk us through what we see.

4      A.    Okay.

5      Q.    So, starting with what we see now.

6      A.    Okay.  You're right at the edge of the soybean field

7   right now, and you're looking at the back of the convenience

8   store, Hardin's store.  So, those trees in the back, to the

9   back right, if you look on the diagram, that's actually where

10  many of the items were found -- the sticks, the cigarette, the

11  beer cans.  They were found to the back right of the field, and

12  if you look to the left, where it's playing right now, where

13  those trees are, that's where 37 feet in her body was found.

14  You can't really tell from this video and the overgrowth, but

15  on the left-hand side of the screen where those trees are,

16  that's where the ditch is, and then you're going to come across

17  the tree line.

18          On the other side of this tree line, the first house

19  that you come to right here is going to be Pauline Smith, her

20  former residence, and that is Roscoe Artis' place where he

21  was living.

22      Q.    I know you mentioned Roscoe Artis is currently

23  serving a life sentence for rape and murder; can you tell us

24  more about that particular conviction?

25      A.    Sure.  He was convicted for the rape and murder of

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 43 of 140

1  Joann Brockman.  Ms. Brockman was found dead behind a barn on

2  October 22nd, 1983, in Red Springs.  According to the appellate

3  opinion, Ms. Brockman was dirty and naked but for her bra and

4  her sweater which were pushed up above her chest.  The evidence

5  showed that Ms. Brockman had been beaten with a stick, that she

6  was sexually assaulted.  There was evidence that her body had

7  been dragged.  Her clothing was found in a different location,

8  and she died of suffocation due to manual strangulation.

9      Q.   And in that case based on the appellate opinion, what

10 evidence did the State rely on to tie Mr. Artis to Joann

11 Brockman's murder?

12     A.   Mr. Artis gave three statements, two of which were

13 confessions.  The police used blood found on Mr. Artis's

14 clothes that he confessed belonged to Ms. Brockman.  A witness

15 testified to seeing Ms. Brockman with Mr. Artis sitting under a

16 tree arguing on the night that she went missing, and another

17 witness testified that she heard Ms. Brockman call "help," I

18 believe three times.

19     Q.   And how old was Joann Brockman at the time of her

20 death?

21     A.   She was 20?  Approximately 20.  I would -- you would

22 have to refresh me on that.

23     Q.   Sure.  If you go to -- how old was Sabrina Buie at

24 the time?

25     A.   11.

1    Q.   And Joann Brockman was murdered less than a month

2  after Sabrina Buie was murdered?

3    A.   Is Ms. Brockman 18?  I'm sorry.

4    Q.   That's okay.

5    A.   I believe Ms. Brockman was 18.

6    Q.   Correct.

7    A.   I'm having a problem remembering that.  Could you

8  repeat your question?

9    Q.   Sure.  So, Joann Brockman was murdered less than a

10 month -- just less than a month after Sabrina Buie was

11 murdered?

12   A.   Correct.  On October 22nd, 1983.

13   Q.   And what law enforcement agencies were involved in

14 Ms. Brockman's case?

15   A.   The Robeson County Sheriff's Department.

16   Q.   And who specifically was the lead investigator in the

17 case?

18   A.   Detective Garth Locklear.

19   Q.   So, Deputy Locklear was involved in both Joann

20 Brockman's case and in Sabrina Buie's case?

21   A.   Correct.

22   Q.   After confirming the DNA profile, that the DNA

23 profile on the cigarette butt matched the DNA profile of Roscoe

24 Artis, did you investigate Mr. Artis's criminal background?

25   A.   Yes, we did.  We had already -- the Commission had

*State v. Henry McCollum and Leon Brown*

1  already interviewed Mr. Artis in 2011 based on the Joann

2  Brockman murder being so close in time and proximity to the

3  Sabrina Buie murder.  After the CODIS hit, myself and

4  investigator Sarah Riney conducted extensive investigation into

5  Mr. Artis and his criminal background.

6     Q.   And what records did you obtain related to Mr.

7  Artis's criminal background?

8     A.    Gastonia Police files, ASIS records, DCIN records,

9  law enforcement files, court records, District Attorney files,

10 DPS records, arrest records, appellate opinions.  In addition,

11 we also interviewed Mr. Artis four times as well as his family

12 and associates.

13    Q.   And do you have the records that you just listed with

14 you today?

15    A.   We do.

16         MS. ALSTON:  Your Honor, we just move for

17 Ms. Stellato to produce those records, just simply for the

18 purposes of her testimony, not to produce as exhibits.

19         THE COURT:  Any objection?

20         MR. BRITT:  No, sir.  It's my understanding she

21 has to be ordered by the Court to do so.

22         THE COURT: All right.  And I'll order those be

23 divulged for purpose of this hearing.

24         THE WITNESS:  Thank you.

25         BY MS. ALSTON:

*State v. Henry McCollum and Leon Brown*

1      Q.   Since we're relying on the information from those

2   records, can you describe Mr. Artis's criminal background,

3   starting with the 1957 conviction?

4      A.   Sure.  In 1957, July 1st -- excuse me -- January 1st

5   -- January 18th, 1957, Mr. Artis was convicted of assault on a

6   female with intent to commit rape.  He was found guilty at

7   trial in Hoke County.  The victim was Alma Edwards, and he was

8   sentenced to 12 to 15 years.

9          A witness testified that she saw the victim attempt

10  to rape -- excuse me -- she saw Mr. Artis attempt to rape the

11  victim -- excuse me.  Yeah, that's correct.

12     Q.   And according to that witness, was Mr. Artis acting

13  alone?

14     A.   Yes, he was.

15     Q.   Continue.

16     A.   On August -- from August 29th, 1967, Mr. Artis was

17  found guilty of assault on a female.  The victim was Maggie

18  Hall.  At the time of that assault he was out on parole.  That

19  was also -- he was also acting alone.

20     Q.   Do you have any details about that?

21     A.   In that specific case, a Sheriff Deputy had seen him

22  earlier in the day chasing the victim around a tree.  Later

23  that night, the victim was ran over with a car and beaten.

24  Both the victim testified that it was Mr. Artis, as well as the

25  Sheriff Deputy stated that -- that earlier in the day he had

*State v. Henry McCollum and Leon Brown*

1  seen Mr. Artis chasing the victim.

2      Q.   Did he say what he -- did he have a weapon when he

3  was chasing the victim?

4      A.   According to Mr. Artis, the victim had a knife, and

5  he claims that he had a stick.

6      Q.   Could you continue, going to the 1970 assault, or

7  whatever is next?

8      A.   Uh-huh.  Sure.  On October 17th, 1970, he was charged

9  with two assaults on a female, unknown victim, and that was

10 either -- that was in Gaston County.  Further information is

11 unknown.

12         The next assault on a female, the date and the victim

13 are also unknown.  This came from a police report as well as an

14 interview with Mr. Artis, and he references picking up a

15 prostitute in Mecklenburg County and, rather, that the

16 prostitute got into his vehicle and attempted to assault him

17 with a knife, that he struck the prostitute, tried to get her

18 out of his vehicle, that she pulled out the knife and that she

19 was cut in the process.  The next morning when he woke up, he

20 found blood all over the side of his car.  The victim is

21 unknown, and it's not clear if she reported the incident or

22 not.

23     Q.   What's the next assault?

24     A.   The next one is on December 14th, 1974.  The victim

25 is Billie Ann Woods, and he was found guilty of assault with

1  intent to commit rape.  That was in Gaston County.

2      Q.   And could you just summarize what happened to Billie

3  Woods, and then I'll ask you to read the portion of the

4  appellate opinion in the case.

5      A.   Ms. Woods was 16 years old.  Artis tried to take her

6  into the woods.  She refused, and he began choking her and

7  threatened to kill her.  He was stopped by someone else who was

8  a witness there.  Again, he acted alone in that assault.

9      Q.   Thank you.  So if you would, Billie Woods testified

10 in the Joann Brockman trial here in Robeson County, and a

11 portion of her testimony is included in Exhibit 26.  Could you

12 read that long paragraph on page 18 on the left side of the

13 page?

14     A.   Starting with, "Ms. Woods testified"?

15     Q.   Yes.

16     A.   Ms. Woods testified that at the time of the incident

17 she was 16 years old.  She related that on the way from her

18 parents' apartment to the store, she was approached by the

19 defendant, that he grabbed her from behind by the arm and told

20 her she was going to the woods with him.  She responded, "No, I

21 ain't."  The defendant insisted, "You're going to give me

22 some," and threw her to the ground, straddled her, put his

23 hands around her throat and started choking her.  Ms. Woods

24 testified that she started saying, "I will.  I'll go," but the

25 defendant continued to choke her saying, "No, I'm just going to

1  kill you now."  As long as she could breathe, Ms. Woods

2  recounted that she told the defendant she would accompany him

3  to the woods, hoping that he would believe her to be sincere

4  and let go of her.  The choking continued, however, and she

5  started to lose her breath, and she was convinced she was

6  dying.  A friend of her sister's walked by and spoke to the

7  defendant, prompting him to jump up and say to Ms. Woods,

8  "What's wrong with you, girl?  Are you crazy?"  As she ran

9  towards the store, Ms. Woods heard the defendant yell after

10  her, "Give me back my" -- "Give me my money back."  She

11  testified she had not that night or any other time received

12  money from the defendant.

13      Q.   Thank you.  Can you continue describing Mr. Artis's

14  past assaults against women after -- that occurred after the

15  Billie Woods incident?

16      A.   Sure.  According to the Brockman Court of Appeals

17  opinion, Artis was also charged with assault with a deadly

18  weapon in 1975.  The victim on that as well as the county is

19  unknown.

20      Q.   Go ahead.

21      A.   In our review of records from the Gaston -- Gastonia

22  Police file, in 1981 a woman named Renee Lipscomb stated that

23  Artis had assaulted her with a brick.  There was a warrant, but

24  no record of resolution in that case.

25      Q.   Do you have any -- do you know any details related to

*State v. Henry McCollum and Leon Brown*

1  -- oh, wait, I think -- excuse me.  Move forward to Bernice

2  Moss.

3      A.    Sure.  Bernice Moss was murdered on 8/25/1980.  She

4  was found nude except for her bra and shirt.  She was beaten

5  with a stick and found with an object in her throat.  This was

6  in Gastonia, North Carolina.  Mr. Artis was a suspect in that

7  murder.  He was questioned initially by police.  That case then

8  went cold.  A warrant was issued for Mr. Artis's arrest on

9  10/2/1984 for first-degree murder in that case.

10      Going back to the one that I just spoke to you about,

11  Renee Lipscomb, she was a witness against him related to the

12  Bernice Moss murder.  According to the report that she made

13  when she was attacked with the brick, it was related to her

14  testimony.

15      Linda Hicks, there's no known date on that; that was

16  actually information that was provided to us by Mr. Artis.  He

17  stated that this was a consensual sex case and that Linda Hicks

18  had a warrant issued for him for first-degree rape in Gaston

19  County.  The Commission was unable to find any information

20  about that.

21      Q.    Related to the Bernice Moss case, you mentioned that

22  the warrant was issued on October 2nd, 1984?

23      A.    October 2nd, 1984.

24      Q.    And just as a reference, that's about a week before

25  the McCollum and Brown trial in October 1984?

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 51 of 140

1    A.    Correct.

2    Q.    And can you just explain more about what happened

3    related to the Bernice Moss case?

4    A.    Sure.  During that time, Artis had fled to Red

5    Springs.  Shortly thereafter, he had been arrested for the

6    Joann Brockman murder.  The charges in the Bernice Moss murder

7    remained pending until 1990.  So, from the time the warrant was

8    issued in 1984 until 1990, according to Gastonia Police

9    Department Detective Michael Butts, the charges were dismissed

10   in 1990 by the District Attorney because Artis was on death row

11   for the murder of Joann Brockman.

12   Q.    Was Artis ever interviewed about his involvement in

13   the Bernice Moss murder?

14   A.    Yes.  He was the last person to see Bernice Moss.  He

15   was interviewed immediately after she was found, so immediately

16   after the homicide in 1980.  And then he was interviewed again

17   after his arrest for the Joann Brockman murder at the Lumberton

18   Jail.

19   Q.    And based on your investigation into all of these

20   past crimes against women or alleged crimes against women, have

21   you identified any similarities in those cases?

22   A.    Related to his crimes against women, there are

23   similarities in that the crime scenes are secluded outdoor

24   locations involving sexual assaults of a violent nature.  In

25   addition to that, there is no mention of other people being

1  involved in his crimes.

2      Q.    Excuse me.  And when was Mr. Artis convicted in the

3  Joann Brockman case?

4      A.    August 31st, 1984, in Robeson County.

5      Q.    And what sentence did he receive for those

6  convictions?

7      A.    Death, but it was later commuted to life.

8      Q.    And roughly how old was Mr. Artis at the time of the

9  Joann Brockman and Sabrina Buie murders?

10     A.    His early 40s.

11     Q.    Again, just as a reference point, you said that Mr.

12 Artis was convicted on October -- excuse me -- on August 31st

13 of 1984.  Mr. McCollum and Mr. Brown were then tried about two

14 months later?

15     A.    In October of 1984.

16     Q.    And was Roscoe Artis ever investigated in connection

17 with the Sabrina Buie murder?

18     A.    We don't have -- Red Springs Police Department there

19 is no law enforcement file that still exists, but there's no

20 mention of Mr. Artis in the SBI investigation file.  In the SBI

21 Crime Lab file there is a -- what's called a DCI form that was

22 located in that file that the Commission obtained.  That form

23 lists all of the fingerprint comparison requests that were

24 received by the Crime Lab from law enforcement agencies.  On

25 that form there's a field code that indicates either an S or a

1  V that indicates Suspect or Victim.  And on this form there is

2  an entry for a fingerprint comparison request to both Roscoe

3  Artis and L.P. Sinclair, and there is an S next to Roscoe Artis

4  and L.P. Sinclair indicating them both as suspects.

5      Q.   Is there any specific documentation of the request by

6  the Red Springs Police Department for the fingerprint

7  comparison against Artis or Sinclair?

8      A.   Yes.

9      Q.   Do you have those documents?

10     A.   Yes, I do.

11          MS. ALSTON:  Your Honor, we'd move for Ms.

12 Stellato to produce those documents, documents related to the

13 fingerprint comparison request.  And we also move for them to

14 be marked as Exhibit 44 and admitted into evidence.

15          And do you have copies?

16          THE WITNESS:  I do.

17          THE COURT:  Mr. Britt, any objection?

18          MR. BRITT:  No, sir.

19              (DEFENDANT'S EXHIBIT NUMBER 44

20              ADMITTED INTO EVIDENCE.)

21          THE COURT:  Allowed.

22          Let's do this, we're about an hour -- close to an

23 hour and a half into it.  Let's take about a 15-minute break

24 and let you have a chance to get everything together.  We'll be

25 at ease for 15 minutes.

*State v. Henry McCollum and Leon Brown*

1          (OFF THE RECORD AT 11:23 A.M.)

2          (MORNING RECESS.)

3          (ON THE RECORD AT 11:44 A.M.)

