**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-2313

J. DUANE GILLIAM, Guardian of the Estate of Leon Brown; RAYMOND
CURTIS TARLTON, Guardian Ad Litem for Henry Lee McCollum; KIMBERLY
ANN PINCHBECK, as limited guardian and conservator of the estate of Henry Lee
McCollum,

　　　　　　　　Plaintiffs - Appellees,

　　　　v.

LEROY ALLEN; CHARLOTTE NOEL FOX, Administrator of the Estate of
Kenneth Snead,

　　　　　　　　Defendants - Appellants,

　　　　and

ROBESON COUNTY; TOWN OF RED SPRINGS; KENNETH SEALEY, both
individually and in his official capacity as the Sheriff of Robeson County; LARRY
FLOYD; PAUL CANADY, Administrator C.T.A of the Estate of Luther Haggins;
ROBERT E. PRICE, Administrator C.T.A of the Estate of Joel Garth Locklear, Sr.,

　　　　　　　　Defendants.

Appeal from the United States District Court for the Eastern District of North Carolina, at
Raleigh.  Terrence W. Boyle, District Judge.  (5:15-cv-00451-BO)

Argued:  December 6, 2022　　　　　　　　　　　Decided:  March 8, 2023

Before NIEMEYER, THACKER, and RICHARDSON, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Thacker and Judge Richardson joined.

———————————

**ARGUED:**  Scott Douglas MacLatchie, Charlotte, North Carolina, Adam F. Peoples, HALL BOOTH SMITH, PC, Asheville, North Carolina, for Appellants.  Catherine Emily Stetson, HOGAN LOVELLS US LLP, Washington, D.C., for Appellees.  **ON BRIEF:** Austin A. Atkinson, Pearson K. Cunningham, HALL BOOTH SMITH, PC, Atlanta, Georgia, for Appellants.  E. Desmond Hogan, W. David Maxwell, Elizabeth C. Lockwood, Matthew J. Higgins, Patrick C. Valencia, HOGAN LOVELLS US LLP, Washington, D.C., for Appellees.

———————————

2

NIEMEYER, Circuit Judge:

In September 1983, Henry McCollum and Leon Brown, two intellectually disabled teenage half-brothers from Red Springs, North Carolina, were, as a jury later found, coerced into signing fabricated confessions, leading to their convictions for the rape and murder of an 11-year-old girl. McCollum, the older brother, was sentenced to death, while Brown, the younger brother, was sentenced to life imprisonment.

Following an investigation by the North Carolina Innocence Inquiry Commission and the testing of DNA evidence, a state court vacated the brothers' convictions, finding there to be "significant evidence that they [were], in fact, innocent." Thereafter, North Carolina Governor Patrick McCrory granted each a "Pardon of Innocence." When they were released in September 2014, McCollum and Brown had served 31 years in prison.

Through appointed guardians, the two commenced this action against six law enforcement officers, the town of Red Springs, and Robeson County under 42 U.S.C. § 1983 for violations of their due process rights, alleging that the defendants coerced them into signing fabricated confessions and then arrested them without probable cause. They also alleged that the defendants failed to provide them with material exculpatory evidence prior to trial. Some of the defendants settled the plaintiffs' claims before trial, but two law enforcement officers went to verdict. The jury awarded the plaintiffs a total of $62 million in compensatory damages and $13 million in punitive damages. The district court observed that the verdicts were likely "the highest jury award in a wrongful conviction case to date." Following entry of the judgment, the court granted the plaintiffs' motion for prejudgment interest, which added another $36 million to the judgment, and denied the defendants'

3

motion to reduce the judgment by the amounts that the plaintiffs had received in settlements with other defendants and from the State of North Carolina as a statutory award. Finally, the court awarded the plaintiffs' counsel $6.25 million in attorneys fees and costs.

On appeal, the defendants challenge (1) the district court's conduct of the trial on several procedural grounds, arguing that they were denied a fair trial and that the district court therefore erred in denying their motion for a new trial; (2) the court's refusal to reduce the jury's verdict by the $11.5 million that the plaintiffs had received from others as redress for their injuries prior to the verdict; (3) the court's addition of $36 million in prejudgment interest to the jury's award; and (4) the reasonableness of the court's award of attorneys fees. For the reasons that follow, we (1) affirm the district court's denial of the defendants' motion for a new trial; (2) vacate the court's order refusing to reduce the verdict amount to account for other recoveries; (3) reverse the court's order awarding prejudgment interest; and (4) affirm the court's award of attorneys fees.

## I

### A

On September 24, 1983, Sabrina Buie, an 11-year-old girl living in Red Springs, North Carolina, went missing. Two days later, her body was found in a soybean field, naked from the waist down with her bra pushed up over her head. Her panties had been shoved down her throat with a stick, and she had been raped. The coroner determined that Buie died of asphyxiation.

An investigation was immediately undertaken by the Red Springs Police Department, Robeson County Sheriff's detectives, and the North Carolina State Bureau of Investigation ("SBI"), and the case was assigned to Robeson County detectives Joel Garth Locklear and Kenneth Sealey and SBI agents Kenneth Snead and Leroy Allen.

Four days after the rape and murder — on September 28, 1983 — a 17-year-old high school student, Ethel Furmage, volunteered to law enforcement officers that she had information about the crime. She told Detective Sealey and Agent Snead that she had "heard at school" that Henry McCollum "had something to do with" the Buie murder. That evening, shortly after 9:00 p.m., Detective Sealey, Agent Snead, and Agent Allen went to McCollum's house, where McCollum was living with his stepmother, Mamie Brown, and his 15-year-old brother, Leon Brown. The officers asked McCollum to go with them to the Red Springs Police Station, and McCollum agreed. He went alone.

McCollum was 19 years old and suffered from severe intellectual disability. His IQ had been measured as low as 56, with an IQ lower than 69 indicating intellectual disability. In high school, he performed at the level of an 8- to 10-year-old. McCollum had never been in legal trouble.

At the police station, according to McCollum, the officers aggressively interrogated him despite his repeated denials of having any involvement in Buie's rape and murder. They yelled at him from inches away, pounded the table, and relentlessly accused him of participating in the crime, providing hypothesized facts. They refused his request to see his mother and had him sign a form waiver of his *Miranda* rights. As the hours wore on without the officers' making progress, Agent Snead drafted a confession, and the officers

5

told McCollum that they would let him "go home" if he signed it but he would "get the gas chamber" if he refused.  After four to five hours of interrogation, at about 2:00 a.m., McCollum finally gave in and signed the confession prepared for him.