4          (DEFENDANTS AND ALL COUNSEL PRESENT.)

5          THE COURT:  You may continue.

6          MS. ALSTON:   Thank you.

7       BY MS. ALSTON:

8    Q.   Ms. Stellato, before the break you produced documents

9  related to fingerprint comparison requests for Roscoe Artis and

10 L.P. Sinclair.  It is now Exhibit 44.  When was the fingerprint

11 request of Roscoe Artis and L.P. Sinclair made by the Police

12 Department?

13   A.   October 5th, 1984.

14   Q.   And again, this is, for frame of reference, October

15 5th, 1984, was a couple of weeks before -- excuse me -- three

16 days before the trial of Henry McCollum and Leon Brown?

17   A.   Three days prior to their trial, correct.

18   Q.   And was the fingerprint comparison request on either

19 Roscoe Artis or L.P. Sinclair ever conducted?

20   A.   No.  If you look -- if you look at the documents.  I

21 handed you an entire file, but if you look at the tabbed

22 documents in that file.  They'll have green tabs on them.  The

23 request -- there's an SBI-5 dated October 5th, 1983, and

24 attached to that form are also fingerprints that were taken by

25 Red Springs Police Department Officer Edwards, also taken on

*State v. Henry McCollum and Leon Brown*

1  October 5th, 1983.  So, they were taken and submitted to the

2  Crime Lab on the same date.  Again, that request was from Red

3  Springs Police Department to the Crime Lab.

4      Q.   And just may I stop you?  You said '83, you meant

5  October of '84?

6      A.   I'm sorry.  Excuse me.  I meant '84.  If you continue

7  to go through some of those tabs, you'll see that there's no

8  record of the comparisons ever being done.  And on the printout

9  that you previously had access to, there's a handwritten note

10  that that request was canceled on October 5th, 1985, which was

11  a year later.  But in that file, on the very front of the file,

12  this was a file provided by the Crime Lab, the front of the

13  report folder, there are handwritten notes that says, "Print

14  out canceled October 5th, 1984.  No lab report testified in

15  court." So, in addition, what we know from this is that the

16  report was never done, and an agent testified in court related

17  to this.  Robert Duncan was the agent that testified in court

18  at McCollum and Brown's trial.

19      Q.   Explain more about what Duncan testified to

20  specifically.

21      A.   Duncan testified to conducting a fingerprint

22  comparison of the prints, nine latent lifts that were taken

23  from the beer cans at the crime scene.  Of those nine lifts,

24  two were of value.  Of the two that were of value, one from the

25  beer can was identified as belonging to the victim, Sabrina

1  Buie.  There was a remaining print of value that was compared

2  against Henry McCollum, Leon Brown, and all of the other

3  suspects and was never matched to any of them.  This is the

4  print that they were doing a comparison to on October 5th,

5  1984.

6      Q.  And can you identify for us who submitted the initial

7  request related to Artis and Sinclair?

8      A.  James Edwards from the Red Springs Police Department.

9      Q.  And could the fingerprint comparison against Roscoe

10 Artis and L.P. Sinclair have -- could that have been carried

11 out in 1984?

12     A.  If the request was made for the comparison in 1984

13 and had not been canceled in 1985, yes, it could have been

14 carried out.  If they -- if they did not have prints on file at

15 the time, which they did for L.P. Sinclair because they were

16 submitting them, they would have also had prints on file for

17 Roscoe Artis at that time, given the arrest -- his arrest

18 record as well as the fact that he was currently incarcerated

19 for the Joann Brockman murder.  Had they not had prints of

20 value, they could have taken them at that time.

21     Q.  And based on your review of the records -- you've

22 summarized Duncan's testimony -- did anyone testify at the

23 McCollum or Brown trials to the fingerprint comparison request

24 for Roscoe Artis or L.P. Sinclair?

25     A.  No.

*State v. Henry McCollum and Leon Brown*

1     Q.   And was the -- you referenced not only the SBI-5 form

2 for L.P. Sinclair, but the form, a printout from the SBI,

3 that's at Exhibit 28.  Were either of those included in the

4 District Attorney's file?  State's file?

5     A.   Not according to the District Attorney.  When we met

6 and disclosed that information, the District Attorney was not

7 aware -- the current District Attorney was not aware of it.

8     Q.   Now, these lift comparison requests also mention L.P.

9 Sinclair; who is L.P. Sinclair?

10     A.   L.P. Sinclair was acquainted with the defendants,

11 whose brother, Louis, dated their sister, Geraldine Brown.

12     Q.   And was L.P. Sinclair ever interviewed by law

13 enforcement in connection with the Sabrina Buie murder?

14     A.   Yes, he was interviewed two times as well as

15 polygraphed and testified at trial.

16     Q.   And can you just summarize what L.P. Sinclair

17 testified to?

18     A.   At trial, at McCollum and Brown's trial, he testified

19 that they were involved in Sabrina's death.

20     Q.   Did he testify at either Mr. McCollum or Mr. Brown's

21 retrials?  L.P. himself?

22     A.   No.

23     Q.   Why not?

24     A.   Because he was killed in 1990.

25     Q.   Was his testimony introduced in either Mr. McCollum

*State v. Henry McCollum and Leon Brown*

1 or Mr. Brown's retrials?

2      A.    In McCollum's 1991 trial.

3      Q.    And was there rebuttal testimony?

4      A.    There was.

5      Q.    Can you describe that?

6      A.    From L.P. Sinclair's former attorney, Judge Stanley

7 Carmical, testified that L.P. Sinclair was not truthful.

8      Q.    And again, to clarify, the fingerprint comparison

9 request was made three days before the start of Mr. McCollum's

10 and Mr. Brown's 1984 trial?

11     A.    To Roscoe Artis --

12     Q.    And L.P. Sinclair.

13     A.    -- and L.P. Sinclair, correct.

14     Q.    And that request identified L.P. Sinclair as a

15 suspect?

16     A.    Correct.

17     Q.    And then just days later, L.P. Sinclair testifies?

18     A.    Correct.

19     Q.    In the 1984 trial.  Do you know anything about L.P.

20 Sinclair's criminal record?

21     A.    I know that he has one.

22     Q.    And you mentioned that L.P. Sinclair was interviewed

23 twice in 1983.  What did L.P. Sinclair tell law enforcement

24 about Sabrina's murder in those interviews?

25     A.    During those interviews L.P. Sinclair told the police

*State v. Henry McCollum and Leon Brown*

1  that he didn't know anything about Sabrina Buie's murder.

2      Q.   Was Mr. Sinclair administered a polygraph

3  examination?

4      A.   After those two interviews, yes.

5      Q.   And can you summarize the results of that polygraph

6  examination?

7      A.   Yes, the result was -- result concluded that L.P.

8  Sinclair did not know anything about Sabrina's murder.

9      Q.   Was any evidence about the two interviews with L.P.

10  Sinclair in 1983 introduced -- let me rephrase.  Was there any

11  evidence based on L.P. Sinclair's interviews, where he says he

12  doesn't know anything about the murder, introduced at trial?

13      A.   No, because at that time L.P. Sinclair was -- had

14  changed his statement and was saying that he did.

15      Q.   I'm going to switch gears and talk a little bit about

16  your collection of the records and evidence in this case.  Now,

17  during your investigation you attempted to collect all the

18  evidence and all the files related to Leon Brown's case?

19      A.   Yes.

20      Q.   And what did -- do you have a way to do that?

21      A.   The Commission has authority to obtain records and

22  evidence.  Currently that's under statute 15A-1471, but at the

23  time that the Commission began its original investigation, it

24  was by court order.

25      Q.   Now, let's focus in specifically on your attempts to

*State v. Henry McCollum and Leon Brown*

1  collect files from the Red Springs Police Department.  Can you

2  describe your attempts to collect those records from the Red

3  Springs Police Department?

4       A.   Files and evidence?

5       Q.   Yes.

6       A.   In June of 2010 the Commission obtained a motion and

7  order to preserve and produce evidence from the Red Springs

8  Police Department.  I sent them that with a cover letter.  Then

9  in August of 2010 the Commission obtained a motion and order

10  for production of law enforcement files maintained by the Red

11  Springs Police Department.  This was also served on them.

12       November 12, 2010, I spoke with Captain Locklear at

13  the Red Springs Police Department.  He stated at that time that

14  their department had no physical evidence, files, or reports in

15  the case.  He also indicated that he had been in touch with SBI

16  at that time and that everything that their department had from

17  the investigation had been turned over to the SBI at the time

18  of their investigation.

19       On the next day, which was November 13, 2010, I

20  received a fax from Captain Locklear stating that he had

21  searched all evidence files and found no evidence retained by

22  their agency.  In addition, he stated that all reports were

23  turned over to the SBI in 1983 and they could not locate any

24  files related to the case.

25       During this time the Commission had obtained several

*State v. Henry McCollum and Leon Brown*

1  other files from various agencies.  There was a report from the

2  State Bureau of Investigation that noted in 1995, based on an

3  appeal filed by Henry McCollum, they had gone to the Red

4  Springs Police Departmart, and a box of evidence and documents

5  had been located there, and that they were instructed by the

6  Department of Justice to hold onto that.  Based on this, in

7  August of 2014 I made several calls to the Red Springs Police

8  Department with no response.

9      Q.    I'm going to stop you there.

10     A.    Sure.

11     Q.    For a brief moment.  So, just to summarize.  So, up

12 until -- you've moved to August of 2014.  Up until that point

13 the Red Springs Police Department has reported that they no

14 long -- they have not -- they don't have a file in the McCollum

15 and Brown cases?

16     A.    Correct.

17     Q.    Okay.  Please continue.

18     A.    Files or evidence.

19     Q.    Files or evidence.

20     A.    Correct.  After not receiving a response, we were in

21 Red Springs conducting an investigation and went in person.  At

22 that time we were going to request a search, a common practice

23 of the Commission if documentation differs from what an agency

24 may tell us.  At that time Captain Locklear reiterated that

25 there had been an audit done by the Red Springs Police

*State v. Henry McCollum and Leon Brown*

1  Department in 2010, and that the evidence was not there.  I

2  discussed with Captain Locklear the 1995 SBI report indicating

3  that at that time in 1995 there was a box of evidence and

4  documents at the Red Springs Police Department.  After some

5  discussion Captain Locklear agreed to search again, and he did

6  locate the box of evidence and documents, and the Commission

7  took possession of that.

8      Q.   And from that box that you retrieved just this year,

9  you retrieved physical evidence and documentary evidence?

10     A.   Correct.

11     Q.   Of the evidence, the physical evidence that you

12 collected, including the cigarette butt, you tested multiple

13 items of evidence?

14     A.   We have.

15     Q.   And could you walk us through the rest of the

16 Innocence Commission's testing in this case in addition to the

17 cigarette butt?

18     A.   Yes.

19     Q.   Thank you.

20     A.   Are you going to put the chart on the screen?

21     Q.   Okay.  I can.  I absolutely can.  It's -- I have it

22 on.  Do you still want it?

23     A.   Okay.  I will start with the cigarette butt that was

24 collected from the crime scene.  In 2011 the Commission

25 conducted STR DNA testing, reamplifying the DNA testing

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 63 of 140

1 extracts from 2005.  A partial STR DNA profile was obtained.

2 It was from an unknown male.  Leon Brown and Henry McCollum are

3 excluded.  In May of 2014 the Commission also had that compared

4 against Darryl Suber, who was also excluded.  In July of 2014

5 the Commission had it uploaded into the CODIS database.  At

6 that time they stated a moderate stringency match occurred

7 between the partial DNA profile obtained from the cigarette

8 butt and the DNA profile contained within the database

9 identified as belonging to Roscoe Artis.

10          In July of 2014 we also conducted Y-STR DNA testing

11 on the cigarette butt extracts.  A partial Y-STR profile was

12 obtained.  The partial Y-STR profile obtained from this sample

13 is consistent with the Y-STR profile obtained from Roscoe

14 Artis.

15          On August 21st, 2014, we received CODIS confirmation

16 from the State Crime Lab that the partial DNA profile obtained

17 from the cigarette butt is consistent with the DNA profile of

18 Roscoe Artis.

19          On August 29th, 2014, we asked for statistical

20 analysis.  We went over these stats earlier.  The probability

21 of randomly selecting an unrelated man matching the combined

22 STR and Y-STR profiles obtained from the cigarette butt, which

23 was consistent with the profile obtained from Roscoe Artis, is

24 approximately 1 in 4.2 trillion for the African-American

25 population.  Roscoe Artis is African-American.

*State v. Henry McCollum and Leon Brown*

1        A piece of plywood that was identified as being taken

2   from the scene was tested at LabCorp in 2011.  It revealed it

3   was first done presumptive chemical analysis for AP,

4   presumptive for semen, negative AP results on seven tested

5   areas.  We also tested it for STR DNA and Y-STR DNA.  No

6   profile was obtained from either one.

7        A large stick of wood identified as taken from the

8   scene -- this was the nine-and-a-half inch stick of wood -- in

9   2011 we had STR DNA testing.  No profile was obtained on the

10  non-stained area.  In 2014 we had Y-STR DNA testing on an

11  unstained end of the stick, as well as the stained end of the

12  stick.  Leon Brown, Roscoe Artis, and Christopher Brown are

13  excluded as contributors of the stained end of the stick;

14  however, no determination can be made regarding Henry McCollum

15  and Darryl Suber as contributors on that mixture due to the

16  partial mixture profile obtained and the possibility of allelic

17  dropout.  On the unstained end of the stick, Leon Brown, Henry

18  McCollum, Darryl Suber, Roscoe Artis, and Chris Brown are all

19  excluded.

20       The next item that was tested on the chart is labeled

21  a small stick identified as being taken from the scene.  This

22  was five inches long.  In 2011 we conducted LabCorp testing.

23  This was STR DNA only on the non-stained area.  The partial

24  profile that was obtained is consistent with the partial

25  profile, DNA profile obtained from the non-sperm fraction of

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 65 of 140

1  the vaginal swab from Sabrina Buie.  Assuming that the

2  non-sperm fraction is Sabrina Buie's profile, she cannot be

3  excluded as a source of the DNA.  The profile from the

4  non-sperm fraction of the vaginal swab was developed by LabCorp

5  in 2005 during testing that was done pursuant to the consent

6  order between CDPL and the District Attorney.  This is the same

7  female profile that was located on the vaginal swab, anal swab,

8  and chest swab of the victim during that testing.  In addition,

9  there was one minor allele detected; no conclusion can be made

10  regarding the source of this minor allele.  Leon Brown and

11  Henry McCollum are excluded as a source of the DNA.

12          In August of 2014 we attempted Y-STR DNA testing on

13  the extracts from the small stick.  No Y-STR DNA profile was

14  obtained.  We also had the entire swab -- excuse me -- the

15  entire stick swabbed; a partial profile was obtained.  Leon

16  Brown, Henry McCollum, Darryl Suber, Roscoe Artis, and Chris

17  Brown are all excluded as contributors of the male DNA detected

18  on the sample.