The confession stated that McCollum committed the murder along with four others — his brother, Leon Brown, and their friends Darrell Suber, Louis Moore, and Chris Brown.  The five of them, according to the confession, were with Buie the evening of September 24, 1983.  When Buie declined to have sex with them, they jointly decided to rape her.  Once Buie had been raped, according to the confession, the boys realized that they would have to "do something" so that she would not tell the police.  Chris Brown then killed Buie by pushing her panties down her throat with a stick while Suber stabbed her with a knife (although, in fact, Buie's body had no stab wounds).  Buie's body was then dragged across the field and left in a shallow ditch.

After McCollum signed the confession and started to head home, as he had been promised, the officers arrested him based on his signed confession.

While McCollum was being interrogated, Mamie Brown and Leon Brown arrived at the station to wait for him.  After McCollum signed the confession — and at a moment when Mamie Brown had briefly stepped outside for air — the officers asked Leon Brown into a room, where he too was questioned, based on McCollum's confession.

Leon Brown was 15 years old and had been determined to be severely intellectually disabled, scoring 55 on recent IQ tests.  Like McCollum, Leon Brown also had never been in legal trouble.

6

According to Brown, the officers interrogated him aggressively, "hammer[ing]" him and "press[ing]" him, even though he denied any involvement in the crime. The officers said that if Brown did not confess, he would face the death penalty. And despite Mamie Brown's repeated requests to be allowed in the room with her son, the officers denied her entry. Agent Locklear drafted a confession for Brown to sign and told him that if he signed it he could go home, but if not, he would be sent to the gas chamber. "Scared" and "miserable," Brown signed the confession at 6:00 a.m., after about four hours of questioning. He stated later that he did not understand what he had signed.

Brown's confession told a story broadly similar to that contained in McCollum's confession, although it had several differences. For instance, Brown's confession named only four boys as having been involved, rather than five. Based on his signed confession, Brown, too, was arrested.

In October 1983, shortly after McCollum and Brown were arrested, another girl from Red Springs, Joann Brockman was raped and murdered. Brockman's body was discovered one mile from Buie's and, like Buie's, her body was found nude from the waist down with her bra pulled up over her head, near a wooded area, where she had been dragged, raped, and strangled to death. A man named Roscoe Artis was quickly identified as a suspect in the Brockman murder. Artis lived in a house adjacent to the field where Buie's body was found — about 40 feet away. But investigators in the Buie case spoke only once with Artis, shortly after the Brockman murder. Someone in the Buie investigation submitted a request for Artis's fingerprint records to be compared to

7

fingerprints found on beer cans near Buie's body, but for some unknown reason, the request was "cancel[ed]" before any analysis was performed.

Subsequently, in January 1984, Detective Locklear and Agent Allen, while investigating the Brockman murder, interviewed Billie Anne Woods, another one of Artis's young victims. In that interview, Woods told the officers that when she was 16, Artis "tried to drag her into the woods" where he "tried to rape her." Also during the investigation of the Brockman murder, the officers discovered that Artis had been charged earlier with yet another rape and murder of a young teenage girl, Bernice Moss, who, like Buie and Brockman, had been found dead in 1980 near a wooded area, nude from the waist down, apparently beaten to death with a stick and with an object in her throat. Artis was never investigated as a suspect in the Buie murder case.

In addition, shortly after McCollum and Brown were arrested, Ethel Furmage, the high school girl who had initially pointed law enforcement to McCollum, admitted to SBI agents that she had lied and had not actually heard anything connecting McCollum to Buie's death, as she had earlier reported. She stated that "she suspected that [McCollum] was involved because he was crazy" and that "he just does not act right."

Finally, while both McCollum and Brown's confessions identified Darrell Suber as an accomplice, the investigating officers discovered that Suber had an air-tight alibi placing him in another town during the night of the murder. Moreover, none of the other persons named in the brothers' confessions were ever charged for Buie's rape and murder.

None of these exculpatory facts discovered following McCollum and Brown's arrest were disclosed to McCollum and Brown, and the two went to trial in October 1984 with

8

their confessions as the main evidence against them.  Both were convicted of first-degree murder and rape, and both were sentenced to death.  The North Carolina Supreme Court, however, overturned those convictions due to an erroneous jury instruction, and the two were tried again, this time separately.  A jury again convicted McCollum, and he was sentenced to death.  Another jury convicted Brown of rape, but not murder, and he was sentenced to life imprisonment.

B

In 2009, after McCollum and Brown had been incarcerated for over 25 years, Brown applied to the North Carolina Innocence Inquiry Commission to have it look into his conviction.  The Innocence Commission is an independent North Carolina governmental agency created in 2006 for the purpose of "investigat[ing] and review[ing] credible, verifiable claims of factual innocence."  After reviewing Brown's application, the Innocence Commission agreed to investigate Brown's conviction, something that the Commission did in only 1% of the matters submitted to it.

While the Innocence Commission was conducting its investigation, DNA recovered from a cigarette butt collected from the Buie crime scene was, at McCollum's request, tested and found to match that of Roscoe Artis, who was then serving a life sentence for the rape and murder of Brockman.  The Innocence Commission also discovered Artis's criminal history and the similarity in modus operandi of the other crimes he committed and the modus operandi of the Buie crime, as well as the fact that a request for Artis's fingerprint records had been submitted and then canceled.  The Commission also

9

uncovered a large number of significant procedural defects in the Buie investigation and found that the confessions were inconsistent with demonstrated facts. For example, both Moore and Suber, who had been identified in the confessions as participants in the Buie crime, had alibis that placed them outside of Red Springs on the day of the murder. Moreover, Buie's panties were actually white, instead of pink, as described in McCollum's confession. And Buie's body had no stab wounds, although McCollum's confession stated that Suber had stabbed Buie with his knife. Innocence Commission agents also interviewed Artis several times, during which Artis acknowledged that Buie had been to his house on the day of the murder and that she had come over to his house most days. They also learned that Ethel Furmage, whose tip pointed police toward McCollum, later acknowledged that she had lied. In all, the Innocence Commission discovered numerous and varied failures and inconsistencies in the investigation of the Buie murder, and it concluded that McCollum and Brown were innocent and that responsibility for the Buie murder likely belonged to Artis.