19          The next item tested is the victim's blouse.  In

20  August of 2011 we conducted presumptive chemical analysis for

21  AP with negative results.  In addition, no Y-STR DNA profile

22  was obtained.  In June of 2014, the Commission sent this to

23  Sorenson to be M-Vac'd for a Y-STR profile; no profile was

24  obtained.

25          The next item was a hair that was removed from the

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 66 of 140

1    victim's shirt during the original investigation.  This was

2    sent to Cellmark and tested in August of 2014.  A mitochondrial

3    DNA profile was obtained from the hair on the victim's blouse.

4    Leon Brown, Henry McCollum, Daryl Suber, Roscoe Artis, and

5    Chris Brown are all excluded as contributors.  Sabrina Buie and

6    her maternal relatives cannot be excluded as a contributor of

7    this sample.

8          There were seven hairs from the inside of the

9    victim's shirt.  These were hairs that were removed in 2014 by

10   Cellmark as part of our testing.  They were tested in August of

11   2014.  On five of the seven hairs no mitochondrial DNA profile

12   was obtained.  On hair number two a partial mitochondrial DNA

13   profile from the hair inside the shirt was obtained.  Leon

14   Brown, Henry McCollum, Darryl Suber, Roscoe Artis, Sabrina

15   Buie, and Chris Brown are all excluded as contributors of the

16   mitochondrial DNA from the sample.

17         On hair number seven a mitochondrial DNA profile was

18   obtained.  Leon Brown, Henry McCollum, Darryl Suber, Roscoe

19   Artis, and Chris Brown are all excluded as contributors.

20   Sabrina Buie and her maternal relatives cannot be excluded as a

21   contributor of the mitochondrial DNA obtained from the sample.

22         The next item are three hairs that were collected

23   from the outside of the victim's shirt.  These hairs were also

24   removed in 2014 by Cellmark.  In August of 2014 they conducted

25   mitochondrial DNA testing.  No mitochondrial DNA profile was

*State v. Henry McCollum and Leon Brown*

1  obtained on two of the hairs.  A mitochondrial DNA profile was

2  obtained from the hair on the outside of the shirt.  Leon

3  Brown, Henry McCollum, Darryl Suber, Roscoe Artis, Sabrina

4  Buie, and Christopher Brown are all excluded as contributors of

5  the mitochondrial DNA obtained.  STR testing was also conducted

6  on this hair; however, no STR DNA profile was obtained.

7          The next item is the victim's bra.  In 2011 the

8  Commission conducted Y-STR DNA testing.  However, no Y-STR DNA

9  profile was obtained.  In June of 2014 the Commission sent the

10  bra to Sorenson to be M-Vac'd for Y-STR DNA testing; again, no

11  Y-STR DNA profile was obtained.

12          The next item is the panties that were removed from

13  the victim's throat.  On August 1st, 2011, LabCorp conducted

14  STR DNA testing.  A partial profile was obtained that is

15  consistent with the partial DNA profile obtained from the

16  non-sperm fraction of the vaginal swabs from Sabrina Buie.

17  Assuming that the non-sperm fraction is Sabrina Buie's profile,

18  she cannot be excluded as a source of the DNA.  Leon Brown and

19  Henry McCollum are excluded.

20          In January of 2013 the Commission asked for Y-STR DNA

21  testing at Cellmark.  No Y-STR DNA profile was obtained.  In

22  August of 2014 we sent the panties to Sorenson to be M-Vac'd.

23  The Y-STR DNA results are inconclusive.  The report indicates

24  that there is a possible allelic activity was observed below

25  the laboratory's analytical threshold, and that portions of the

1  DNA profile appeared at such low levels that no conclusion can

2  be drawn as to the source.

3          The next item is the victim's vest.  In August of

4  2011 LabCorp conducted a presumptive chemical analysis for AP

5  with negative results in two areas.  They also tried Y-STR DNA

6  testing; no Y-STR DNA profile was obtained.  In June of 2014

7  Sorenson tried M-Vac Y-STR DNA testing; no Y-STR DNA profile

8  was obtained.

9          The next item is the victim's left shoe.  In August

10  of 2011 at LabCorp presumptive chemical analysis for AP with

11  negative results and Y-STR DNA testing with no Y-STR DNA

12  profile obtained.  In August of 2014 the left shoe was sent to

13  Cellmark for STR DNA testing.  Due to the insufficient amount

14  of DNA, DNA testing was not performed.

15          The victim's right shoe:  In August of 2011 Y-STR

16  testing was performed with no Y-STR DNA profile obtained.  In

17  August of 2014 at Cellmark, STR DNA testing was performed.  A

18  partial DNA profile was obtained from the top right shoe that

19  is consistent with originating from an unknown female.  The DNA

20  profile previously obtained from the non-sperm fraction of the

21  vaginal swabs from Sabrina Buie cannot be excluded as a

22  possible contributor of the DNA.  Darryl Suber, Henry McCollum,

23  Leon Brown, and Roscoe Artis are excluded as possible

24  contributors of the DNA.  No conclusion can be reached

25  regarding the presence of additional types in the sample.  On

*State v. Henry McCollum and Leon Brown*

1  the bottom right of the shoe, no STR DNA profile could be

2  obtained.

3      Next there were four hairs collected from the

4  victim's right shoe.  These were hairs that were removed from

5  the shoe at Cellmark in 2014.  In August of 2014 the Commission

6  conducted mitochondrial DNA testing at Cellmark.  No

7  mitochondrial profile was obtained from two of the four hairs.

8  On hair number two a mitochondrial DNA profile was obtained

9  from the hair on the right shoe.  Leon Brown, Henry McCollum,

10 Darryl Suber, Roscoe Artis, Sabrina Buie, and Chris Brown are

11 all excluded as contributors of this profile.  On hair number

12 three a partial mitochondrial profile was obtained from this

13 hair on the right shoe.  Leon Brown, Henry McCollum, Darryl

14 Suber, Sabrina Buie, Chris Brown are all excluded as

15 contributors of the mitochondrial obtained from this sample.

16 The partial mitochondrial sequence obtained from this hair

17 contains a single base variation from the sequence obtained

18 from Roscoe Artis.  Therefore, no conclusion can be made

19 regarding Roscoe Artis as a contributor to this hair.

20      The next item is the victim's pants.  In August of

21 2011 LabCorp conducted presumptive chemical analysis for AP on

22 seven areas of the pants, and that revealed negative results.

23 They also had three combined cuttings taken from different

24 areas on the pants, and no Y-STR DNA profile was obtained from

25 any of these cuttings.

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 70 of 140

1        The victim's vaginal swabs, chest swab, left thigh

2   swab, and anal swab were all Y-STR DNA tested at LabCorp in

3   August of 2011 with no Y-STR DNA profile obtained.  The

4   Commission tested two hairs from the pubic hair combings of the

5   victim.  These two hairs were identified by the SBI lab in 1983

6   as being inconsistent with the pubic hairs of the victim.

7   These were tested at Cellmark in August of 2014 for

8   mitochondrial DNA testing.  On hair one the partial sequence

9   data obtained from this hair indicates a mixture of two or more

10  mitochondrial DNA profiles and is therefore inconclusive.  In

11  hair number two a partial mitochondrial profile was obtained

12  from this hair.  Leon Brown, Henry McCollum, Darryl Suber,

13  Roscoe Artis, and Christopher Brown were all excluded as

14  contributors to the mitochondrial DNA obtained.  No conclusion

15  can be made regarding Sabrina Buie as a possible contributor of

16  this sample.

17        Fingernail scrapings from the victim -- excuse me --

18  fingernail clippings from the victim, both her left hand and

19  her right hand, were sent to Cellmark in August of 2014 for STR

20  DNA testing.  No STR DNA profile was obtained.

21        The wrapper from the victim's body was sent to

22  Cellmark in August of 2014 for STR DNA testing.  No STR DNA

23  profile was obtained.

24        Three matches that were collected in the woods next

25  to the cigarette butt were sent to LabCorp in August of 2011

*State v. Henry McCollum and Leon Brown*

1  for STR DNA testing.  No STR DNA profile was obtained from any

2  of the three.

3          One plastic ring pack holder was sent to LabCorp in

4  August of 2011 for STR DNA testing.  No STR DNA profile was

5  obtained.

6          Three Schlitz Malt Liquor beer cans that were found

7  near the matches and the cigarette butt as well as the sticks

8  were sent to LabCorp on August -- in August of 2011 for STR DNA

9  testing.  There was no STR DNA profile obtained from two of the

10  cans.  On the third can a partial STR profile was obtained that

11  was consistent with the partial DNA profile obtained from the

12  non-sperm fraction of the vaginal swabs from Sabrina Buie.

13  Assuming that the non-sperm fraction is Sabrina Buie's profile,

14  she cannot be excluded as the possible source of DNA.  Leon

15  Brown and Henry McCollum are excluded as a source of DNA.

16          There was a remaining beer can found in front of the

17  shed.  It was sent to Cellmark in August of 2014 for STR DNA

18  testing.  A partial DNA profile was obtained originating from

19  an unknown male.  Darryl Suber, Henry McCollum, Leon Brown,

20  Roscoe Artis, and the DNA profile previously obtained from the

21  non-sperm fraction of the vaginal swabs of Sabrina Buie are all

22  excluded as contributors.

23          There were nine latent lifts on three latent print

24  cards at the time of the original investigation.  Of these nine

25  latent lifts, two of those prints were found to be of value.

*State v. Henry McCollum and Leon Brown*

1  One was identified as belonging to the victim.  In 2011 at the

2  Crime Lab, the Commission had six of these prints examined.

3  The one print of value was still found to be of value although

4  it was not able to be uploaded to AFIS.  It was for manual

5  comparison only.

6          In 2014 the Commission resubmitted all of the prints

7  to the Crime Lab.  The one identifiable print of value was

8  still found to be of value for manual comparison only.  It was

9  compared at that time to Roscoe Artis.  The report indicates it

10  was inconclusive due to the insufficiency of the ridge detail

11  in the major case inked impressions of Roscoe Artis.  According

12  to the Crime Lab, due to the natural aging process of the skin

13  over the course of time, the increase in size and the number of

14  creases and the loss of elasticity, it may not be possible to

15  obtain a major case inked impression that contains sufficient

16  detail in the necessary area, joints of the fingers, to conduct

17  a conclusive comparison.  These nine latent lifts have been

18  digitally preserved by the Crime Lab.

19          After this was conducted, the Commission sent all

20  nine latent lifts to the Crime Lab for STR DNA testing.  The

21  Crime Lab tested eight -- not the one that matched the victim

22  -- on August 27th, 2014.  No STR DNA profile was obtained from

23  any of the eight latent lifts.

24          The remaining item on the chart: There are latent

25  lifts from items at the crime scene.  These were lifted from a

1   paper bag and a beer can in 1991 by former SBI Lab Director

2   Haywood Starling.  These prints were not lifted until 1991.  A

3   latent print examination is still pending at the North Carolina

4   State Crime Lab.

5       Q.    Ms. Stellato, at this point you tested/submitted for

6   testing everything that could be forensically tested in this

7   case?

8       A.    No.

9       Q.    No?

10      A.    We haven't submitted every -- I mean, it's impossible

11  to submit every item.  There -- there is a Vaseline can.  There

12  is a chewing gum wrapper.  There are the -- the paper bag that

13  we saw the Red Springs Police Department officer touch.  There

14  is -- there are the medical examiner sheets, too, that covered

15  the victim's body.  You know, there are other items.  However,

16  the Commission has spent quite a bit of money on testing as

17  well as we have to make the best decisions possible with

18  forensic testing.  And we are at an MAR hearing.

19      Q.    Well, to summarize the testing that you have

20  conducted, the DNA profile found on the cigarette butt is

21  consistent with the DNA profile for Roscoe Artis?

22      A.    Correct.

23      Q.    And other than the DNA of the victim, this is the

24  only other conclusive DNA profile that you've identified?

25      A.    Yes.  Other than the DNA of the victim.

*State v. Henry McCollum and Leon Brown*

1      Q.   Right.  So, none of the testing, forensic testing

2  results, indicate that DNA from Mr. McCollum or Mr. Brown was

3  found on the items of physical evidence in this case?

4      A.   Correct.

5      Q.   I'm going to switch gears to the other aspects of

6  your investigation.  During your investigation you've conducted

7  in-person interviews?

8      A.   Yes.

9      Q.   And you've interviewed Mr. McCollum?

10     A.   Yes, we did.

11     Q.   And what has Mr. McCollum said about his involvement

12 in the rape and murder of Sabrina Buie?

13     A.   During Commission interviews, Mr. McCollum has always

14 maintained his innocence, that he had nothing -- that he had

15 nothing to do with the rape and murder of Sabrina Buie.

16     Q.   And you've also interviewed Leon Brown?

17     A.   Yes.

18     Q.   And what has Mr. Brown said about his involvement in

19 the rape and murder of Sabrina Buie?

20     A.   During Commission interviews Mr. Brown has also

21 always maintained that he had no involvement in the rape and

22 murder of Sabrina Buie and that he is innocent.

23     Q.   Did you also interview Mr. Artis?

24     A.   Yes, we did.  Four times.

25     Q.   What were the dates of those four interviews?

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 75 of 140

1    A.    March 2nd, 2011; July 11th, 2014; July 31st, 2014;

2  and August 22nd, 2014.

3    Q.    And did you record those interviews?

4    A.    Yes, we did.

5    Q.    Do you have those recordings with you today?

6    A.    Yes, we do.

7          MS. ALSTON:  And, Your Honor, we'll just move

8  for Ms. Stellato to produce those recordings for the purpose of

9  her testimony.  We don't need them admitted.

10          THE COURT:  Any objection?

11          MR. BRITT:  No, sir.

12          THE COURT:  And for the purpose of this hearing

13  only, what is being divulged?

14          BY MS. ALSTON:

15    Q.    Step back up.  Why did the Innocence Commission

16  interview Mr. Artis back -- your first interview was 2011.  Let

17  me step back -- is in March of 2011.  Why did the Innocence

18  Commission interview Mr. Artis then?

19    A.    During our investigation the Commission became aware

20  of the Joann Brockman homicide less than one month after the

21  murder of Sabrina Buie in the same town in a similar manner,

22  and we wanted to interview Mr. Artis related to the case.