As a result of the Innocence Commission's finding, a motion for appropriate relief was filed on McCollum and Brown's behalf in state court, with the support of Robeson County District Attorney Johnson Britt. Following a hearing, the court ordered a vacatur of their convictions "based on significant new evidence, that they [were], in fact, innocent." Consequently, on September 3, 2014, McCollum and Brown were released from prison, after having been incarcerated for 31 years. Britt also wrote a letter to Governor McCrory in support of McCollum and Brown's request for pardons, stating that "Roscoe Artis was a/the perpetrator of the murder and rape of Sabrina Buie, and Henry McCollum and Leon

10

Brown were not, despite their statements that they were involved in the commission of the crimes." Governor McCrory issued Pardons of Innocence to both McCollum and Brown in June 2015.

## C

In August 2015, McCollum and Brown commenced this action against six law enforcement officers who were involved in the investigation and prosecution of their cases, as well as the town of Red Springs and Robeson County. They asserted counts for false arrest, deprivation of due process, malicious prosecution, and municipal liability. In 2017, Red Springs and its police officers settled, paying each plaintiff $500,000. Robeson County and Detectives Locklear and Sealey, as well as Agents Snead and Allen, chose to continue litigating.[*] The district court thereafter denied their motion for summary judgment based on qualified immunity, and we affirmed. *See Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019).

During trial, Robeson County and Detectives Locklear and Sealey reached a settlement with the plaintiffs, agreeing to pay each plaintiff $4.5 million, thereby leaving only Agents Snead and Allen in the case. After a five-day trial, the jury returned a verdict against them, awarding each plaintiff $31 million in compensatory damages. The jury also awarded McCollum $8 million in punitive damages and Brown, $5 million. The court entered judgment on the verdict on May 14, 2021.

---

[*] In April 2020, the administrator of Snead's estate entered her appearance in the case upon the death of Snead. We nonetheless continue referring to Snead and not his estate.

11

Following the entry of judgment, Agents Snead and Allen filed a motion for a new trial and a motion to reduce the judgment to account for the sums that the plaintiffs had received from prior settlements and from North Carolina as a statutory award. The district court denied both motions. Also, following the entry of judgment, the plaintiffs filed a motion for prejudgment interest and a motion for attorneys fees and costs. The court granted both motions, awarding the plaintiffs $36 million in prejudgment interest and $6.25 million in attorneys fees and costs. The court then entered an amended judgment to reflect its rulings. In the end, the judgment for the plaintiffs and against the defendants was roughly $111 million plus $6.25 million in attorneys fees and costs.

This appeal followed.

## II

Agents Snead and Allen (hereafter, "the defendants") contend first that their trial was procedurally flawed and unfair and that the district court therefore abused its discretion in denying their motion for a new trial. Specifically, they argue that the court erred (1) in admitting into evidence the Pardons of Innocence that Governor McCrory issued to the plaintiffs; (2) in permitting Johnson Britt, the former District Attorney for Robeson County, to testify as to his beliefs regarding the defendants' credibility, which was an issue for the jury, and in bolstering Britt's testimony; (3) in commenting during the trial in a manner that showed bias in favor of the plaintiffs; and (4) in choosing only five interrogatories for the jury to answer because, as the defendants argue, they were not sufficiently specific. We address each argument in order.

12

A

Over the defendants' objection, the district court took judicial notice of Governor McCrory's Pardons of Innocence and admitted them into evidence. It also prohibited the defendants from impeaching the pardons as evidence. Also, at one point, the court stated that the plaintiffs were "innocent for purposes of [this] trial." But on several other occasions, it made clear that while the pardons were evidence, they were not *res judicata*, and it did not preclude the defendants from introducing evidence and making arguments challenging the fact of the plaintiffs' innocence. The defendants argue that the court's rulings essentially undermined their defense, which, as they stated, was that the plaintiffs' confessions were given freely and without any coercive pressure and that "everything flowed from the confessions." As they said, "That's our case." Moreover, they maintain that the court erred in allowing the pardons to be treated as affirmative evidence of innocence rather than as the purely discretionary act of the Governor.

The weight and role of the pardons evidence came up repeatedly during the course of trial, prompting the court to explain that the defendants' innocence was not a central issue and that the pardons were not impeachable evidence. And repeatedly the defendants pressed the position that only by showing the plaintiffs' actual guilt could the defendants argue that the confessions were freely and voluntarily given.

We note first that underlying this issue was the fact that the plaintiffs' convictions were vacated by a final order of a state court in an earlier proceeding, "based on significant new evidence that they [were], in fact, innocent," and the Governor only reiterated this with his pardons. Also, evidence of the State's finding of innocence was a necessary

13

prerequisite for the plaintiffs' claims in this case. *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). In any event, the plaintiffs' guilt or innocence and the defendants' misconduct were not so necessarily linked as the defendants argue and the state court's ruling did not prevent the defendants from challenging the allegations of their misconduct. If the plaintiffs' convictions were attributable to mistake, or to evidence later recanted or proved false, or simply to an innocent failure of the system, the defendants could not be held liable. The defendants could be held liable in this case only if the plaintiffs' convictions were attributable to the defendants' misconduct, as alleged by the plaintiffs. Moreover, while the district court's statements and rulings limited to some extent the defendants' ability to contest the plaintiffs' innocence, those limitations did not preclude the defendants from asserting the core argument of the case — that the plaintiffs had freely confessed and that the verdicts "flowed" from those confessions. To prevail, the defendants needed only to prove that McCollum and Brown's guilty verdicts *were not attributable to their misconduct*. And the district court attempted to make this clear, as shown in several exchanges between the court and defendants' counsel.

When defendants' counsel stated to the court that despite the pardon, "we must be able to get out the fact that Henry McCollum confessed multiple times," the court responded, "You're not going to step on any toes if you argue that. The issue is whether the confessions were constitutionally obtained." After counsel expressed agreement with the court, the court added, "Well, the elephant in the room is guilt or innocence. And if you want to choose to engage that, that's your business. That's a trial strategy." When counsel stated that they were not undertaking to prove guilt, the court observed, "You say

14

you're not actually doing that, but the subtheme of this entire trial has been that they were wrongfully pardoned, not wrongfully convicted." Counsel answered, "Well, that's not been my intention — ." But then counsel continued in the direction he stated he was not going, pleading to the court, "[D]on't instruct the jury that they're precluded from arguing innocence." The court answered, "You can argue that if that's the road you want to go down," and then explained, however, that counsel could not "challenge the pardon," as the court had taken judicial notice of it.