23    Q.    And in 2011 what did Mr. Artis report about Sabrina

24  Buie's murder?

25    A.    Mr. Artis spoke a lot about his case, the Joann

1  Brockman murder.  He was asked if he recalled a murder prior to
2  the Joann Brockman murder and Artis -- Mr. Artis stated that he
3  did.  He stated that two boys had been locked up for it, and he
4  recalled that it was a girl named Sabrina.  Mr. Artis stated
5  that police had taken seven boys downtown and that the last two
6  boys, named Henry and Leon had been charged, but that those two
7  boys didn't do it.  Mr. Artis stated that he knew nothing about
8  the murder, only that the two guys convicted of the murder
9  didn't do it.
10      Q.   So, you interviewed Mr. Artis again a few years
11  later, in July of 2014.  And forgive me.  Was it July 31st or
12  July 13th?
13      A.   The next interview was on July 11th, 2014.  And then
14  there's an interview on July 31st, 2014.
15      Q.   So, related to the July 31st?
16      A.   July 11th.
17      Q.   July 11th interview with Roscoe Artis, can you tell
18  us what he said then about Sabrina Buie?
19      A.   Mr. Artis stated that he did not know Sabrina Buie
20  but that he had seen her sometimes, and he would see Sabrina
21  Buie getting into cars.  Mr. Artis stated that he didn't even
22  know the day that Sabrina Buie was murdered.  At that time
23  Mr. Artis was told that there was DNA from the crime scene that
24  matched him.  He was not told what the item was that matched
25  him.  Mr. Artis stated then that once, maybe twice Sabrina Buie

1   had rode up on her bicycle while he was in his sister's

2   driveway and that she had went to the store to buy cigarettes

3   for him.  He stated that when this happened his sister, Pauline

4   Smith, had been there, and that the 11-year-old victim, Sabrina

5   Buie, had returned for -- had returned with cigarettes for him

6   and left.  Mr. Artis indicated that he had never had any

7   contact with Sabrina Buie at any other location other than his

8   driveway, including at the store.  Mr. Artis was asked how his

9   DNA could be at the crime scene, and Mr. Artis stated it must

10  have been planted there.

11      Q.   Just following that, you interviewed him a third

12  time, on July 31st.  Could you tell us what Mr. Artis said then

13  about Sabrina Buie specifically on the night of the murder?

14      A.   Uh-huh.  Mr. Artis stated that although he had not

15  told us this in his two prior interviews, Sabrina had come over

16  on the day that she went missing and it had been misting rain

17  that day and they were outside.  Mr. Artis relayed that his

18  sister, Pauline, had told Sabrina to go home, and his sister

19  had told Mr. Artis to get Sabrina a hat to cover her head from

20  the rain and Mr. Artis did.  Mr. Artis stated that Sabrina

21  never showed up the next day like she usually would.  After

22  Sabrina left, Mr. Artis stated that he went to bed because he

23  had to go to work the next day between 4:30 a.m. and 5:00 a.m.

24  Mr. Artis was asked if he worked seven days a week, and after

25  some discussion he admitted that he did not work on weekends or

1  Sundays.  Sabrina Buie had gone missing on a Saturday night,
2  and the next day was a Sunday.  Mr. Artis stated he thought
3  nothing of Sabrina not returning the next day, but then they
4  had found her body.  Mr. Artis stated that Sabrina would come
5  over every day on her bicycle.  Mr. Artis stated that on that
6  day it was not raining hard; it was misting rain, and he gave
7  her a hat and she was to return it the next day, but she never
8  showed up, and he didn't know what happened to her.  He again
9  stated she was supposed to bring it the next afternoon, and my
10 sister said, well, she will bring it back in the afternoon
11 because she's always going to come back anyway.  But when she
12 left we never seen her no more.
13          When asked which direction Sabrina Buie went, he
14 stated she rode off in the direction of Harry's store.  This
15 was not in the direction of her home.  Mr. Artis also relayed
16 that on the day before she went missing, he had seen her get
17 into a black or blue Monte Carlo.  He later stated it was a
18 white truck.  Mr. Artis was confronted with the inconsistencies
19 and asked why he had never told us this story in the prior two
20 interviews, and Mr. Artis stated he had told us this story.
21 Mr. Artis was reminded that all of our Commission interviews
22 are recorded.  Mr. Artis was also confronted with the
23 inconsistency of the victim heading toward the store and not in
24 the direction of her home.  Mr. Artis then stated that the
25 victim had told him before she left she was going to stop by

*State v. Henry McCollum and Leon Brown*

1    the store first on her way home.

2        Q.   So, following this third interview, Roscoe Artis

3    wrote the Commission a letter on August 15th, 2014?

4        A.   Yes, he did.

5        Q.   Do you have that letter?

6        A.   I have that letter here.  I'll need to get that

7    letter.

8                MS. ALSTON:  Your Honor, we move for Ms.

9    Stellato to produce that letter, and mark it as exhibit 45 and

10   admit it into evidence.

11               THE COURT:  And so ordered.

12                    (DEFENDANT'S EXHIBIT NUMBER 45

13                     RECEIVED IN EVIDENCE.)

14               MS. ALSTON:  And we have copies.  May I

15   approach?

16               THE COURT:  Yes, ma'am.

17           BY MS. ALSTON:

18       Q.   Ms. Stellato, can you describe that letter and then

19   read the portion of it that relates to Sabrina Buie?

20       A.   This was the second letter that Mr. Artis wrote to

21   the Commission since our second interview of him, the first of

22   2014.

23               This letter provided new details for Mr. Artis about

24   his contact with the victim on the day that she disappeared as

25   well as information related to the Bernice Moss murder.  In

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 80 of 140

1    this letter Mr. Artis also asked that I come back and visit

2    him.  That was his second request.

3         Q.   Could you read the letter?

4         A.   I'll read the portion as it relates to Sabrina Buie.

5         Q.   Yes.

6         A.   "I went in the house and home.  I was looking at the

7    TV and here come this young girl.  She came in the house.  My

8    sister said, 'Go home, what are you doing out in this rain?'

9    She said, 'I come to see if you want me to go to the store.'  I

10   said, 'No, go home.'  She came and hugged my neck and kissed me

11   on my face.  I grab her hand and wrist, and I told her to go

12   home.  She's still standing there.  I grab her by her bicep and

13   told her to go home.  I then put her little face in my hand and

14   told her to go home and I will give you some change tomorrow.

15   She left.  My sister said, 'Give her one of your old cap and

16   jacket.  She can bring them back tomorrow.'  And she left by

17   herself, and I know she got wet because the rain got heavy, but

18   she never showed up the next day.  So, if any DNA was at the

19   crime scene it came from my jacket and cap, and that is it.  I

20   got a witness -- I got witnesses will tell you I never left the

21   house that night after she left because it rained for a long

22   time."

23        Q.   Okay.  Thank you.  So, after you received this letter

24   that contained a request by Mr. Artis for you to see him, did

25   you go see him again?

*State v. Henry McCollum and Leon Brown*

1          A.    Yes, we did.

2          Q.    And when was that?

3          A.    August 22nd, 2014.

4          Q.    And what did Mr. Artis report then about Sabrina Buie

5     on the night of the murder?

6          A.    During that interview?

7          Q.    Yes.

8          A.    Mr. Artis stated that on the day that Sabrina went

9     missing it was sprinkling, that Mr. Artis went inside the home,

10    his sister's home, sat down on the chair inside the kitchen and

11    here came Sabrina.  Mr. Artis stated that his sister said to

12    Sabrina, "Girl, what are you doing out here in the rain?"  And

13    Sabrina said, "I came to see if you need me to go to the

14    store."  And I said to her, "No, you need to go home," and

15    Sabrina came over to me and caught him around the neck.  Artis

16    told Sabrina to go home.  Mr. Artis stated Sabrina then --

17    excuse me -- Mr. Artis stated that he then caught her by her

18    hand or her wrist and told her to go home again.  Pauline, his

19    sister, then told her, "Yeah, you need to go home because your

20    mama's probably worried about you," and Sabrina just stood

21    there.  Mr. Artis then caught her on the arm and said,

22    "Sabrina, go home."  Then I took her like my little girl, "Go

23    home," so she left.

24             According to Artis, Pauline, his sister, told him to

25    go get an old jacket and a cap and let Sabrina wear them and

1  she would bring them back the next day, but Sabrina never

2  showed up the next day.  Artis stated he never left the home

3  that night after Sabrina left.  Artis told the Commission that

4  his sister and his nieces will tell the Commission the same

5  story.

6          According to Artis, the reason that Sabrina Buie

7  started coming to his home is that one day he saw her coming

8  down the driveway and he had her go to the store and buy him a

9  pack of cigarettes, and every evening after that she would come

10 over to his home.  Artis was unable to describe the color or

11 the type of hat -- the color or type of hat or coat that he

12 provided and he never saw either of those items again.  But he

13 states that the reason his DNA would be at the crime scene is

14 that it had to have come from his jacket or hat.  Artis was

15 asked why he never mentioned the jacket or hat before, and

16 Mr. Artis replied that he never even was aware of them.

17 According to Mr. Artis, he was recently speaking with his niece

18 on the telephone about this case and that his niece told him

19 over the phone that she had given Sabrina these items on that

20 day.

21          I confronted Mr. Artis with the fact that this was

22 the first time he said it was the niece who gave him the items.

23 Prior to that he had said it was his sister.  Artis denied

24 this.  He said it had always been his niece.  He also stated

25 his niece would confirm it.

*State v. Henry McCollum and Leon Brown*

1      I then confronted Mr. Artis with the fact that the

2  Commission had interviewed his family members, including his

3  sister and both of his nieces, and that they denied these

4  statements.  Mr. Artis said they do not remember.

5      Mr. Artis says that Sabrina came over to their house

6  every afternoon, that sometimes she would go to the store for

7  him and sometimes not.  If she went to the store for him she

8  would always buy cigarettes for him, and she would also go to

9  the store for other people in the home, including Pauline and

10  the nieces.

11      Mr. Artis stated that he never saw the victim smoke

12  or drink, but if you were to check around Red Springs, the

13  victim would go out and night and doesn't come home.  He last

14  saw her that night at six o'clock as she left towards the

15  store.  He states that his entire family was in the kitchen

16  when Sabrina was there.  Mr. Artis was also confronted with the

17  inconsistency of the fact that we had interviewed his family

18  members and that his family members say Sabrina had never been

19  to their home.  Again, Mr. Artis says they don't remember.

20      Mr. Artis also said during the interview, "Why would

21  I get out of bed at two to three in the morning in the rain, go

22  to her, find that little girl and do this to her and then come

23  back to bed?"  Mr. Artis had never been provided with the time

24  of death or any details.

25      Mr. Artis stated that if the police would have done

1  their job, Leon and Henry would not be in prison.

2      Q.   Now, you mentioned kind of in those explanations that

3  you also interviewed Mr. Artis's family members?

4      A.   Yes.

5      Q.   Can you tell us who you interviewed?

6      A.   We interviewed his sister, Pauline Smith; his niece,

7  Yvonne Smith; and another niece, Alice Sinclair.

8      Q.   And were those interviews also recorded?

9      A.   Yes, they were.

10      Q.   And do you have them with you?

11      A.   Yes, I do.

12          MS. ALSTON:  Your Honor, we move for her to

13  produce those for the purposes of her testimony.

14          THE COURT:  And so ordered.

15          THE WITNESS:  Thank you.

16          BY MS. ALSTON:

17      Q.   And if you could again just summarize what you've

18  already stated about what the family members said about Sabrina

19  Buie -- Artis's family members?

20      A.   As I said earlier, they were interviewed regarding

21  Artis's statements about Sabrina coming to their home.  They

22  state that -- Pauline Smith and Alice Sinclair state that

23  Sabrina Buie had never been to their home.  Pauline Smith also

24  denies that Sabrina Buie would have ever gone to the store for

25  them.  They lived next door to the store.  There was a field --

*State v. Henry McCollum and Leon Brown*

Case 5:15-cv-00451-BO   Document 128-2   Filed 03/29/17   Page 85 of 140

1    there was their home, a field, and then the store.  Ms. Smith

2    indicates that they went to the store for themselves, including

3    Mr. Artis who would go to the store himself.

4         In addition, the Commission confirmed that it was not

5    raining on the night of September 24th or 25th, 1983, and that

6    the victim was wearing a vest that had a hood on it the night

7    she went missing.

8    Q.   And going back to your four interviews with

9    Mr. Artis.  In those interviews what does Mr. Artis say about

10   Henry McCollum's involvement in Sabrina Buie's rape and murder?

11   A.   Mr. Artis has always stated that Henry McCollum is

12   innocent.

13   Q.   And in those interviews what does Mr. Artis say about

14   Leon Brown's involvement in Sabrina Buie's rape and murder?

15   A.   Mr. Artis has always stated that Leon Brown is

16   innocent.

17        MS. ALSTON:  Nothing more from Mr. McCollum.

18   Mr. Brown has.

19        THE COURT:  Mr. Payne?

20        MR. PAYNE:  Thank you, Your Honor.

21             CROSS-EXAMINATION                    12:38 PM

22        BY MR. PAYNE:

23   Q.   Ms. Stellato, I'd like to pick up with you right

24   where you just left off, okay?

25   A.   Okay.

*State v. Henry McCollum and Leon Brown*

1      Q.   One thing that is consistent with regard to

2 Mr. Artis's statement is that Henry McCollum is innocent; would

3 that be right?

4      A.   Correct.

5      Q.   One thing that is consistent with what Mr. Artis has

6 told you is that Leon Brown is innocent; isn't that correct?

7      A.   Correct.

8      Q.   Would you say, ma'am, that from the first time that

9 you talked to Mr. Artis to the last time you talked to

10 Mr. Artis, his statements have gotten more and more

11 inconsistent with each other?

12     A.   Yes, I would.

13     Q.   Would you characterize them as providing him more and

14 more contact with Sabrina Buie from the first time he talked to

15 you till the last time he talked to you?

16     A.   I wouldn't characterize it.  I would say he is

17 providing more information related to being in contact with Ms.

18 Buie as after the interviews, yes.

19     Q.   And one thing that you were just telling the Court

20 was that he provided you the hour of the morning that Sabrina

21 Buie went missing -- or the hour of the morning that it is

22 suspected that she was killed; isn't that correct?

23     A.   Harry's store closed at midnight.  The victim was

24 seen after 11:00 p.m. and then when her father came home after

25 12:00 p.m. is -- is when he went looking for her and she

*State v. Henry McCollum and Leon Brown*

1    couldn't be located.  At no time when we interviewed Mr. Artis

2    were we ever providing him with details of the crime, certainly

3    not a 2:00 to 3:00 a.m. window of when the victim could have

4    been killed.

5         Q.    That never came from you all?

6         A.    No.

7         Q.    And I believe you said you consulted the almanac with

8    regard to corroborating whether or not there was rain that

9    night as he last told you?

10        A.    The Farmers Almanac has weather for every day related

11   to that zip code.  If you need the reports, we can provide

12   them.

13        Q.    No, ma'am, your word is fine.  Did you do that?

14        A.    Yes, we did.  It had zero percent precipitation on

15   both the night of the 24th and the morning of the 25th.  We

16   looked all around that time frame just to be certain.

17        Q.    Okay.  I'd like to back up just a moment, if I could,

18   with you.  Your involvement, that is, the Commission's

19   involvement in this case, kind of got kicked off with a letter

20   that Leon Brown wrote you; isn't that right?

21        A.    In 2009, correct.

22        Q.    Now, you in particular have some specialized training

23   in investigation, don't you?

24        A.    I do.

25        Q.    All right.  You have training in interrogation?

*State v. Henry McCollum and Leon Brown*

1      A.    Yes, I do.

2      Q.    Interviewing?

3      A.    Yes, I do.

4      Q.    Basics of DNA?

5      A.    I do.

6      Q.    And I'm not going to name them all, but national and

7  local innocence conferences?

8      A.    Yes.

9      Q.    And I believe you are a graduate of law school,

10 too --

11     A.    Yes.

12     Q.    -- isn't that correct?  Now, Mr. Brown, at the point

13 that the Commission got into the formal inquiry stage, had to

14 execute what's called a waiver of procedural safeguard; is that

15 right, ma'am?