In short, what was at issue in this trial is whether the plaintiffs' convictions were the result of misconduct on the part of the defendants. The Governor's pardons merely reflected a finding of the plaintiffs' innocence but did not demonstrate misconduct. Moreover, the defendants did indeed present substantial evidence that the investigation and interrogations were carried out by appropriate methods, that no coercion of any kind was used in the interrogations, and that the defendants had no knowledge of the plaintiffs' intellectual disabilities.

In these circumstances, we do not find that the district court abused its discretion in admitting the pardons as evidence and in prohibiting the parties from impeaching them as evidence. *See United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) (noting that "district courts have wide-ranging control over management of . . . courtroom procedures[] and the admission of evidence").

15

B

The defendants also contend that the district court abused its discretion in allowing Johnson Britt, the former District Attorney of Robeson County who had served in that role for over 25 years, to testify without being proffered as an expert witness and to testify about the credibility of other witnesses, which was properly for the jury to assess. They also argue that these errors were aggravated by the district court's vouching for Britt's credibility by stating that Britt was "extremely experienced and credible and that he can take care of himself," and that "you couldn't find anybody whose credentials are more sacred than Mr. Britt's."

Britt testified on behalf of the plaintiffs at trial on the basis of his understanding of Robeson County murder prosecution strategies and techniques, drawn from personal involvement in 200 to 250 murder cases and 50 to 100 rape cases, as well as his experience working with the Robeson County Sheriff's Department on a daily basis for nearly 30 years. He stated that he was familiar with the routine practices of Robeson County and the SBI. And he testified that McCollum and Brown's claims were the only post-conviction claims of innocence that he had ever supported in his career. He said that when he was informed of the result of the DNA testing in this case, he conducted a thorough review of the case file and was struck by the many similarities between the Buie murder and the Brockman murder, for which Artis was eventually convicted. Indeed, in his letter to Governor McCrory supporting the plaintiffs' pardons, Britt went so far as to say that he was "shocked" that investigators had not picked up on the similarities between the murders.

16

But the portion of Britt's testimony on which the defendants focus most intensely concerns his understanding of what would have been routine interrogation practices in this sort of case and whether those practices were actually followed here. Britt was asked whether, based on his "personal experience and knowledge of interrogations conducted in the thousands of felony cases in this part of the State," he found credible the defendants' descriptions of the interrogations as calm and uncoercive. Britt answered that he did not; he had not found it "credible" that the defendants did not raise their voices or pressure McCollum and Brown. More specifically, he said:

> Based on my knowledge of interrogation techniques, based upon my knowledge of the personalities of some of those involved and reputations of some of those involved, I do not believe that it was a cordial conversation. I believe their voices would have been raised. I believe that there would have been yelling, there may have been cussing, there may have been swearing, there may have been threatening remarks made.

Britt did acknowledge that it was standard technique for interrogators to become less "cordial" as a suspect's story deviated from what the interrogators knew. He also explained that interrogators sometimes used a "good cop/bad cop" method and that "there may be cussing involved, there is swearing involved . . . and it gets pounded and pounded." Finally, Britt testified to the reputation of Agent Snead, describing him as a specialist brought in to "break" a person during an interrogation.

The line between expert testimony and fact testimony is often blurred, giving rise to ambiguity as to whether a witness needs to be qualified as an expert and whether a witness can testify as an expert and as a fact witness simultaneously. *See, e.g.*, *United States v. Garcia*, 752 F.3d 382, 387 (4th Cir. 2014). But when, as here, a witness could

17

readily have been qualified as an expert, the fact that the witness was not so qualified is often harmless, particularly when the basis of the opinion is clear. *See, e.g.*, *United States v. Perkins*, 470 F.3d 150, 156–57 (4th Cir. 2006). But even as an expert witness, Britt was not competent to testify to the credibility of witnesses, and his testimony on that topic was clearly objectionable. *See United States v. Allen*, 716 F.3d 98, 105–06 (4th Cir. 2013).

Most of Britt's testimony was undoubtedly admissible as fact-witness testimony on matters such as past practices, policies, reputations, and other topics about which he had personal knowledge. But his testimony about whether McCollum and Brown's interrogations were "calm and uncoercive" likely crossed the line. While that testimony was based on his "experience and knowledge of interrogations" and on his "knowledge of personalities . . . and reputations of those involved," Britt ultimately gave an opinion about what occurred in the interrogations that could only be a conjectural extrapolation from foundational facts, as he had no personal knowledge of what occurred during the interrogations. *See* Fed. R. Evid. 602. This testimony therefore was objectionable opinion evidence.

But in view of the fact that both McCollum and Brown testified in detail about their interrogations, testifying that they were not calm, but in fact highly coercive and the fact that Britt's corroborating evidence was on the whole mostly unobjectionable, any error during his testimony was minor and not so harmful as to require a new trial. Britt could readily have been qualified as an expert, as all seem to acknowledge, and the substance from any remaining objectionable testimony, entered through one or two improper questions, could have been restated with proper questions.

18

The defendants' argument, however, goes further, complaining that the district court's vouching for Britt bolstered his testimony and aggravated the evidentiary errors related to Britt. To be sure, the court's comments in this regard were objectionable, but the defendants did not object. Indeed, counsel for the defendants did not even disagree with the court's observation about Britt's credentials. On commencing Britt's cross-examination, defendants' counsel stated that it was "an honor" to meet Britt and that it was "an honor to cross-examine [him] in light of [his] great credentials." This is hardly an objection; it is instead an agreement that Britt was an excellent, well-credentialed, and credible witness.

At bottom, we are left with brief moments of testimony during a five-day trial when Britt testified inappropriately. But, in view of the extensive evidence given by others, who did indeed give direct evidence based on personal knowledge of what occurred during the interrogations, we conclude that the errors were harmless.

C

The defendants next contend that the district court's comments during trial revealed a bias in favor of the plaintiffs. The comments to which the defendants point generally arose in connection with the defendants' efforts to press the court on its earlier rulings that Governor McCrory's pardons could not be impeached as evidence of innocence. For instance, they point to an exchange when the judge told the defendants' counsel, "You're not going to impeach the Pardon of Innocence so move on and stay off that or else I'll sit

19

you down." Yet, shortly thereafter, the same attorney then sought to impeach the state court finding of innocence:

> [Y]ou will see that a Superior Court judge, at a hearing that was attended by Ms. Stellato and McCollum and Brown's attorneys, with the stroke of a pen, set aside their convictions and the cited reference and statute had to do with a DNA statute. And the wording of it, I don't have it exactly, but it is something to the effect that a judge is empowered to set aside or toss out a conviction if DNA evidence is subsequently discovered which is favorable. It doesn't say favorable how. Favorable to someone else or favorable not to them, it's just if it's favorable. And at that hearing, neither of these law enforcement defendants —

At that point, it would appear that the defendants' counsel was about to say that the defendants in this case had not had the opportunity to defend their investigation before the state court that vacated the guilty verdicts, thus ignoring the district court's repeated admonitions they were not to impeach either the state court's ruling of innocence or the Governor's pardons. The judge sustained the plaintiffs' objection, saying, "I just ruled. You know, now you are going past my ruling. . . . This is a bad start . . . and the jury takes note of that."