16     A.    Correct.

17     Q.    And that procedural safeguard is a document in which,

18 in this particular case, Leon Brown had to give up certain

19 rights; isn't that right?

20     A.    Correct.

21     Q.    And it was at that point that he was assigned what's

22 called waiver counsel; isn't that right?

23     A.    Correct.

24     Q.    And that would be Ms. Ann Kirby from the Pitt County

25 Public Defender's Office sitting to my right?

*State v. Henry McCollum and Leon Brown*

1    A.    Eventually.  He was -- he was originally assigned

2  another public defender, and then he moved locations and was

3  assigned Ms. Kirby.

4    Q.    Ms. Kirby.

5    A.    Uh-huh.

6    Q.    And he executed such a document?

7    A.    Yes, he did.

8    Q.    And in which, of course, it was witnessed by his

9  attorney?

10   A.    Uh-huh.

11   Q.    And he had to agree to provide full disclosure

12  regarding all inquiry requirements of the Commission?

13   A.    Yes, he did.

14   Q.    He had to tell you that he understood that if he

15  refused to cooperate in any way or become uncooperative with

16  the Commission, then the inquiry could be discontinued?

17   A.    Correct.

18   Q.    He also had to waive all procedural safeguards and

19  privileges with regard to his claim of innocence?

20   A.    Correct.

21   Q.    He also understood and told you this, that that

22  includes a waiver of his right against self-incrimination under

23  the United States and State Constitutions?

24   A.    Correct.

25   Q.    And he also had to give up his right to

*State v. Henry McCollum and Leon Brown*

1  attorney-client privilege for any attorney who had represented

2  or was representing him with the crime for which he is being

3  charged?

4      A.   Yes, he did.

5      Q.   And it would be safe to say at this point that he has

6  cooperated with you?

7      A.   Yes.

8      Q.   And of course, the Commission has never invoked its

9  power to terminate his inquiry at any point; isn't that

10  correct?

11      A.   No, we have not.

12      Q.   You were telling the judge that part of your initial

13  inquiry was examining the inconsistencies in the statements or

14  confessions; isn't that right, ma'am?

15      A.   Correct.

16      Q.   And you considered various factors when you were

17  considering the trustworthiness or the believability of those

18  confessions; isn't that correct?

19      A.   The consistency of the confessions, uh-huh.  Correct.

20      Q.   I'm sorry.  You know, you're a little soft-spoken.

21      A.   Sorry.

22      Q.   If you can speak into that horn right there --

23      A.   I'll try.

24      Q.   -- I'd appreciate it.

25      A.   Yes.

*State v. Henry McCollum and Leon Brown*

1     Q.   Thank you.  And one of the things that I believe that

2  you considered would be the -- the fact there was two -- these

3  were two boys at that time; isn't that right?

4     A.   They were.

5     Q.   Leon was 15 and Mr. McCollum 19?

6     A.   Correct.

7     Q.   And you also learned during the course of your

8  inquiry that both of these boys at the time had learning

9  disabilities or had mental -- they were mentally retarded;

10  isn't that correct?

11     A.   The files indicated that information, correct.

12     Q.   As a matter of fact, you familiarized yourself with

13  the -- with the trials of both young men?

14     A.   Yes, we did.

15     Q.   And you learned from Mr. Brown's trial that a

16  Mr. Franklin Egoff, who's a staff psychologist, testified on

17  his behalf?

18     A.   Correct.

19     Q.   And Mr. Egoff or Dr. Egoff testified that Leon had a

20  full scale IQ of 54?

21     A.   Correct.

22     Q.   In 1983?

23     A.   Correct.

24     Q.   Which falls in the mildly mentally retarded range?

25     A.   Correct.  That was his testimony.

*State v. Henry McCollum and Leon Brown*

Page  86

1          Q.    Yes, ma'am.

2          A.    Uh-huh.

3          Q.    And you also familiarized yourself with the trial of

4    Mr. McCollum?

5          A.    Yes, I did.

6          Q.    And at his trial, the second trial, the jury found as

7    a matter of fact that he, too, was mentally retarded; isn't

8    that correct; if you look at number 40 of the Issues and

9    Recommendation Form you have before you there?

10         A.    Yes, they did.  They determined when he was 15 years

11   old his IQ was 56.

12         Q.    56.  When he was 15 he was unable to perform

13   adequately to keep up with his class in the 4th grade?

14         A.    Correct.

15         Q.    He was transferred to a special school for the

16   emotionally disabled and mentally retarded in the 5th grade?

17         A.    Correct.

18         Q.    And when he was 15 years old his reading recognition

19   level was at the 4th grade 4 months reading comprehension?

20         A.    Reading comprehension of 2nd grade 9 months and

21   spelling at 3rd grade and 9 months, correct.

22         Q.    Thank you.  And as part of your training you have

23   gone to school and had experience and learned about false

24   confessions, haven't you?

25         A.    Yes, I have.

*State v. Henry McCollum and Leon Brown*

1    Q.   Okay.  And it was part of your inquiry to determine
2    who was present when both boys were interrogated, was it not?
3    A.   Who -- who was present, law enforcement?
4    Q.   Yes, ma'am.
5    A.   Correct.  Uh-huh.
6    Q.   And you did that?
7    A.   Yes, we did.
8    Q.   And you determined that when Mr. McCollum was
9    testified (sic), there were three law enforcement officers
10   present?
11   A.   When Mr. McCollum was questioned?
12   Q.   Excuse me.  Was questioned.
13   A.   Uh-huh.  Correct.
14   Q.   And that would be Special Agent Ken Snead, Special
15   Agent Allen, both of the SBI, and Detective Sealey of the
16   Robeson County Sheriff's Department?
17   A.   Correct.
18   Q.   And you also learned that Special Agent Allen had
19   been to the autopsy prior to the interrogation of Mr. McCollum
20   and of Mr. Brown?
21   A.   Can I just go back to the question?  Where did you
22   say -- I'm sorry.  Where did you say Mr. Sealey worked?
23   Q.   He was with the Robeson County Sheriff's Department.
24   A.   Okay.
25   Q.   And okay, so back to my question there.

*State v. Henry McCollum and Leon Brown*

1       A.    Uh-huh.

2       Q.    Special Agent Allen had attended the autopsy of

3   Sabrina Buie one day prior to the interrogation of Mr. McCollum

4   and Mr. Brown?

5       A.    Correct.

6       Q.    The same officer that was present at Mr. McCollum's

7   interrogation?

8       A.    Correct.

9       Q.    The same officer who knew about the panties that the

10  -- that the pathologist found stuffed down the throat of

11  Sabrina Buie?

12      A.    That was revealed in the autopsy.

13      Q.    The same officer who knew about the stick that was

14  broken off in the throat of Sabrina Buie?

15      A.    That was also revealed in the autopsy.

16      Q.    The same officer who did the crime scene sketch?

17      A.    Yes, he did, and Agent Allen did that crime scene

18  sketch, yes.

19      Q.    And was that of significance to you that the crime

20  scene officer, officer who had attended the autopsy, was also

21  in the interrogation room of Mr. McCollum?

22      A.    It was of note.  I don't know that I would say it was

23  of significance, but it was certainly of note to our

24  investigation.

25      Q.    And in the course of your inquiry, did you also

1  learn, Ms. Stelatto, that Agent Snead was present in the

2  interview room with Mr. Brown for a few minutes alone?

3      A.   With Mr. Brown, yes, we did.

4      Q.   Prior to his interrogation by Detective Locklear?

5      A.   Correct.

6      Q.   And Captain Haggins?

7      A.   Correct.

8      Q.   And just for recollection, the same Detective

9  Locklear who was the investigating officer in this case was the

10 same Detective Locklear that was the investigating officer in

11 the Samantha Brockman -- the Joann Brockman murder case; isn't

12 that right?

13     A.   Yes, he was.

14     Q.   Now, you -- you showed Judge Sasser the video that

15 you all took recently?

16     A.   Yes, sir.

17     Q.   Okay.  And did you also take some pictures?

18     A.   Yes, we did.

19          MR. PAYNE:  If I could have Defendant's Exhibit

20 Number 4 up, please.  May I approach, please, Judge?

21          THE COURT:  Yes, sir.

22          BY MR. PAYNE:

23     Q.   I'm going to point to this particular spot on the

24 map.

25     A.   Uh-huh.

*State v. Henry McCollum and Leon Brown*

1      Q.   This little house right here, that's the house you

2  all identified as whose house?

3      A.   Pauline Smith.

4      Q.   And Pauline Smith was who?

5      A.   The sister of Roscoe Artis.

6      Q.   And Exhibit Number 4, of course, is the?

7      A.   Crime scene sketch.

8      Q.   By?

9      A.   Agent Allen.

10     Q.   All right.  And we have back up at the top the

11 location of the various items of physical evidence.

12     A.   Correct.

13     Q.   All right.  And we have a distance measurement from

14 the victim's body, is that correct?

15     A.   Correct.

16     Q.   And that's 36.9 feet to what's this line right here,

17 the tree line?

18     A.   The ditch.  And then the tree line.

19     Q.   All right.  Of course, it's not to scale.

20     A.   The drawing?

21     Q.   Right.

22     A.   No.

23     Q.   But this is the approximate location -- you've

24 already shown it on the overhead aerial photograph -- of the

25 house in which Mr. Artis was living at the time?

*State v. Henry McCollum and Leon Brown*

1      A.   Correct.

2           MR. PAYNE:  All right.  May I approach, please,

3  Judge?

4           THE COURT:  Yes, sir.

5        BY MR. PAYNE:

6      Q.   I'm going to show you Defendant's Exhibits.  These

7  will be 46, 47, and 48.  Do you recognize, 46, 47 and 48, Ms.

8  Stellato?

9      A.   Yes, I do.

10     Q.   Do you recognize them to be photographs that you all

11 took around this particular house towards the tree line?

12     A.   Yes, I do.

13     Q.   And they fairly and accurately describe that scene at

14 the time that you took it; is that right?

15     A.   They do.

16          MR. PAYNE:  Offer them into evidence at this

17 point, Judge.

18          THE COURT:  Any objection?

19          MR. BRITT:  No, sir.

20          THE COURT:  So allowed.

21             (DEFENDANT'S EXHIBITS NUMBER 46-48

22              RECEIVED IN EVIDENCE.)

23          MR. PAYNE:  Could you show Judge Sasser, please

24 -- all right.  Let me get up there with you.  The first one --

25          MR. BRITT:  May I approach?

*State v. Henry McCollum and Leon Brown*

1          THE COURT:  Yes, sir.

2      BY MR. PAYNE:

3    Q.   Hold the first one up there.

4    A.   (Witness complies.)

5    Q.   Okay.  That is -- would that be the back of this

6  house?

7    A.   Correct.  It would be the back.  This would be

8  actually under the carport, so it's kind of the back left, does

9  that make sense?  But you're looking out toward the right, so

10  these trees that you're seeing are toward the ditch, toward the

11  field.

12    Q.   Towards this tree line?

13    A.   Correct.

14    Q.   All right.

15    A.   And you're standing in the opposite corner.

16    Q.   Thank you.  Now, the next one would be?

17    A.   So, you're in the same location.

18    Q.   That's --

19    A.   But now you're moving --

20    Q.   That's Exhibit what?

21    A.   47.

22    Q.   47.  Okay.

23    A.   Now you're moving past, like, the door, so now you're

24  in the back yard all the way looking toward the tree line.  On

25  the other side of this tree line is the field, so you're going

1  to go to the tree line, there's going to be a ditch, and then

2  you're in the field; you're in the back yard.

3      Q.   And 49?

4      A.   This is the front of the home.  Again, right here is

5  the tree line, ditch, field, but you're in the front yard.

6      Q.   If you'd set it down here.  Oriented --

7      A.   Uh-huh.

8      Q.   -- towards the right of the --

9      A.   Right.

10      Q.   -- diagram?

11      A.   So, you're in the driveway looking -- if you were

12  looking further right, you would actually be looking all the

13  way to South Main, but right now you're looking diagonal.

14      Q.   Thank you, ma'am.  And you took those pictures

15  because of the proximity of Ms. -- Ms. Buie's body and

16  Mr. Artis's house, would that be true?

17      A.   We took the pictures related to the proximity of

18  where Mr. Artis was living next to the field where she was

19  found, yes.

20      Q.   Thank you, ma'am.  I'd like to ask you some

21  questions, Ms. Stellato, about your testimony with regard to

22  your investigation of the criminal record of Mr. Artis.

23      A.   Okay.

24      Q.   Without going into every single one, because you've

25  done that already for the Court, you told the Court that you

*State v. Henry McCollum and Leon Brown*

1  did -- you were comparing the similarities of his prior

2  charges or suspicions of rape and/or rape and murder; you

3  remember that?

4       A.   Yes.  But I should say that all of these are not

5  charges.  These are all of the crimes that the Commission

6  became aware of either through criminal records or Mr. Artis'

7  interviews himself or other people that we interviewed.

8       Q.   And just for purposes of what we're talking about

9  here, the reason why that's important is, is what we would call

10 kind of 404(b) evidence, isn't it?

11      A.   Correct.

12      Q.   In other words, evidence of *modus operandi*, right?

13      A.   That would be why it's important to you, yes.

14      Q.   Okay.  And so, when you did that, you found certain

15 similarities, and what were they?

16      A.   The similarities were assaults against women,

17 violence of a sexual nature in outdoor secluded areas with

18 force.

19      Q.   And with regard to the Brockman murder, she was found

20 in what condition?

21      A.   She was found wearing only a shirt and her bra pushed

22 up, naked in a field.

23      Q.   And Ms. Buie?

24      A.   She was found wearing only her bra pushed up around

25 over her neck, back of her shoulders, naked in a field.

*State v. Henry McCollum and Leon Brown*

1     Q.   Both of them strangulated?

2     A.   Ms. Buie was found with her panties and a stick down

3  her throat, correct.

4               THE COURT:  And, Mr. Payne, it's about one

5  o'clock.  We can go ahead and take a lunch break.

6               MR. PAYNE:  Yes, sir.

7               THE COURT:  And come back and pick back up.

8               MR. PAYNE:  Yes, sir.

9               THE COURT:  Counsel, just if you folks have a

10 preference, an hour and 15 minutes or an hour and a half; do

11 you have a preference timewise?

12              MR. BRITT:  It's your call.

13              THE COURT:  Everybody think an hour and 15

14 minutes is enough?

15              MR. PAYNE:  Sure.

16              THE COURT:  All right.  We'll be at ease an hour

17 and 15 minutes.  We'll come back at 2:15.

18              (OFF THE RECORD AT 12:58 P.M.)

19              (LUNCHEON RECESS.)

20              (ON THE RECORD AT 2:18 P.M.)

21              (DEFENDANTS AND ALL COUNSEL PRESENT.)

22              (COURT CONFERS WITH CLERK.)

23              THE COURT:  All right.  Counsel, Exhibit 44,

24 Madam Clerk was asking the location of that.  I don't believe

25 that's -- I've got that.  44.