To demonstrate bias, the defendants also cite the district court's repeated warnings that the defendants' attorneys would be cut off if they went too slowly. Based on such exchanges, the defendants argue that the district court's comments surely left the jurors with the sense that the judge favored the plaintiffs, thus showing bias and prejudicing the outcome of the trial making a verdict for the plaintiffs "a foregone conclusion."

We do not agree. The incidents cited were neither an abuse of discretion nor evidence of bias. The comments to which the defendants point were clearly made

20

following defense counsel's failure to comply with the court's earlier rulings, prompting a firmer judicial response.

The defendants also point to another portion of the trial in which the court characterized their position as being that McCollum was a murderer and "ought to be executed." In their briefing on appeal, they contend that this was an unfair and prejudicial mischaracterization of their position. But in fact, testimony from Agent Snead was introduced making precisely that assertion, stating that he wished that the death sentence had been carried out for both McCollum and Brown.

At bottom, the district court's responses identified by the defendants were no more than the court's efforts to keep the trial on track and to enforce the rulings it had made. It is "settled beyond doubt" that it is "neither possible nor desirable for district judges to sit back and observe trials as nonchalant spectators" and that "district courts have an affirmative duty to prevent trials from becoming protracted and costly affairs," with "the duty to rein in [collateral] questioning when it strays too far from the matters in dispute." *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006) (cleaned up). The defendants have not demonstrated that the district court's interruptions and directions to speed their questioning and keep it relevant to the issues were biased or disproportionate. *See Liteky v. United States*, 510 U.S. 540, 556 (1994) ("A judge's ordinary efforts at courtroom administration — even a stern and short-tempered judge's ordinary efforts at courtroom administration — remain immune"); *United States v. Castner*, 50 F.3d 1267, 1273 (4th Cir. 1995) ("The district court interrupted and interrogated both defense and government witnesses and properly questioned the relevance of certain evidence prior to admission. In

21

so doing, we find that the district court was simply fulfilling its obligation to clarify confused factual issues or misunderstandings, to correct inadequacies of examination or cross-examination, and to otherwise ensure that the trial proceeded efficiently and fairly" (cleaned up)).

## D

Finally with respect to the conduct of the trial, the defendants contend that the district court abused its discretion in not submitting more detailed interrogatories to the jury for its rendering of the verdict. While the court submitted five interrogatories asking broad questions, such as whether the defendants coerced or fabricated the written confessions, the defendants proposed numerous and highly granular interrogatories, essentially requiring the jury to determine whether or not every single factual proposition asserted by the plaintiffs was true. To this end, the defendants requested 5 separate interrogatories regarding McCollum's *Miranda* waiver and 12 interrogatories regarding the details of McCollum's interrogation and confession. They argue that such detailed interrogatories were necessary in this case to enable the court to rule on the officers' qualified immunity defense.

Earlier in the proceedings below, the district court had denied the defendants' motion for summary judgment based on qualified immunity, concluding that resolution of their immunity defense turned on factual issues. We affirmed, basing our decision on the same broad-based questions that the district court submitted to the jury. We stated, for example:

22

> There can be no reasonable dispute that it was clearly established in 1983 that an arrest in the absence of probable cause was a violation of an individual's Fourth Amendment rights, and that a coerced confession could not form the basis of probable cause for an arrest. Further, existing precedent in 1983 would have made it clear to a reasonable officer that the police conduct at issue here, viewed in the light most favorable to Appellees, was coercive.

*Gilliam*, 932 F.3d at 235 (citation omitted). The district court's interrogatories were framed to answer the questions on which our qualified immunity opinion turned, such as whether defendants coerced McCollum and Brown's confessions. And the jury's answer to those questions enabled the court to resolve the immunity questions, as it did.

We conclude that the district court's chosen interrogatories fell well within the scope of its discretion.

\*    \*    \*

At bottom, we affirm the district court's denial of the defendants' Rule 59 motion for a new trial.

## III

The defendants also contend that the district court erred in denying their Rule 59(e) motion to have the district court reduce the jury's verdict by the amounts that the plaintiffs had recovered as redress for their injuries before the verdict, thus preventing double recovery.

During trial and shortly before the jury retired for its deliberations, Detectives Locklear and Sealey settled the plaintiffs' claims, agreeing to pay each plaintiff $4.5 million. And earlier — in December 2017 — the town of Red Springs and two of its police

officers also settled, paying each plaintiff $500,000. Still earlier, North Carolina paid each plaintiff $750,000 in statutory damages for their wrongful conviction and incarceration. Thus, before the verdict, each defendant had received $5.75 million in payment for the injuries they had suffered, for a total of $11.5 million.

When the district court addressed this issue with counsel during the trial, the parties agreed to a jury instruction telling the jury that if it returned a verdict for the plaintiffs, it should find *all* damages caused by the violations and should not take into account any settlements because the court would take care of any adjustments that might be appropriate. But when the court entered the judgment, it did not make any adjustments to account for prior recoveries.

The defendants accordingly challenged the judgment by timely filing a Rule 59(e) motion to amend the judgment, noting that McCollum and Brown "have already received $11.5 million in compensation for their injuries" and arguing that, to avoid "double recoveries" the court should amend the judgment to credit them for $11.5 million. They contended that such relief was necessary to assure that the plaintiffs received only "one satisfaction" or "single recovery" for their injuries. *See Holland v. S. Pub. Util. Co.*, 180 S.E. 592, 593–94 (N.C. 1935) (recognizing the one satisfaction rule); *Baity v. Brewer*, 470 S.E.2d 836, 838 (N.C. Ct. App. 1996) (noting that *Holland* is still in "full force and effect"); N.C. Gen. Stat. § 1B-4(1) (providing that when one plaintiff has settled against one defendant "for the same injury," which is also alleged to be caused by other defendants, the amount of settlement "reduces the claim against" the other defendants "to the extent of any amount stipulated" in the settlement agreement); *see also Chisholm v. UHP Projects,*

24

*Inc.*, 205 F.3d 731, 737 (4th Cir. 2000) (applying the one satisfaction rule when the judgment represents compensation for a single indivisible harm).