*State v. Henry McCollum and Leon Brown*

1              MS. ALSTON:  44 is the -- 44 is this binder.

2  (Confers with clerk and Mr. Payne.)

3              MR. PAYNE:  44 for the record, Judge, is the --

4  is the State -- North Carolina --

5              THE COURT:  Okay.

6              MR. PAYNE:  -- State SBI latent file.

7              THE COURT:  All right.  And the witness remain

8  under oath.  And, Mr. Payne, you may continue.

9              MR. PAYNE:  Thank you, Judge.  There was also

10  the issue with regard to Exhibit Number 45 which was?

11              MS. ALSTON:  It's the August 15th letter.

12              MR. PAYNE:  The August 15th letter.

13              THE COURT:  Okay.

14              MR. PAYNE:  We want to make sure for the record.

15  We weren't sure that the court reporter got it, but the August

16  15th letter from Artis to Ms. Stellato is in evidence.

17              THE COURT:  Okay.  And I'm sorry, that is

18  Exhibit 45?

19              MR. PAYNE:  45.

20              THE COURT:  All right.  And moving to introduce

21  that into evidence?

22              MR. PAYNE:  Yes, sir.

23              THE COURT:  Any objection?

24              MR. BRITT:  No, sir.

25              THE COURT:  All right.  It's allowed.  All

*State v. Henry McCollum and Leon Brown*

1  right.  We have -- where is the original?

2             MR. PAYNE:  You have it, Judge.  It was handed

3  up to you in a folder.

4             THE COURT:  That file.

5             MR. PAYNE:  Yes, sir.

6             THE COURT:  Okay.  Here we go.  You may proceed.

7             MR. PAYNE:  Thank you, Your Honor.

8        BY MR. PAYNE:

9     Q.   Ms. Stellato, when I left off speaking with you

10 before lunch, I was asking you about your findings with regard

11 to the similarities in other crimes regarding Mr. Artis.  One

12 other one I wanted to ask you to expound upon is the Bernice

13 Moss murder.

14    A.   Okay.

15    Q.   Turning your attention to that one very quickly.  Did

16 the -- as the Court's already heard, there were two foreign

17 objects found in Sabrina Buie's throat, panties and a stick,

18 right?

19    A.   Correct.

20    Q.   And in Bernice Moss's throat, the -- the autopsy also

21 located an object lodged in her throat?

22    A.   Correct.

23    Q.   And she was nude?

24    A.   Correct.

25    Q.   Except for a bra?

1     A.   And a shirt.

2     Q.   And a shirt.  And she was beaten with a stick?

3     A.   Yes, she was.

4     Q.   Okay.  You referenced also, Ms. Stellato, in your

5  direct examination a box of evidence that had been consistently

6  -- not boxed evidence, but Red Springs Police Department

7  consistently maintained no evidence was located there, and you

8  located a box of evidence there, correct?

9     A.   A box of evidence and documents.

10    Q.   And documents.  And in this box of evidence contained

11  the following: crime scene photographs?

12    A.   Correct.

13    Q.   Latent lifts?

14    A.   From 1991, correct.

15    Q.   Empty envelopes?

16    A.   Correct.

17    Q.   An unsealed SBI envelope?

18    A.   Correct.

19    Q.   That envelope contained nine evidence envelopes of

20  hairs and slides?

21    A.   Yes, it did.

22    Q.   And those hairs and slides included pubic hair

23  combings from Sabrina Buie?

24    A.   Yes, they did.

25    Q.   Also included hair found on Sabrina's blouse?

*State v. Henry McCollum and Leon Brown*

1    A.    Correct.

2    Q.    Hair from an anal swab?

3    A.    Labeled "hair from an anal swab," correct.

4    Q.    And labeled "known head and pubic hairs" from

5  Sabrina?

6    A.    Yes.

7    Q.    The box also contained an envelope labeled "enclosed

8  inked prints, McCollum, Brown, victim, and three latent

9  prints"?

10   A.    It was labeled that.  Upon conducting an inventory,

11 there were no prints of the victim inside that envelope, but

12 the other items were in the envelope.

13   Q.    It also contained two business cards from the former

14 SBI Director Haywood Starling that had latent lifts on the back

15 of the cards?

16   A.    Latent lifts collected from the crime scene evidence

17 in 1991 by Haywood Starling, correct.

18   Q.    And the lifts were labeled "beer can in envelope"?

19   A.    Yes.

20   Q.    And "beer can in paper bag"?

21   A.    Yes.

22   Q.    And as you indicated, those were dated 1991 and

23 immediately prior to Mr. McCollum's second trial?

24   A.    Correct.

25   Q.    The box also contained an unsealed envelope labeled

*State v. Henry McCollum and Leon Brown*

1  "wrapper from victim's body"?

2  　　A.　Yes, it did.

3  　　Q.　That envelope contained a small sealed envelope

4  containing the wrapper from Sabrina Buie's body?

5  　　A.　Yes, it did.

6  　　Q.　A sealed plastic bag labeled "left nails of Sabrina

7  Buie"?

8  　　A.　Yes.

9  　　Q.　And a sealed plastic bag labeled "the right nails of

10 Sabrina Buie"?

11 　　A.　Yes.

12 　　Q.　These were fingernail clippings?

13 　　A.　Yes, they were.

14 　　Q.　The box also contained an envelope containing a beer

15 can?

16 　　A.　Correct.

17 　　Q.　A Vaseline jar?

18 　　A.　Correct.

19 　　Q.　And a gum wrapper?

20 　　A.　Correct.

21 　　Q.　All collected from the crime scene?

22 　　A.　Correct.

23 　　Q.　And none of these items had ever been submitted for

24 testing, to your knowledge?

25 　　A.　No, they had not.

*State v. Henry McCollum and Leon Brown*

1    Q.   Thank you.  Now, I'd like to ask you with regard to

2  those prints that were requested to be compared from that --

3  from that beer can.

4    A.   Just to be clear, Mr. Payne, you weren't encompassing

5  all of the -- all of the items of evidence in that box?

6    Q.   No, ma'am.

7    A.   Okay.

8    Q.   No, ma'am.

9    A.   I'm sorry.

10    Q.   The beer can that was submitted with the print and

11  requested to be compared to Mr. Artis very recently?

12    A.   Uh-huh.

13    Q.   All right.  Now, what I want you to do is turn your

14  attention to the request for the prints?

15    A.   Okay.

16    Q.   Go back to 1983.  If I could have Exhibit 28 pulled

17  up.  Now, if you could go to Bates stamp 269.

18    A.   Okay.

19    Q.   Are you there?

20    A.   I am.

21         MR. PAYNE:  May I approach, please, Judge?

22         THE COURT:  Yes, sir.

23       BY MR. PAYNE:

24    Q.   You were telling Judge Sasser that on the request it

25  has special codes for suspect and victim, isn't that right?

*State v. Henry McCollum and Leon Brown*

1      A.   That's correct.

2      Q.   And Exhibit 28 at page 269 shows the submission, does

3   it not?

4      A.   It doesn't show the submission.  It shows the

5   submission date.

6      Q.   Right.

7      A.   The submission is actually the SBI-5.

8      Q.   That's correct.  I want to get the date in.  The date

9   is October 5, 1984?

10      A.   That's correct.

11      Q.   And it has Mr. Sinclair's name, L.B. Sinclair?

12      A.   Uh-huh.  I believe that's a typo.  It should be L.P.

13   Sinclair.

14      Q.   All right.  With an S?

15      A.   Uh-huh.

16      Q.   And Artis, Roscoe, with an S?

17      A.   Yes, it does.

18      Q.   And this was an SBI-5 form which, as we all know, is

19   the official request form that law enforcement sends up to SBI?

20      A.   Correct.

21      Q.   From the Red Springs Police Department?

22      A.   Correct.

23      Q.   That S has a very significant designation, does it

24   not?

25      A.   Before you get to the "S," that S-O-V, that stands

*State v. Henry McCollum and Leon Brown*

1    for -- and this is called a DCI form.  S-O-V is a code that

2    stands for Suspect or Victim code.  So, you're only ever going

3    to see an "S" or a "V" there, S being suspect, V being victim.

4        Q.   Okay.  Suspect or victim code.  And so, they made a

5    selection, didn't they?

6        A.   Correct.

7        Q.   And that selection was "suspect," right?

8        A.   That's correct.

9        Q.   Suspect for Sinclair?

10       A.   Correct.

11       Q.   Suspect for Artis?

12       A.   Correct.

13       Q.   And that was three days, as you know, prior to the

14   opening trial of Leon Brown and Henry McCollum?

15       A.   Yes, it was.

16       Q.   And as we all can see, it was canceled on 10/5 of

17   1985?

18       A.   Yes.

19       Q.   And the form -- the Exhibit Number 44 that you've

20   introduced today contains additional information with regard to

21   that; isn't that right, ma'am?

22       A.   It does.

23       Q.   Is that the information which says, "No lab report

24   testified in court"?

25       A.   Yes, on the front of the folder it says, "Printout

1  canceled 10/5/84.  No lab report testified in court."  It then

2  has initials 10/17/85.

3      Q.   Now, I believe you also testified that at the time,

4  of course, Mr. Artis was in custody; he'd been arrested?

5      A.   At the time of -- of the what?  The cancellation?

6      Q.   At the time of the request?

7      A.   Correct.

8      Q.   Because he had -- he has been to trial and convicted?

9      A.   Yes, he has.

10     Q.   And the -- the prints were prints that law

11  enforcement had at the time?

12     A.   (No response.)

13     Q.   They had the prints.

14     A.   Mr. Artis had been arrested prior to the Joann

15  Brockman murder several times.  We know that the Crime Lab had

16  some prints on file for him under one of his alias names.  In

17  addition to that, law enforcement agencies could have had

18  fingerprints.  If they did not, they could have obtained them

19  at the time of the request, as they did for L.P. Sinclair with

20  the SBI-5 form.  When a law enforcement agency submits an SBI-5

21  request with fingerprints attached to it, it may be because the

22  Crime Lab doesn't have the fingerprints.  If those fingerprints

23  are on file, the Crime Lab can pull them.

24     Q.   But with his long criminal history, it is certainly

25  reasonable to assume they would have had his prints?

*State v. Henry McCollum and Leon Brown*

1      A.   It's reasonable to assume they could have gotten his

2  fingerprints.

3      Q.   Okay.  Have gotten them.  Okay.  And when we talk

4  about -- now, coming forward with the attempt to compare, the

5  Commission asked the SBI to examine that print; isn't that

6  right?

7      A.   To examine the print of value, the identified print

8  of value --

9      Q.   Right.

10     A.   -- from the nine latent lifts that were taken from

11 the beer cans at the crime scene against the prints on file for

12 Roscoe Artis under his alias.

13     Q.   Okay.  And then they requested the submission of

14 inked impressions -- new inked impressions; isn't that correct?

15     A.   They stated -- correct.  They -- they originally

16 stated that the prints that they had on file were not

17 sufficient for a comparison given their age, and then they

18 requested major case inked impressions, which the Commission

19 went with the Crime Lab to obtain those major case inked

20 impressions.  Then after obtaining them, they issued the report

21 that stated, due to the age of those prints, they couldn't make

22 the -- they couldn't make the comparison.  They also stated

23 that they may never be able to make it, given the age.

24     Q.   But Mr. Sincla -- Mr. Artis is now 31 years older

25 now?

1      A.   Yes.  30 years older.

2      Q.   And his hands have aged 31 years?

3      A.   According to the Crime Lab.

4      Q.   Okay.  Now, in the course of your investigation you

5   have talked to various law enforcement agencies and, of course,

6   the District Attorney's Office?

7      A.   I have.

8      Q.   And this District Attorney's Office has been nothing

9   but cooperative with the North Carolina Innocence Inquiry

10  Commission, isn't that correct?

11     A.   That's correct.

12          MR. PAYNE:  And, Your Honor, it's already been

13  introduced into evidence, but with regard to Exhibit 35,

14  affidavit of outstanding attorney Adam Stein, I just want to

15  read the following items into the record -- not the entire

16  affidavit, but part of it, if Your Honor please.

17          THE COURT:  Yes, sir.

18          MR. PAYNE:  "I represented Leon Brown in the

19  second trial for first degree rape, first degree murder in

20  1992.  During his 1992 trial and after the murder charge was

21  dismissed, Mr. Brown was offered by the State a deal to plead

22  guilty to second degree rape.  Mr. Brown rejected that offer."

23          BY MR. PAYNE:

24     Q.   To come back full circle, Ms. Stellato, to what I

25  asked you earlier when we started out talking, Mr. Brown has

*State v. Henry McCollum and Leon Brown*

1  always maintained to you his innocence, isn't that correct?

2      A.   To the Commission?

3      Q.   Yes, ma'am.

4      A.   That's correct.

5      Q.   And he's always been consistent with that, hasn't he?

6      A.   That's correct.

7           MR. PAYNE:  Thank you very much.

8           THE WITNESS:  You're welcome.

9           MR. PAYNE:  No further questions, Judge.

10          THE COURT:  Mr. Britt?

11          MR. BRITT:  Yes, sir, if I may.

12                    CROSS-EXAMINATION                2:35 PM

13      BY MR. BRITT:

14      Q.   Ms. Stellato, let's focus on the forensic testing.

15      A.   Okay.

16      Q.   In 1983 when Sabrina Buie was murdered and raped,

17  what, if any, forensic testing was conducted on evidence

18  collected?

19      A.   The fingerprints, which you're aware of.  They did

20  ABO blood typing, which matched the victim.  That was done on

21  the two sticks that were found.  And also they did microscopy,

22  which they analyzed the hairs found to determine if they

23  matched Leon Brown or Henry McCollum.

24      Q.   And did you testify that there were also some

25  presumptive tests done to try -- for the presence of semen?

*State v. Henry McCollum and Leon Brown*

1      A.   Yes.  Correct.

2      Q.   And what were those results?

3      A.   Negative.

4      Q.   Was there any semen found on or in Sabrina Buie?

5      A.   No.

6      Q.   And we know that from the autopsy report?

7      A.   Correct.

8      Q.   And the autopsy was performed by now Chief Medical

9  Examiner Deborah Radisch?

10      A.   Correct.

11      Q.   In addition to testing presumptively for semen, there

12  was what is commonly called a rape kit?

13      A.   Correct.

14      Q.   Portions of that rape kit you found recently?

15      A.   That's correct.  The -- the rape kit was -- was

16  definitely divided into parts at some point.

17      Q.   And a rape kit includes items that are obtained from

18  a victim?

19      A.   From the victim.

20      Q.   That includes hair; at that time would have included

21  vaginal swabs, vaginal smears, anal swabs, anal smears, just

22  depending on what the allegations were?

23      A.   Correct.

24      Q.   There may have actually been even mouth swabs?

25      A.   Correct.

*State v. Henry McCollum and Leon Brown*

1    Q.   Head hairs are -- are taken?

2    A.   From the victim --

3    Q.   From the victim.

4    A.   -- yes, as well as pubic hairs.

5    Q.   And then in a -- with a suspect rape kit, are you

6  familiar with what items would have been collected from a

7  suspect rape kit in 1983?