The district court denied the defendants' motion, labeling the claimed reduction a "setoff" and ruling that because the defendant "failed to raise a setoff as an affirmative defense in their answer to the amended complaint," as required by Federal Rule of Civil Procedure 8(c), they waived the defense. *See* Fed. R. Civ. P. 8(c) (requiring a party to plead "any avoidance or affirmative defense"). The court added that "a setoff was not raised by the moving defendants at any time prior to the Rule 59(e) motion."

On the merits, the district court ruled that "allowing a . . . setoff in this matter would be inconsistent with the twin goals of § 1983 actions — compensation of persons injured by deprivations of federal rights and prevention of abuses of power by those acting under the color of state law," citing *Robertson v. Wegmann*, 436 U.S. 584, 591 (1978).

Finally, the court found that even if a setoff was "appropriate" for the settlements, the court would not include the $750,000 that each plaintiff received from North Carolina because those awards would compensate plaintiffs for their losses from "erroneous convictions and imprisonment," whereas the damages plaintiffs sought in this action were for "physical injuries, pain and suffering, and mental anguish."

The court therefore denied the defendants' motion for reduction of the verdict.

We find several problems with the court's reasoning. First, the court's treatment of the claimed reduction as an affirmative defense of "setoff" confused "setoff" with the damages doctrine of one satisfaction for injury suffered. A setoff is generally the amount of a "counter-demand," "generally of a liquidated debt *growing out of an independent*

25

transaction." *Setoff*, *Black's Law Dictionary*, (11th ed. 2019).  Second, any affirmative defense of "setoff" could not have been pleaded before the facts giving rise to it occurred, *i.e.*, before the settlements were reached.  Thus, we conclude that the court's finding of waiver was error.  The record shows that the defendants filed their motion as soon as they learned of the court's refusal to reduce the verdict.

Indeed, the defendants could not even have been expected to raise the issue of credits for settlements *before* the judgment because the court's earlier statements and jury instructions indicated that the court would address the subject *after* the verdict.  When credit for the settlements was discussed at trial, the parties agreed that the jury would be instructed to return the *full amount* of damages and that the court would later make any adjustments it thought appropriate to accommodate the settlements.  And the court so instructed the jury.  First, as to damages, the court said:

> If you find the defendants are liable to plaintiffs, then you must determine an amount that is fair compensation for the plaintiffs' damages.  These damages are called compensatory damages.  The purpose of compensatory damages is not to punish, but it is to make the plaintiffs whole.  That is, it is to compensate them for the damage they have incurred.
>
> \*       \*       \*
>
> The damages you award must be fair compensation *for all of the damage that the plaintiffs have actually suffered or are reasonably likely to suffer* in the future.  *No more and no less*.
>
> Compensatory damages are not limited to expenses that plaintiff may have incurred because of their injury.
>
> If you find that defendants are liable to plaintiffs, the plaintiffs are entitled to compensatory damages for any of the physical injuries, pain and suffering, mental anguish, shock, discomfort or other physical ailments that they have suffered and are reasonably likely to suffer in the future because of defendants' wrongful acts.

26

> Plaintiffs may also recover the reasonable value of each day of confinement after taking the time they would have been released if defendants had not taken the actions that plaintiff alleges.

(Emphasis added).   Then, after giving the jury those damages instructions, the court specifically told the jury not to adjust any damages award to account for settlements, stating:

> Defendant[s] Sealey and Locklear have reached a settlement agreement with . . . McCollum and Brown. . . .  If you find plaintiffs are entitled to damage[s] in this case, *you must not consider the settlement agreement for the purpose of calculating the damage suffered by plaintiffs.  That is the job of the court*.

(Emphasis added).

We therefore must presume that the jury awarded the plaintiffs *all of the damages* that they found appropriate by reason of the defendants' wrongs.  The size of the jury's award, which the court later characterized as the largest award ever entered for such claims, strongly supports that presumption.  But when the court directed the entry of judgment on the verdict, it failed to reduce the jury verdict to account for the settlements to avoid double recovery.  Only then did the defendants learn of the court's refusal and their need to respond, which they did promptly by filing a timely motion to amend the judgment.

On the merits, the court found that denying the motion was necessary to serve the goals of § 1983, the relevant one of which was to provide "compensation [to] persons injured by deprivations of federal rights."  But the district court erred in concluding that this goal would be frustrated by reducing the verdict amount to account for prior settlements.  The jury indeed awarded the plaintiffs compensation for all damages, as it was instructed, and by failing to account for the settlements and prior recoveries, the court

27

allowed the plaintiffs a double recovery, violating the one satisfaction rule. That rule is an "equitable doctrine [that] operates to reduce a plaintiff's recovery from the nonsettling defendant to prevent the plaintiff from recovering twice from the same assessment of liability." *Chisholm*, 205 F.3d at 737. Where "[n]o apportionment of culpability between the defendants is possible because the whole premise of this scenario is that both defendants, settling and nonsettling, are liable for a . . . single, indivisible harm . . . the amount imposed at trial against the nonsettling defendant will necessarily be the full amount of damages." *Id.* at 738. While the doctrine applies only to joint liability, the district court stated that this case was based on joint liability, such that all the culpable defendants were jointly liable to the plaintiffs for damages. Thus, we conclude that the district court should have applied the one satisfaction rule and given the defendants credit for the prior settlement recoveries so as to avoid a double recovery.

The district court also stated in its ruling that, in any event, it would not reduce the jury's verdict to account for the $1.5 million paid to plaintiffs by North Carolina because the authorizing statute limited such compensation to "pecuniary loss sustained by the person through his or her erroneous conviction and imprisonment." N.C. Gen. Stat. § 148-82. The court concluded that such loss was distinct from the damages claimed in this case, which were for "physical injuries, pain and suffering, and mental anguish." The court thus presumed that pecuniary losses for erroneous conviction and imprisonment were not covered by the jury's award in this case.