8    A.   Hairs as well as blood.  Blood was also taken from

9  the victim, although it was too degraded to be used.

10    Q.   And in 1983, when you're referring to the laboratory

11  reports, the hairs that were collected from Sabrina Buie's body

12  and the hairs collected from Mr. Brown and Mr. McCollum, there

13  was an analysis performed or a comparison?

14    A.   Comparison.

15    Q.   And in 1983 the evidence was insufficient to identify

16  any of those hairs as belonging to Mr. Brown or Mr. McCollum?

17    A.   Specifically I remember them trying to compare the

18  hairs against Darryl Suber and Chris Brown with no

19  identifications made.  I would have to refer to the report.

20    Q.   In -- but in 1983 there was no identification or link

21  based upon hair examination between the body of Sabrina Buie

22  and any hairs collected from any suspects?

23    A.   No, sir.  There was not.

24    Q.   Moving forward to 2004-2005.

25    A.   Okay.

*State v. Henry McCollum and Leon Brown*

1     Q.   It was then that DNA testing was attempted for the

2   first time?

3     A.   Correct.

4     Q.   And that was done as a result as an -- of an order, a

5   consent order between Mr. Rose and myself as counsel for the

6   parties?

7     A.   For Henry McCollum, correct.

8     Q.   And in the 2004-2005 DNA analysis, there was a

9   partial DNA sample that was developed?

10    A.   From the cigarette butt, yes, sir.

11    Q.   And based upon that DNA profile, partial DNA profile

12  developed from the cigarette butt, Mr. McCollum at that time

13  was excluded --

14    A.   Yes, he was.

15    Q.   -- as having contributed to that DNA profile?

16    A.   He was.

17    Q.   At that point was there any other DNA compared with

18  the profile developed from the cigarette butt in 2004-2005?

19    A.   No, sir.

20    Q.   Mr. Brown filed his claim with the Innocence

21  Commission in 2010, 2009-2010?

22    A.   2009.

23    Q.   Am I correct in saying that initially the review of

24  his case focused on the statements that he purportedly made and

25  that Mr. McCollum purportedly made?

*State v. Henry McCollum and Leon Brown*

1     A.    In our initial review?

2     Q.    Yes.

3     A.    That was -- right.  We don't -- we don't begin DNA

4  testing until a case would get past an initial review phase.

5     Q.    And in that review process it's your testimony that

6  there were inconsistencies between Mr. Brown's statement and

7  Mr. McCollum's statement?

8     A.    Yes, there were.

9     Q.    One of those inconsistencies was that they did not

10 name the exact number of people who allegedly participated in

11 this murder-rape?

12    A.    The exact number or that one of them lived out of

13 state, yes.

14    Q.    And part of what you did in reviewing law enforcement

15 files, you were able to determine, were you not, that based

16 upon the law enforcement investigation in 1983, that Louis

17 Moore, who is named as an accomplice in one of the confessions,

18 actually was living and residing in another state as of

19 September -- on the date of this offense?

20    A.    Yes, sir, as of June 1983.

21    Q.    And it's fair to say that's something that law

22 enforcement knew as of that time?

23    A.    They knew that, yes, sir.

24    Q.    And based upon your review of the law enforcement

25 files, you also learned that Darryl Suber was an alleged

*State v. Henry McCollum and Leon Brown*

1  accomplice?

2      A.   Yes, I did.

3      Q.   And based upon those same law enforcement files, you

4  learned that an alibi had been established for Darryl Suber in

5  that he was in the town of Maxton?

6      A.   On the night of the murder.  Yes, I did.

7      Q.   Are you able to explain to us the different types of

8  DNA analysis that are available now in terms of you've referred

9  to STR, Y-STR, mitochondrial DNA testing; can you explain the

10 ---

11     A.   Sure.  STR DNA testing is DNA testing that looks at

12 the nucleus of a cell.  It's the most discriminating type of

13 DNA testing.

14     Q.   Let me stop you.

15     A.   Okay.

16     Q.   When you say it is the most discriminating, what do

17 you mean by that word?

18     A.   It is -- means that it's the one -- it's also the one

19 -- it's the one that you hear about most commonly when it says

20 "one in the world's population."  No two people will have the

21 same type of STR DNA unless they are identical siblings.  So

22 that's what I mean when I say "discriminating."

23     Q.   Okay.

24     A.   Whereas Y-STR, it is testing that looks at DNA that's

25 found in males only.  Therefore, it's paternally inherited, and

*State v. Henry McCollum and Leon Brown*

1 every male in the same paternal line will have the same Y-STR

2 profile.

3     Q.    And with respect to mitochondrial?

4     A.    Mitochondrial DNA is the maternal line.  It's not

5 good with mixtures, which is why you'll typically see it in

6 items such as hair or bone.  You wouldn't see it, for example,

7 on the victim's clothing because a victim would mask, like her

8 blood or her fluids would mask a male profile.

9     Q.    With respect to the testing that has been performed

10 in this case from 2004, 2005 to the present, what, if any,

11 person was identified by STR DNA analysis?

12     A.    Roscoe Artis.

13     Q.    What, if any, person has been identified as the

14 result of Y-STR DNA analysis?

15     A.    I should say that also the victim -- that the profile

16 from the victim cannot be excluded under STR DNA.  Under Y-STR

17 Roscoe Artis has also been identified.

18     Q.    And who, if anyone, who has been -- has been

19 identified utilizing mitochondrial DNA testing?

20     A.    Only the victim cannot be excluded.  I believe in one

21 mitochondrial test we did, Artis was not able to be excluded

22 either.

23     Q.    With respects -- with respect to the interviews that

24 have been conducted with Mr. Artis, has Mr. Artis been

25 consistent or inconsistent with his alleged involvement with

*State v. Henry McCollum and Leon Brown*

1  Sabrina Buie?

2      A.    Inconsistent.

3      Q.    And with respect to the -- the other crimes that Mr.

4  Artis has either been convicted of or been a -- has been a

5  suspect in, has the manner of death between -- is the manner of

6  death between Sabrina Buie, Joann Brockman, and Ms. Moss, are

7  they consistent?

8      A.    The manner of death is consistent between all three,

9  yes.

10     Q.    And the manner of assault between the three homicide

11 victims and the victims of the assaults with the intent to

12 commit rape, have they been consistent?

13     A.    Yes, they have.

14     Q.    Other than in -- in the course of your investigation,

15 other than the statements that were attributed to Mr. Brown and

16 Mr. McCollum, has there been any evidence that was developed

17 linking either Mr. McCollum or Mr. Brown to the murder and rape

18 of Sabrina Buie?

19     A.    Any evidence?

20     Q.    Is there any evidence that has been developed during

21 the course of the investigation that linked Mr. McCollum and

22 Mr. Brown to the murder and rape of Sabrina Buie?

23     A.    The Commission has not been able to substantiate any

24 evidence linking them to the crime.

25     Q.    And had there been any evidence that linked Mr. Brown

*State v. Henry McCollum and Leon Brown*

1  or Mr. McCollum to the murder and rape of Sabrina Buie, what

2  would the Commission's steps have been?

3     A.   If the Commission found evidence that linked Leon

4  Brown to involvement in the rape or murder, then the Commission

5  would close the case.

6     Q.   And just so the record is clear, Mr. McCollum never

7  filed a claim of innocence?

8     A.   No, sir, Mr. McCollum is not a claimant.

9     Q.   And has not filed a claim?

10    A.   No, he hasn't.  But his attorney has been cooperative

11 with the Commission investigation.

12    Q.   And so, the investigation that the Commission

13 undertook was as a result of the claim filed by Mr. Brown?

14    A.   It has been a result -- Leon Brown is our claimant.

15 At the same time, as I've explained in the past, with there

16 being five boys named in the confession, the Commission's job

17 is to look at all five and to make determinations about who was

18 involved, if any.  If one was involved, if four were involved,

19 you know, our job is to figure out the truth about whoever was

20 involved.

21    Q.   And with respect to the claim that Mr. Brown filed,

22 have you found it difficult, if not impossible, to eliminate

23 consideration of Mr. McCollum as part of Mr. Brown's claim?

24    A.   Yes.  I mean, we could -- we could never not look

25 into Mr. McCollum's case as well because they are so closely

*State v. Henry McCollum and Leon Brown*

1  connected.

2      Q.   With respect to the box of evidence located at the

3  Red Springs Police Department earlier this summer, had any of

4  that evidence previously been submitted to what was the SBI

5  Crime Lab, now the State Crime Lab, for any type of analysis?

6      A.   The hairs had been submitted in 1983, and then, in

7  1991 the -- the evidence went missing after 1991, after

8  McCollum's trial in 1991.  The hairs had definitely been

9  submitted.  Some of the evidence had been submitted at trial in

10 1984.  The sheets were brought out at trial.  There were

11 different items that had been submitted.

12     Q.   And based upon your investigation, there's been no

13 additional evidence that has turned up linking Mr. Brown or

14 Mr. McCollum to these crimes?

15     A.   Physical evidence?

16     Q.   Physical evidence.

17     A.   No, sir.

18     Q.   The evidence that linked them to the crimes when they

19 were originally charged involved the statements they made; is

20 that correct?

21     A.   Correct.

22     Q.   And then the testimony of one L.P. Sinclair?

23     A.   Correct.  And the statement of Ethel Furmage.

24     Q.   And you testified earlier on direct examination that

25 Mr. Sinclair had actually been interviewed by law enforcement

*State v. Henry McCollum and Leon Brown*

1    twice prior to testifying?

2        A.   Yes, he had been interviewed twice by law

3    enforcement.

4        Q.   And his trial testimony differed from the previous

5    statements obtained from -- made by him in the investigation?

6        A.   Yes, it did.

7        Q.   In essence, Mr. Sinclair denied knowing anything in

8    the statements previous -- prior to the first trial,

9    Mr. Sinclair denied knowing anything about Sabrina Buie's

10   death?

11       A.   Correct.

12       Q.   At trial he testified that Mr. McCollum and Mr. Brown

13   had confided in him with respect to what had happened to

14   Sabrina Buie?

15       A.   That they were involved in the rape and murder of

16   Sabrina Buie, yes.

17       Q.   And there was no other evidence that was presented

18   against them?

19       A.   No, sir.

20             MR. BRITT:  Thank you.  I don't have any other

21   questions.

22             THE COURT:  Any redirect?

23             MS. ALSTON:  No.

24             THE COURT:  Any recross?

25             MR. PAYNE:  No, sir.

*State v. Henry McCollum and Leon Brown*

 1                    THE COURT:  All right.  You may step down.

 2          Any further evidence on behalf of Mr. McCollum?

 3                    MS. ALSTON:  No further evidence.

 4                    THE COURT:  All right.

 5                    MR. PAYNE:  No further evidence on behalf of

 6  Mr. Brown.  We rest, Judge.

 7                    THE COURT:  Mr. Britt, any evidence on behalf of

 8  the State?

 9                    MR. BRITT:  No, sir.  There's no evidence on

10  behalf of the State.

11                    THE COURT:  Let's take a very short, about a

12  ten-minute break -- well, you know, actually a 15-minute break

13  before closing arguments if you want to be heard.  We'll be at

14  ease 15 minutes.

15                    (OFF THE RECORD AT 2:53 P.M.)

16                    (AFTERNOON RECESS.)

17                    (ON THE RECORD AT 3:31 P.M.)

18                    (DEFENDANTS AND ALL COUNSEL PRESENT.)

19                    THE COURT:  All right.  And it's defendants'

20  motions.  My understanding during the break counsel wish to

21  waive, I guess, the opening closing argument.

22                    MS. ALSTON:  That's correct, Your Honor.

23                    MR. PAYNE:  Yes, sir.

24                    THE COURT:  And I'll hear from the State.

25  Mr. Britt, Mr. Osman.

*State v. Henry McCollum and Leon Brown*

1              MR. BRITT:  Yes, sir.  Your Honor, we're here

2    today, it's a culmination of a process that involved

3    postconviction DNA testing.  The statute that governs the

4    procedures, 15A-269 and then 270, and if I may, if the Court

5    will indulge me.

6              THE COURT:  Yes, sir.

7              MR. BRITT:  15A-269 reads, "A defendant may make

8    a motion for the trial -- to the -- before the trial court that

9    entered the judgment of conviction against the defendant for

10   performance of DNA testing and, if testing complies with FBI

11   requirements and the data meets NDIS criteria, profiles

12   obtained from that testing shall be searched and uploaded to

13   CODIS if the biological evidence meets all the following

14   conditions:  If the material -- is material to the defense --

15   the defendant's defense; is it related to the investigation or

16   prosecution that resulted in the judgment; meets either of the

17   following conditions:  It was not DNA tested previously -- it

18   was not tested previously, but the requested DNA test would

19   provide results that are significantly more accurate and

20   probative of the identity of the perpetrator or accomplice or

21   have a reasonable probability of contradicting prior test

22   results, the court shall grant the motion for DNA testing and,

23   if testing complies with the FBI requirements, the run of any

24   profiles obtained from the testing upon its determination that

25   the conditions set forth in subdivisions (1), (2), and (3) of

*State v. Henry McCollum and Leon Brown*

1  subsection (a) of this section have been met; if the DNA

2  testing being requested has been -- had been conducted on the

3  evidence, there exists a reasonable probability that the

4  verdict would have been more favorable to the defendant; and,

5  three, the defendant has signed a sworn affidavit of

6  indigency."

7      The statute continues, but more significantly is 270,

8  which reads, "Notwithstanding any other provision of law, upon

9  receiving the results of the DNA testing conducted under

10 G.S. 15A-269, the court shall conduct a hearing to evaluate the

11 results and determine if the results are unfavorable or

12 favorable to the defendant; (b) If the results of DNA testing

13 conducted under this section are unfavorable to the defendant,

14 the court shall dismiss the motion and, in the case of a

15 defendant who is not indigent, shall assess the defendant for

16 the cost of the testing; (c) If the results of DNA testing

17 conducted under this section are favorable to the defendant,

18 court shall enter an order that serves the interest of justice,

19 including an order that does any of the following:

20     (1)  Vacates and sets aside the judgment.

21     (2)  Discharges the defendant if the defendant is in

22 custody.

23     (3) Resentences the defendant.

24     (4) Grants the defendant a new trial.

25      In the responsive pleadings, the State has conceded

*State v. Henry McCollum and Leon Brown*

1 the issue that the DNA test results most recently conducted by

2 the Innocence Commission on behalf of Mr. Brown and

3 Mr. McCollum are, in fact, favorable.  Based upon those test

4 results, a third party has been identified as either a

5 participant or the perpetrator of the murder and rape of

6 Sabrina Buie.  Those DNA test results exclude the defendants

7 McCollum, Brown, and any alleged accomplices contained in those

8 statements.

9         As the Court has heard evidence today, the evidence

10 against Mr. Brown and Mr. McCollum at their original trial in

11 1984 and then their subsequent trials in 1991 and 1992 centered

12 on the alleged confessions made by both.  After reviewing the

13 DNA test results; after looking at the inconsistencies between

14 the two statements, including the fact that one alleges an

15 additional perpetrator than the other; there are differences in

16 the manner in which it's alleged the body was disposed, at a

17 minimum Mr. Brown and Mr. McCollum are entitled to a new trial.