That conclusion, however, is belied by the record and by what the jury was told. It was told to award *all damages*, including "expenses" and the "reasonable value of each

28

day of confinement." Moreover, the court told the jury that they could award all damages "proximately caused by the defendants' conduct," *i.e.*, damages for injury that was "either the direct result or reasonably probable consequence of the defendants' conduct." We conclude that pecuniary losses for the plaintiffs' erroneous convictions and incarceration are damages that were proximately caused by the defendants' wrongful conduct and that the jury was told to award them. Thus, North Carolina's payments to the plaintiffs were in respect to the very damages that the jury was told to award and which it presumably did award to the plaintiffs. Accordingly, we reject the reasoning on which the district court relied in refusing to reduce the jury verdict by the amounts received from North Carolina.

Nonetheless, if the $1.5 million received by the plaintiffs from North Carolina was from a "collateral source," as understood under North Carolina's collateral source rule, then the district court's refusal to reduce the verdict by this amount might yet be appropriate. North Carolina's collateral source rule, which was discussed in cases cited by the parties but not actively addressed by the parties nor analyzed by the district court, "prohibits a plaintiff's recovery from being reduced by some source *collateral to* the defendant." *Hairston v. Harward*, 821 S.E.2d 384, 387 (N.C. 2018) (emphasis added) (cleaned up); *see also Chisholm*, 205 F.3d at 737. Thus, as a substantive principle of remedies, North Carolina's collateral source rule "prevent[s] the tortfeasor from a windfall when a portion of the plaintiff's damages have been paid by a collateral source." *Wilson v. Burch Farms, Inc.*, 627 S.E.2d 249, 257 (N.C. Ct. App. 2006). It thus operates as a kind of exception to the one-satisfaction rule, allowing for the possibility of a windfall for plaintiffs *so as to prevent defendants from unjustly benefiting*. *See Hairston*, 821 S.E.2d

29

at 394; *Caroline-A-Contracting, LLC v. J. Scott Campbell Constr. Co.*, 856 S.E.2d 131, 134 (N.C. Ct. App. 2021).

Although the defendants in this case were state actors, they were sued in their individual capacities, and the state statutory compensation fund from which the plaintiffs received their $750,000 payments appears to be entirely separate from them. *See Cates v. Wilson*, 361 S.E.2d 734, 737 (N.C. 1987) ("The instant case presents the issue of whether the collateral source rule embraces gratuitous government benefits. We hold it does"). Thus, while the collateral source rule might apply in this case, we nonetheless remand the issue for the district court to determine in the first instance whether it indeed does.

Accordingly, we vacate the district court's order denying the defendants' motion to amend the judgment and remand to have the judgment account at least for the $10 million that the plaintiffs received in prior settlements and to have the district court determine whether the $1.5 million received from North Carolina was from a collateral source, and, if not, to further reduce the judgment accordingly.

IV

After the jury returned its compensatory award of $62 million in favor of the plaintiffs and the district court entered judgment on the verdict, the plaintiffs filed a motion under Rule 59(e) to have the court award prejudgment interest. The court granted the motion and calculated prejudgment interest at the rate of 8% of the total compensatory damages, beginning from September 3, 2014, when the plaintiffs were released from

30

prison.  It thus increased the jury's compensatory judgment by approximately $36 million — from $62 million to $98 million.

The defendants contend first that the plaintiffs' request was not authorized by Rule 59(e) because the plaintiffs could have pleaded a claim for prejudgment interest before judgment and specifically articulated such a request to the jury.  The defendants note that "[t]here has been no intervening change in controlling law, no new evidence allegedly not previously available at trial, and no clear error of law to correct or meaningful injustice to prevent," citing well-established legal principles holding that Rule 59(e) motions may not be used to raise arguments that could have been raised prior to judgment.  *See, e.g.*, *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).  Thus, they argue, the motion should have been denied.

The defendants also contend that not only did the complaint not request prejudgment interest, but no evidence for it was presented at trial.  And this was consistent with the fact that the complaint sounded in tort, claiming the deprivation of constitutional rights, not the loss of use of money where prejudgment interest would most naturally be appropriate as an element of compensation.  *See West Virginia v. United States*, 479 U.S. 305, 310 n.2 (1987) (noting that prejudgment interest compensates "for the loss of use of money").

Finally, the defendants argue that the sheer size of the interest award — $36 million, constituting an increase of more than 50% of the jury's compensatory damages award — suggests that the award of prejudgment interest was not compensatory but punitive in nature.  *See, e.g.*, *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1297–98 (7th Cir. 1987).

31

In granting the plaintiffs' motion, the district court recognized the standard that Rule 59(e) is available only "where there is a showing of an intervening change in controlling law, new evidence not previously available, or clear error of law that must be corrected to prevent manifest injustice," citing *Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007), and *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993).   And applying that standard, the court concluded that "the failure to award prejudgment interest would result in a *manifest injustice*," (emphasis added), because only by awarding prejudgment interest would the plaintiffs be made whole.

First, it is well understood that "[p]rejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *West Virginia*, 479 U.S. at 310 n.2.  Prejudgment interest classically applies when there is a "delayed payment of a contractual obligation."  *Id.* at 308 (quoting *Royal Indem. Co. v. United States*, 318 U.S. 289, 296 (1941)).   In that sense, "[p]rejudgment interest is an element of complete compensation," *id.* at 310, and is awarded when the plaintiff has been deprived of the use of a determinate sum of money.

In this case, when the jury was instructed to compensate the plaintiffs fully for all injuries, it must be assumed that the jury did so, providing "complete compensation."  To be sure, one cannot know for certain whether the jury considered as an element of complete compensation any delay in payment when it entered its general compensatory damages verdict.  Yet, it is a fair assumption that the jurors understood themselves to be determining damages *at the then-present time*, thus implicitly or explicitly taking into account the fact

32

that the plaintiffs had not had the benefit of their damages award for some years since their injuries were sustained. *See* Stephen J. Carroll, Rand Corporation, *Jury Awards and Prejudgment Interest in Tort Cases*, at v (1983) (finding in an empirical study that juries implicitly account for the passage of time since injury accrual by "increas[ing] awards over and above inflation . . . at a rate of 3.7 percent per year for the time between injury and trial"); *see also Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583, 594 (2d Cir. 1961) ("[N]o one would be so naive as to suppose that juries do not throw into the scales the years that a plaintiff may have had to wait before his case can be heard by a jury"); *Greater Westchester Homeowners Assn. v. City of Los Angeles*, 603 P.2d 1329, 1338 (Cal. 1979) (stating that adding interest to a nonpecuniary tort damages award "adds uncertain conjecture to speculation"). In any event, it was the role of the jury to determine whether to award prejudgment interest. *See Cordero v. De Jesus-Mendez*, 922 F.2d 11, 13 (1st Cir. 1990) ("[I]n an action brought under 42 U.S.C. § 1983, the issue of prejudgment interest is so closely allied with the issue of damages that federal law dictates that the jury should decide whether to assess it"); *see also Havis v. Petroleum Helicopters, Inc.*, 664 F.2d 54, 55 (5th Cir. 1981); *Newburgh Land & Dock Co. v. Texas Co.*, 227 F.2d 732, 735 (2d Cir. 1955). Therefore, given these considerations and absent any indication to the contrary, we must assume that the jury awarded fully compensating damages.