18 The statute authorizes the Court to do any one or a combination

19 of those four.

20         I would be remiss if I did not read the following

21 with respect to what the North Carolina State Bar in commentary

22 to Rule 3.8 has said in the Rules of Professional Conduct,

23 Rule 3.8 involves special prosecut -- special responsibilities

24 of the prosecutor.

25              Comment [1]:  A prosecutor has the

1     responsibility of a minister of justice and
2     not simply that of an advocate; the
3     prosecutor's duty to seek justice -- is to
4     seek justice, not merely to convict.  The
5     responsibility carries with it specific
6     obligations to see that the defendant is
7     accorded procedural justice and that guilt
8     is decided upon the basis of sufficient
9     evidence.  Precisely how far the prosecutor
10    is required to go in this direction is a
11    matter of debate and varies in different
12    jurisdictions.
13        The prosecutor represents the
14    sovereign and, therefore, should use
15    restraint in the discretionary exercise of
16    government powers, such as the selection of
17    cases to prosecute.  During trial, the
18    prosecutor is not only an advocate, but he
19    is also -- may also make decisions normally
20    made by an individual client, and those
21    affecting the public interest should be
22    fair to all.  In our system of criminal
23    justice, the accused is to be given the
24    benefit of all reasonable doubt.  With
25    respect to evidence and witnesses, the

*State v. Henry McCollum and Leon Brown*

1          prosecutor has responsibilities different

2          from those of a lawyer in private practice.

3          The prosecutor should make timely

4          disclosure to the defense of available

5          evidence known to him or that tends to

6          negate the guilt of the accused, mitigate

7          the degree of the offense, or reduce the

8          punishment.  Further, a prosecutor should

9          not intentionally avoid pursuit of evidence

10         merely because he or she believes it would

11         damage the prosecutor's case or aid the

12         accused.

13         The evidence that you have heard today, in my

14 opinion, negates the evidence that was presented at trial, and

15 as a result, the outcome of a -- of a trial, I believe, would

16 be different.

17         If the Court merely -- and I -- and I apologize for

18 using that word, but if the Court's remedy is to grant a new

19 trial, based upon this new evidence, the State does not have a

20 case to prosecute against Mr. McCollum and Brown when comparing

21 the statements with the now-known forensic evidence in this

22 case, and as a result the State would not reprosecute them.

23         They have been incarcerated for 31 years.  And as a

24 result, I do believe it is in the interest of justice -- in the

25 interest of justice that the Court find that -- make that

*State v. Henry McCollum and Leon Brown*

1 finding, that this evidence is favorable, and as a result they

2 are entitled to one or all of the available remedies that the

3 Court deems are appropriate.

4         THE COURT:  Thank you, sir.

5       On behalf of Mr. McCollum?

6         MR. ROSE:  Thank you, Your Honor.  My name is

7 Ken Rose.  I represent Mr. McCollum along with Vernetta

8 Alston and Rich Johnston.

9       We can't give these defendants back the 31 years that

10 they've been incarcerated -- Mr. McCollum on death row for

11 almost all of those 31 years, Mr. Brown imprisoned and on death

12 row for a few of those years.  But we can do what we -- now

13 what we should have done a long time ago, and that is

14 acknowledge their innocence, release them, and give them a

15 chance at a new life.

16       I want to acknowledge Mr. Britt's role in this.  He

17 is -- he is absolutely right about the ethical duties of the

18 prosecutor, and he has epitomized the best -- in the best

19 tradition of those duties to do justice and not to seek --

20 merely seek convictions.  Also, I would like to acknowledge,

21 Your Honor, the role of the actual Innocence Commission and

22 just to say candidly to the Court that the attorneys for

23 Mr. McCollum could not be here today and would not be in a

24 position to establish their innocence but for the amazing work

25 of the Innocence Inquiry Commission.

*State v. Henry McCollum and Leon Brown*

1      Finally, Your Honor, I'd like to acknowledge also and

2 recognize the suffering of not just Mr. McCollum and Mr. Brown,

3 but the families that have gone through this process of 31

4 years.  Their mother, who died last year, not knowing that

5 their sons -- her sons would be found innocent and released;

6 and their grandmother, who also died while they were

7 incarcerated.

8      Your Honor, based on the favorable DNA evidence and

9 the corroborating evidence that you heard today tending to

10 establish Henry McCollum and Leon Brown's innocence of the

11 crimes for which they were convicted and sentenced, and

12 pursuant to 15A-270, in the interest of justice, Mr. McCollum

13 requests that you vacate his convictions of first degree murder

14 and first degree rape and his death sentence, that you order

15 his immediate discharge from the custody of the State of North

16 Carolina, and that you dismiss all charges in these cases

17 against Mr. McCollum with prejudice based on evidence of their

18 innocence.

19      Thank you, Your Honor.

20          THE COURT:  Thank you, sir.

21      On behalf of Mr. Brown.

22          MR. PAYNE:  May it please the Court, good

23 afternoon.  Your Honor, lawyers like to talk a lot, but I'll be

24 brief, Your Honor, because I think most everything that's been

25 said has been said.

*State v. Henry McCollum and Leon Brown*

1          On behalf of Ms. Kirby and Mr. Leon Brown, we want to

2    join with counsel in urging the Court to dismiss all charges

3    against Mr. Brown, enter an order, as we have discussed,

4    finding a dismissal is warranted based upon the evidence of

5    innocence.

6          And let me join in with my co-counsel here with

7    extending a hand across the aisle to Mr. Britt, who has shown

8    what integrity means in the best traditions of the legal

9    profession.

10          And as Mr. Rose said, we couldn't be here were it not

11   for the Innocence Commission.  And it would be remiss if I

12   didn't point out we have Chief Justice I. Beverly Lake sitting

13   in here, who is so responsible for that and has established

14   such a jurisprudence for the State of North Carolina.

15          So, Your Honor, there ends it.  Ask you to enter the

16   order.

17          Thank you, sir.

18              THE COURT:  Thank you, sir.

19          Court finds that on September 29th, 1983, that

20   19-year-old Henry McCollum and 15-year-old Leon Brown were

21   arrested for the murder of Sabrina Buie.  In October 1984, both

22   defendants were tried together in Robeson County, convicted of

23   first degree murder and rape and sentenced to death.  *State*

24   *versus McCollum,* 321 N.C. 557, 364 S.E.2d 112, (1988).

25          Next, Court finds that in *McCollum and Brown*,

1 312 N.C. 557 (1988), the North Carolina Supreme Court vacated

2 the defendants' convictions and ordered new trials.

3       Next, Court finds that Mr. McCollum was reconvicted

4 and resentenced to death at his second trial in 1991.

5 Mr. Brown was reconvicted of first degree rape at his second

6 trial in 1992 and sentenced to life in prison, the facts of

7 this case reported in the opinion *State versus McCollum and*

8 *Brown,* 312 N.C. 557 (1988) and *State versus McCollum,* 334 N.C.

9 208 (1994), and *State versus Brown* 112 N.C. App. 390 (1993).

10       The evidence -- Court finds that the evidence against

11 Mr. McCollum and Mr. Brown was centered on and comprised almost

12 entirely of their confessions.

13       Next, Court finds that no physical evidence, either

14 at the time of their arrest or at any time since, linked

15 Mr. McCollum or Mr. Brown to the scene or the commission of

16 this crime. Both Mr. McCollum and Mr. Brown, as well as their

17 alleged and uncharged accomplices, were eliminated as the

18 sources of an unknown and potentially identifiable fingerprint

19 found at the crime scene.

20       Next, Court finds both Mr. McCollum and Mr. Brown

21 have maintained their complete innocence of this crime.

22       Court finds that on November 6th, 2004, this Court

23 granted Mr. McCollum's motion for postconviction DNA testing of

24 biological evidence pursuant to N.C. General Statute 15A-269.

25       Court finds in 2010 at the request of Mr. Brown, the

*State v. Henry McCollum and Leon Brown*

1 North Carolina Innocence Inquiry Commission staff began

2 investigating his claim of actual innocence.

3 Court finds the Commission undertook to test or

4 retest the physical evidence collected by law enforcement in

5 Mr. Brown's case.

6 Court finds after DNA testing the physical evidence

7 in 2004 and 2010, Mr. McCollum and Mr. Brown, respectively,

8 were excluded as possible contributors of the DNA from a

9 cigarette butt and other items found at the crime scene

10 adjacent to direct evidence of the murder.

11 Next, Court finds that over four years of testing,

12 the Commission staff received DNA test results for several

13 items of physical evidence obtained in the course of their

14 investigation in Mr. Brown's case.  The Commission's testing

15 confirmed that the Y-STR DNA profile obtained from the

16 cigarette butt found next to bloody sticks and other evidence

17 at the crime scene is consistent with the Y-STR DNA profile

18 obtained from another individual, state prison inmate Roscoe

19 Artis.

20 Court next finds that the DNA results not only

21 contradict the State's previous theory, that Mr. McCollum and

22 Mr. Brown raped and murdered Sabrina Buie with certain alleged

23 but uncharged accomplices, they, along with other

24 circumstantial evidence, show a strong likelihood that serial

25 rapist and murderer Mr. Artis alone raped and murdered Ms.

*State v. Henry McCollum and Leon Brown*

1  Buie.

2        Court finds these newly discovered DNA results

3  presented by the Commission to counsel for Mr. McCollum,

4  counsel for Mr. Brown, and counsel for the State yield

5  favorable evidence for Mr. McCollum and Mr. Brown.  This

6  conclusion the State does not contest.

7        Court finds the result of the court-ordered DNA

8  testing pursuant to North Carolina General Statute 15A-269,

9  especially when considered together with the rest of the

10 results of the Commission's investigation, are favorable to

11 Mr. McCollum and Mr. Brown.  The defense has thus satisfied the

12 standard under 15A-270, and they are entitled to relief as

13 available under the statute.  The State has conceded that

14 Mr. McCollum and Mr. Brown are entitled to relief under General

15 Statute 15A-270 and has indicated there's insufficient evidence

16 to retry them.

17       Under these circumstances, the interest of justice in

18 this case compel that the Court vacate the convictions and

19 death sentence of Mr. McCollum and the conviction and life

20 sentence of Mr. Brown and discharge both men from confinement

21 based on significant new evidence that they are, in fact,

22 innocent.

23       Court therefore concludes that, based on the

24 foregoing and in view of the favorable DNA evidence tending to

25 establish Henry McCollum and Leon Brown's innocence of the

*State v. Henry McCollum and Leon Brown*

1 crimes for which they were convicted and sentenced, and

2 pursuant to North Carolina General Statute 15A-270, subsection

3 (c)(2), in the interest of justice, this Court, first, vacates

4 Mr. McCollum's convictions of first degree murder and first

5 degree rape and his death sentence under Robeson County case

6 numbers 83 CRS 15506 and 15507 and 91 CRS 40727.  The Court

7 further vacates Mr. Brown's conviction of first degree rape and

8 life sentence under Robeson County case number 92 CRS 2492.

9          The Court orders the immediate discharge of

10 Mr. McCollum and Mr. Brown from the custody of the State of

11 North Carolina and dismisses with prejudice all charges in

12 these cases against Mr. McCollum and Mr. Brown based upon the

13 District Attorney's statement that he does not intend to seek

14 any further charges against the defendants along with the

15 evidence of the defendant's innocence.

16          Court finally orders that the Department of Public

17 Safety Division of Adult Corrections immediately process and

18 release the defendants.

19          Anything else from the State?

20          MR. BRITT:  No, sir.  I would just so that

21 there's no confusion with respect to the file numbers.

22          THE COURT:  Yes, sir.

23          MR. BRITT:  The original Robeson County file

24 numbers for Mr. McCollum are 83 CRS 15506 and 07.  When venue

25 was transferred to Cumberland County for the second trial,

*State v. Henry McCollum and Leon Brown*

1  there was a new indictment returned against Mr. McCollum in

2  Cumberland County, and that is the file number for which the

3  death judgment was entered, and that is 91 CRS 40727.

4             THE COURT:  All right.

5             MR. BRITT:  And then with respect to Mr. Brown,

6  the original Robeson County file numbers were 83 CRS 15822 and

7  23.  Likewise, when venue was changed to Bladen County, there

8  was new -- there were new indictments returned there, and those

9  file numbers are Bladen County 92 CRS 2491 and 2492.

10            THE COURT:  All right.  And in my written

11 judgment, I'll include all file numbers, make sure that's

12 clear, both the Robeson County, the Cumberland County, and the

13 Bladen County file numbers.

14        Anything else?

15            MR. BRITT:  No, sir.

16            THE COURT:  Anything else on behalf of

17 Mr. McCollum?

18            MS. ALSTON:  No, sir.

19            THE COURT:  On behalf of Mr. Brown?

20            MR. PAYNE:  No, sir.  Thank you, Your Honor.

21            THE COURT:  All right.  Thank you, folks.  All

22 right.  Then we'll be at ease.

23            (THEREUPON, THIS MATTER CONCLUDED AT 3:52 P.M.)

24

25

*State v. Henry McCollum and Leon Brown*

## CERTIFICATE

I, Julie R. Ryan, the officer before whom the foregoing proceeding was taken, do hereby certify that said transcript, pages 1 through 139 inclusive, is a true, correct and verbatim transcript of said proceeding.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was heard; and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, and am not financially or otherwise interested in the outcome of the action.

_Julie R. Ryan_

Julie R. Ryan, CVR-CM-M, CCR

Official Court Reporter

_State v. Henry McCollum and Leon Brown_

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE

COUNTY OF ROBESON               SUPERIOR COURT DIVISION
_____

STATE OF NORTH CAROLINA     )     <u>CERTIFICATE OF DELIVERY</u>
                            )     <u>OF TRANSCRIPT</u>
vs.                         )
                            )     ROBESON COUNTY FILE NOS.
HENRY LEE MCCOLLUM,         )     83 CRS 15506-7
                            )     CUMBERLAND COUNTY FILE NO.
          Defendant.        )     91 CRS 40727
                            )
and                         )
                            )
STATE OF NORTH CAROLINA     )
                            )     ROBESON COUNTY FILE NOS.
vs.                         )     83 CRS 15822-23
                            )     BLADEN COUNTY FILE NO.
LEON BROWN,                 )     92 CRS 241-2
                            )
          Defendant.        )
_____

        The undersigned does hereby certify that the

transcript of the September 2, 2014, MAR hearing in the

above-named matters was requested of Julie R. Ryan, Official

Court Reporter, on September 17, 2014, and pages 1 through 139

delivered and/or mailed to the Innocence Inquiry Commission as

listed below on October 3, 2014.

                    _Julie R. Ryan_____
                    Julie R. Ryan, CVR-CM-M, CCR
                    Official Court Reporter
                    Robeson County Courthouse 18
                    Lumberton, NC  28358

Kendra Montgomery-Blinn, J.D.
Executive Director
North Carolina Innocence Inquiry Commission
P.O. Box 2448
Raleigh, NC  27602