If the court had been able to conclude that the jury award did not fully compensate the plaintiffs, it might have been able to consider prejudgment interest. For instance, when damages consist of the failure to satisfy a contractual obligation to pay money, the courts have, in their discretion, added prejudgment interest. *See West Virginia*, 479 U.S. at 310;

33

*Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030–31 (4th Cir. 1993). Even so, it must be generally understood that "[t]he notion that prejudgment interest is discretionary with the fact finder . . . does not authorize a court, once a jury has determined damages, to add to those damages a sum for prejudgment interest." *Eden v. Amoco Oil Co.*, 741 F. Supp. 1192, 1196 (D. Md. 1990).

In this case, however, it was impossible for the court to calculate prejudgment interest, and any such award could only be the product of speculation, amounting to a double recovery for the plaintiffs or punishment of the defendants. The plaintiffs' claims sounded in tort, as the plaintiffs claimed damages for their wrongful arrest, prosecution, and incarceration, and they presented evidence that they suffered permanent injury from the wrongs, beginning with their wrongful arrests and continuing through their incarceration, and *into the future*. They did not explicitly allege nor raise in substance any claim nor provide any proof for loss of use of money. Rather, their evidence indicated that their damages amorphously aggregated over the course of time from their arrest to the time of trial and into the future. And the jury was so instructed: "The plaintiffs are entitled to compensatory damages . . . that they have suffered and are reasonably likely to suffer *in the future* because of the defendants' wrongful acts." (Emphasis added). Because the district court could not know how much the damages were at any given point in time or what portion of damages represented compensation for future suffering, there was no way for it to calculate prejudgment interest. Moreover, if the jury compensated the plaintiffs for future damages, there would, in any event, be no loss of use of money as to them. Thus, damages for injuries that the plaintiffs were suffering even at the time of trial in 2021 and

34

into the future could not bear interest.  In view of the nature of the injuries and the jury's general verdict, any "calculation" of interest on amounts as they accrued could only be the product of speculation and not compensation for the loss of use of money.  Because the court simply did not have a basis to calculate interest, the $36 million award it added to the jury's verdict was functionally a double recovery or punitive or both.

Finally, it is striking, in light of the jury's large verdict, which the court observed was unprecedented in size, that the court found it to be a "manifest injustice" that the plaintiffs were not awarded another 50% and therefore increased the $62 million compensatory award to $98 million.  In adding $36 million to the verdict, the court had to presume that the jury did not comply with its instruction that "the damages that you award must be *fair compensation for all of the damage* that plaintiffs have actually suffered or are reasonably likely to suffer in the future.  *No more and no less*."  (Emphasis added).  But there is no evidence that the jury did not comply with that instruction and no indication that the court believed that the jury did not comply.

At bottom, we conclude that the district court's award of prejudgment interest was based on error and constituted an abuse of discretion.  Accordingly, we reverse the court's order awarding it.

V

Finally, the defendants challenge as unreasonable the amount of attorneys fees that the district court awarded.  The court awarded $6,002,433.12 in fees and $140,187.36 in costs to Hogan Lovells US LLP; $24,272.50 in fees to Cheshire Parker Schneider, PLLC;

35

and $95,257.50 in guardian ad litem fees to Tarlton Polk PLLC, for a total of approximately $6.25 million.

The defendants contend first that plaintiffs' counsel should not have been permitted to bill out-of-town rates because the plaintiffs did not make a sufficient showing that equivalently competent in-town representation was unavailable.   They argue that the plaintiffs failed both prongs of *National Wildlife Federation v. Hanson*, which requires a court to determine (1) whether adequate local counsel was genuinely unavailable and, if so, (2) whether the plaintiffs chose unreasonably expensive counsel from elsewhere. 859 F.2d 313, 317–18 (4th Cir. 1988).  The district court, however, gave consideration to both prongs and found that the plaintiffs had satisfied them.  And the court was especially well positioned to make this determination, having a deep understanding of the case's complexity and knowledge of the local availability of counsel able to handle and staff such a case.  Accordingly, we reject this argument.

The defendants also contend that the plaintiffs' counsel assigned too much work to associates rather than to partners.  This argument is somewhat peculiar given that in assigning work to associates, the cost of the work likely became cheaper on an hourly basis. This would reduce the overall cost unless the defendants were able to demonstrate that partners' performance would have been so much more efficient than associates' that it would nevertheless have been more cost-effective for partners to have done the work.  But the defendants have not made such a showing.  Accordingly, we also reject that argument.

Finally, the defendants contend that there was too much block billing and too much time spent on specific assignments.  The district court, however, considered each of the

36

defendants' claims and rejected them after reasoned consideration, although it did make some adjustments and deny the plaintiffs' reimbursement for expert fees. The court's work was neither perfunctory nor a rubberstamp of the plaintiffs' motion.

Awards of attorneys fees are reviewed for abuse of discretion, and they "must not be overturned unless [they are] clearly wrong." *Berry v. Schulman*, 807 F.3d 600, 617 (4th Cir. 2015) (quoting *Plyler v. Evatt*, 902 F.2d 273, 278 (4th Cir. 1990)). Our review is, therefore, "sharply circumscribed." *Id.* (quoting *Plyler*, 902 F.2d at 278). Recognizing the court's role and perspective, as well as its careful consideration of the defendants' challenges, we conclude that the court's awards fell well within its discretion. Accordingly, we affirm the court's award of fees and costs.

VI

In sum, we affirm the district court's order denying the defendants' motion for a new trial; we vacate its order denying the defendants' motion to reduce the jury's compensatory damages award and direct that the court reduce the award by $10 million and determine whether the award should be reduced by another $1.5 million; we reverse the court's order awarding prejudgment interest; and we affirm the court's award of attorneys fees and costs. The judgment is accordingly affirmed in part, reversed in part, and vacated in part, and the case is remanded for further proceedings and entry of a judgment consistent with this opinion.

                                                          IT IS SO ORDERED.