# EXHIBIT A

| | |
|---|---|
| J. DUANE GILLIAM, Guardian of the Estate of Leon Brown, RAYMOND C. TARLTON, Guardian Ad Litem for HENRY LEE MCCOLLUM, and KIMBERLY PINCHBECK, as Limited Guardian and Conservator of the Estate of Henry Lee McCollum,<br><br>Plaintiffs,<br><br>v.<br><br>ROBESON COUNTY, TOWN OF RED SPRINGS, KENNETH SEALEY, both Individually and in his Official Capacity as the Sheriff of Robeson County, LARRY FLOYD, LEROY ALLEN, PAUL CANADAY, Administrator C.T.A. of the Estate of Luther Haggins, ROBERT PRICE, Administrator C.T.A. of the Estate of Joel Garth Locklear, Sr., CHARLOTTE NOEL FOX, Administrator of the Estate of Kenneth Snead,<br><br>Defendants,<br><br>and<br><br>JEFFERSON INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, GENERAL STAR NATIONAL INSURANCE COMPANY, CLARENDON NATIONAL INSURANCE COMPANY, and LEXINGTON INSURANCE COMPANY,<br><br>Supplemental Defendants. | **SUPPLEMENTAL COMPLAINT AGAINST DEBTOR INSURANCE COMPANIES TO AID IN EXECUTION OF THIS COURT'S FINAL JUDGMENT AGAINST DEFENDANTS SNEAD AND ALLEN AND TO GARNISH INSURANCE PROCEEDS**<br><br>**Case No. 5:15-CV-00451-BO** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 4

PROCEDURAL BACKGROUND .................................................................................. 5

THE PARTIES ............................................................................................................ 7

JURISDICTION AND VENUE ..................................................................................... 8

DEMAND FOR JURY TRIAL ..................................................................................... 9

FACTUAL BACKGROUND .......................................................................................... 9

I.     THE INSURERS ISSUED INSURANCE POLICIES COVERING NORTH
CAROLINA STATE EMPLOYEES, INCLUDING SNEAD AND ALLEN, FOR
LIABILITY IMPOSED ON THEM FOR THEIR ACTS OR OMISSIONS
DURING THE COURSE OF THEIR EMPLOYMENT. .................................... 9

     A.     Jefferson Issued Insurance Policies Covering The Periods Of June 2, 1982
To July 1, 1991. ......................................................................... 10

     B.     National Casualty Issued Insurance Policies Covering The Periods Of July
1, 1991 To July 1, 1996. .............................................................. 12

     C.     General Star Issued Insurance Policies Covering The Periods Of July 1,
1996 To July 1, 2003. .................................................................. 14

     D.     Clarendon Issued Insurance Policies Covering The Periods Of July 1,
2003 To July 1, 2007. .................................................................. 17

     E.     Lexington Issued Insurance Policies Covering The Periods Of July 1, 2007
To July 1, 2008, July 1, 2010 To July 1, 2011, July 1, 2013 To July 1,
2014, And July 1, 2015 To July 1, 2016. ......................................... 19

          1.     Lexington Issued Three Occurrence-Based Policies. .............. 19

          2.     Lexington Also Issued Claims-Made Policies. ...................... 21

          3.     Lexington Engaged In Bad Faith And Unfair And Deceptive Trade
Practices By Attempting In Secret And Without Notice To Snead,
Allen, Or Plaintiffs To Rewrite The $10 Million 2015–2016
Lexington Claims-Made Policy To Make It A Worthless
Occurrence-Based Policy. ............................................... 22

II.    THE INSURERS' POLICIES RESPOND TO THE FINAL JUDGMENT. .................. 26

Case 5:15-cv-00451-BO   Document 508-2   Filed 02/27/24   Page 3 of 58

  A.  Because Of Wrongful Acts And Omissions, Plaintiffs McCollum And Brown Were Wrongfully Charged With The Rape And Murder Of Sabrina Buie. ........................................................................................ 26

  B.  Snead And Allen Committed Additional Wrongful And Negligent Acts And Omissions During And After The Investigation Leading To Plaintiffs' Incarcerations. ................................................................ 33

  C.  Plaintiffs McCollum And Brown Were Exonerated After Thirty-One Years Of Wrongful Incarceration. ........................................... 37

  D.  Plaintiffs McCollum And Brown Suffered Substantial Harm Due To Their Wrongful Incarcerations Stemming From Snead's And Allen's Wrongful Acts And Omissions. ........................................................... 39

III. PURSUANT TO THE FINAL JUDGMENT, PLAINTIFF MCCOLLUM, DUE TO THE ACTS AND OMISSIONS OF SNEAD AND ALLEN, AND PLAINTIFF BROWN, DUE TO THE ACTS AND OMISSIONS OF SNEAD, WERE AWARDED DAMAGES IN THIS ACTION. .................................... 42

IV. PLAINTIFFS MCCOLLUM AND BROWN ARE ENTITLED TO INSURANCE PROCEEDS FROM THE FINAL JUDGMENT. ........................................... 43

FIRST CAUSE OF ACTION ......................................................................... 44

SECOND CAUSE OF ACTION ..................................................................... 46

THIRD CAUSE OF ACTION ........................................................................ 47

FOURTH CAUSE OF ACTION ..................................................................... 48

FIFTH CAUSE OF ACTION ......................................................................... 49

SIXTH CAUSE OF ACTION ........................................................................ 50

SEVENTH CAUSE OF ACTION ................................................................... 51

EIGHTH CAUSE OF ACTION ..................................................................... 53

NINTH CAUSE OF ACTION ....................................................................... 54

TENTH CAUSE OF ACTION ....................................................................... 54

REQUEST FOR RELIEF .............................................................................. 55

Plaintiff Henry Lee McCollum[1] and Plaintiff Leon Brown[2] (collectively, "Plaintiffs" or "Plaintiffs McCollum and Brown" or individually, "Plaintiff McCollum" and "Plaintiff Brown"), by and through undersigned counsel, for their Supplemental Complaint Against Debtor Insurance Companies To Aid In Execution Of This Court's Final Judgment Against Defendants Snead[3] And Allen And To Garnish Insurance Proceeds owed by Jefferson Insurance Company ("Jefferson"), National Casualty Company ("National Casualty"), General Star National Insurance Company ("General Star"), Clarendon National Insurance Company ("Clarendon"), and Lexington Insurance Company ("Lexington") (collectively, "Supplemental Defendants" or "Insurers"), allege as follows:

## INTRODUCTION

1.       Plaintiffs were each sentenced to death and spent over 31 years in prison for a crime that they did not commit.  In May 2021, after a five-day trial in this Court, a jury found that former State Bureau of Investigation Agents Kenneth Snead and Leroy Allen were responsible for Plaintiffs' wrongful incarcerations and awarded each of them $31 million in compensatory damages, plus a combined $13 million in punitive damages.  The damages owed are set out in this Court's Judgment (the "Final Judgment") dated April 20, 2023.  Nearly three years later, Plaintiffs have yet to receive the compensation that they are owed.

2.       Defendants are insurance companies that issued policies to the State of North Carolina covering its employees for exactly the type of wrongful acts that Snead and Allen committed.  Despite repeated demands that the insurance companies fulfill their obligations under

---

[1] Raymond C. Tarlton is the Guardian Ad Litem for Henry Lee McCollum.  Kimberly Pinchbeck is the Limited Guardian and Conservator of the Estate of Henry Lee McCollum.

[2] J. Duane Gilliam is the Guardian of the Estate of Leon Brown.

[3] Charlotte Noel Fox is the Administrator of the Estate of Kenneth Snead.

4

their policies, they have refused to compensate Plaintiffs. One of those insurers—Lexington—went so far as to engage in a surreptitious plot to attempt to "reform" a policy providing $10 million in coverage for Plaintiffs' claims in 2019, four years after Plaintiffs' civil rights suit was filed. Lexington's 2015–2016 claims-made policy explicitly states that it is triggered by claims made in 2015—such as Plaintiffs' lawsuit. But Lexington now contends that this language was a mistake, despite the fact that Lexington repeatedly used the very same language in policies for the prior year and in several subsequent years. Lexington's attempt to re-write the policy to escape its coverage obligations, without notice to covered parties, is ineffective as a matter of law. Because Lexington's denial of coverage was egregious and in bad faith, Lexington is liable for treble and punitive damages exceeding the coverage that it owes under its policies.

3.      Plaintiffs have waited long enough to be compensated for their wrongful incarcerations. Their attempts to obtain fair compensation from the insurers out of court have failed. These supplemental proceedings and a jury trial on the insurance companies' coverage obligations are therefore necessary for Plaintiffs to finally put this case behind them.

**PROCEDURAL BACKGROUND**

4.      On April 20, 2023, this Court entered final judgment in favor of Plaintiff McCollum and Plaintiff Brown, holding North Carolina law enforcement officers Snead and Allen jointly and severally liable to Plaintiff McCollum, and Snead liable to Plaintiff Brown. A copy of the Final Judgment is attached hereto as Exhibit 1.

5.      In holding Snead and Allen jointly and severally liable to Plaintiff McCollum, as part of the Final Judgment, this Court awarded Plaintiff McCollum $25.25 million in compensatory damages.[4]

6.      In holding Snead liable to Plaintiff Brown, as part of the Final Judgment, this Court awarded Plaintiff Brown $25.25 million in compensatory damages.

7.      Plaintiff McCollum sought to enforce and satisfy the Final Judgment by collecting from the Insurers, which insured Snead and Allen for, and are indebted to Snead and Allen for, the damages assessed against Snead and Allen in the Final Judgment.  Pursuant to Federal Rule of Civil Procedure 69 and North Carolina General Statutes Section 1-302, Plaintiff McCollum attempted to execute and satisfy the Final Judgment against Snead and Allen.  The Final Judgment was returned unsatisfied by Allen on February 16, 2024.  *See McCollum, et al. v. Robeson County, et al.*, Case No. 5:15-cv-00451-BO, Dkt. No. 507 (E.D.N.C. Feb. 16, 2024).  Upon information and belief, the Final Judgment will soon be returned unsatisfied by Snead.

8.      On April 11, 2023, Plaintiff McCollum demanded that the Insurers, which insured Snead and Allen, pay directly to Plaintiff McCollum what is owed under their policies.[5]

9.      In response to Plaintiff McCollum's demand, the Insurers have either denied any obligation to provide coverage for any of the damages awarded against Snead and Allen in the Final Judgment, or have failed to respond to the demand for coverage.

---

[4] Plaintiff McCollum was also awarded $8 million in punitive damages, and Plaintiff Brown was awarded $5 million in punitive damages.  Plaintiffs McCollum and Brown were also awarded $6.25 million in attorneys' fees and costs.

[5] As set forth more fully throughout the Supplemental Complaint, Plaintiffs have claims against Lexington for common law bad faith and unfair and deceptive trade practices pursuant to North Carolina General Statutes Section 75-1.1.

6

10.    Plaintiff Brown sought to enforce and satisfy the Final Judgment by collecting from Jefferson, National Casualty, and Lexington, which are the Insurers that insured Snead for, and are indebted to Snead for, the damages assessed against Snead in the Final Judgment.  Pursuant to Federal Rule of Civil Procedure 69 and North Carolina General Statutes Section 1-302, Plaintiff Brown attempted to execute and satisfy the Final Judgment against Snead.  Upon information and belief, the Final Judgment will soon be returned unsatisfied by Snead.

11.    On April 11, 2023, Plaintiff Brown demanded that Jefferson, National Casualty, and Lexington pay directly to Plaintiff Brown what is owed under their policies.

12.    In response to Plaintiff Brown's demand, Jefferson and Lexington have denied any obligation to provide coverage for any of the damages assessed against Snead in the Final Judgment.  National Casualty provided no response.

13.    Plaintiffs therefore file this Supplemental Complaint against the Insurers to recover the insurance proceeds that the Insurers owe to Snead and Allen by virtue of this Court's Final Judgment.

## **THE PARTIES**

14.    Plaintiff Henry Lee McCollum is a resident of North Carolina.

15.    Plaintiff Leon Brown is a resident of North Carolina.

16.    Raymond C. Tarlton (Guardian Ad Litem for Henry Lee McCollum) is a resident of North Carolina.

17.    Kimberly Pinchbeck (Limited Guardian and Conservator of the Estate of Henry Lee McCollum) is a resident of Virginia.

18.    J. Duane Gilliam (Guardian of the Estate of Leon Brown) is a resident of North Carolina.

7

19.     Upon information and belief, Defendant Jefferson Insurance Company is a corporation organized and existing under the laws of the state of New York, with its principal place of business in Virginia.

20.     Upon information and belief, Defendant National Casualty Company is a corporation organized and existing under the laws of the state of Ohio, with its principal place of business in Arizona.

21.     Upon information and belief, Defendant General Star National Insurance Company is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Connecticut.

22.     Upon information and belief, Defendant Clarendon National Insurance Company is a corporation organized and existing under the laws of the state of Texas, with its principal place of business in New York.

23.     Upon information and belief, Defendant Lexington Insurance Company is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Massachusetts.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action by virtue of supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, Federal Rule of Civil Procedure 19, Federal Rule of Civil Procedure 64, Federal Rule of Civil Procedure 69, and North Carolina General Statutes Article 31.  This Court had original jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983, and therefore has supplemental jurisdiction over the claims raised in this Supplemental Complaint.

25.     This Court has personal jurisdiction over the Insurers because each Insurer sold insurance policies in North Carolina, covering risks arising in North Carolina, and protecting

8

residents of North Carolina who have been harmed by wrongful conduct of employees of the State of North Carolina.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to this action occurred within this District, including the trial before this Court that resulted in this Court's Final Judgment.

## DEMAND FOR JURY TRIAL

27.     Plaintiffs hereby demand trial by jury of all issues raised in this Supplemental Complaint.

## FACTUAL BACKGROUND

### I.    THE INSURERS ISSUED INSURANCE POLICIES COVERING NORTH CAROLINA STATE EMPLOYEES, INCLUDING SNEAD AND ALLEN, FOR LIABILITY IMPOSED ON THEM FOR THEIR ACTS OR OMISSIONS DURING THE COURSE OF THEIR EMPLOYMENT.[6]

28.     Pursuant to North Carolina General Statutes Section 143-300.3—the "Defense of State Employees Act"—"upon request of an employee or former employee, the State may provide for the defense of any civil or criminal action or proceeding brought against him in his official or individual capacity, or both, on account of an act done or omission made in the scope and course of his employment as a State employee."

29.     Pursuant to North Carolina General Statutes Section 58-31-15, the Insurers agreed to provide professional liability insurance to North Carolina employees, such as Snead and Allen.

30.     That insurance, described in more detail below, insures employees of the State of North Carolina, including Snead and Allen, for liability imposed on them for their acts or omissions during the course of their employment by the State of North Carolina.  The indemnity

---

[6] Emphasis by bolding in the insurance policies has been removed for purposes of this Complaint. Capitalization remains.

coverage that each of the Insurers agreed to provide was expressly tethered to liability imposed on North Carolina employees in any action in which—pursuant to the Defense of State Employees Act—the State of North Carolina provided a defense to such employee for any alleged acts or omissions of those employees within the scope of their employment.

31.     Plaintiffs are judgment creditors of Snead and Allen with rights under the insurance policies at issue here, as the Insurers are indebted to Snead and Allen.  Therefore, Plaintiffs are entitled to the insurance proceeds under the insurance policies covering the damages they were awarded in the Final Judgment, as described more fully in Sections III and IV.

32.     Snead was employed by the State of North Carolina from on or before September 1983 to 1994.

33.     Allen was employed by the State of North Carolina from on or before September 1983 to at least 2021.

**A.     Jefferson Issued Insurance Policies Covering The Periods Of June 2, 1982 To July 1, 1991.**

34.     Defendant Jefferson issued several excess indemnity insurance policies covering Snead and Allen for liability imposed on either of them as a result of their acts and omissions while employed by the State of North Carolina (collectively, the "Jefferson Policies").  To the best of Plaintiffs' knowledge, true and correct copies of at least portions of the Jefferson Policies are attached hereto as Exhibits 2 to 8.[7]

_____

[7] On April 11, 2023, Plaintiffs asked Jefferson to conduct a comprehensive search of its records and provide Plaintiffs with any evidence relating to the potentially existing Jefferson Policies.  As of the date of this Supplemental Complaint, Jefferson has not responded to this request.

10

35.     Jefferson issued the following policies:

| Policy Number | Policy Period | Exhibit Number |
|---------------|---------------|----------------|
| JE 63643 | 06/02/1982–06/02/1985 | 2 |
| JE 69809 | 06/02/1985–06/02/1988 | 3 |
| JE 63647 | 07/01/1986–07/01/1987 | 4 |
| JE 69813 | 07/01/1987–07/01/1988 | 5 |
| JE 63817 | 07/01/1988–07/01/1989 | 6 |
| JE 69818 | 07/01/1989–07/01/1990 | 7 |
| JE 69820 | 07/01/1990–07/01/1991 | 8 |

36.     By an endorsement in each of the Jefferson Policies, Jefferson promised to "provide excess indemnity for any occurrence which results in a claim against any employee of the State of North Carolina as provided in" the Defense of State Employees Act.  *E.g.*, Ex. 2 at p. 9.

37.     Each of the Jefferson Policies insures Snead and Allen.

38.     The State of North Carolina provided a defense for Snead and Allen, which, according to Section 143-300.3, is required when an employee requests a defense for an "act done or omission made in the scope and course of his employment as a State employee."

39.     The Jefferson Policies state that Jefferson "shall pay any judgement in excess of the provisions of Statutory Limits, but exclusive of any investigative, adjustment or legal expenses." *E.g.*, Ex. 2 at p. 9.

40.     The Jefferson Policies were intended to provide indemnity-only coverage on an excess basis where a law enforcement officer, like Snead or Allen, is held liable for a judgment

11

arising from his or her acts or omissions in a suit for which the State of North Carolina provided a defense to the employee under the Defense of State Employees Act.

41.     Jefferson bears the burden to establish, and has not established, that there are exclusions in the Jefferson Policies that apply to preclude or limit coverage.

42.     Jefferson bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the Jefferson Policies.

43.     Each of the Jefferson Policies contains an "Insolvency Clause," which states: "The insolvency or bankruptcy of the Insured shall not release the Company from any of its obligation assumed hereunder. In case execution against the Insured on any final judgment covered by this insurance shall be returned 'unsatisfied' by reason of such insolvency or bankruptcy, then an action may be maintained by the injured person, or his or her personal representative, against the Company on this Policy in the same manner and to the same extent as the Insured, but not in excess of the Policy limits." *E.g.*, Ex. 2 at p. 5.

**B.      National Casualty Issued Insurance Policies Covering The Periods Of July 1, 1991 To July 1, 1996.**

44.     Defendant National Casualty issued several excess indemnity insurance policies covering Snead and Allen for liability imposed on either of them as a result of their acts and omissions while employed by the State of North Carolina (collectively, the "National Casualty Policies"). To the best of Plaintiffs' knowledge, true and correct copies of at least portions of the National Casualty Policies are attached hereto as Exhibits 9 to 13.[8]

---

[8] On April 11, 2023, Plaintiffs requested National Casualty to conduct a comprehensive search of its records and provide Plaintiffs with any evidence relating to the potentially existing National Casualty Policies. As of the date of this Supplemental Complaint, National Casualty has not responded to this request.

45. National Casualty issued the following policies:

| Policy Number | Policy Period | Exhibit Number |
|---|---|---|
| PO219000 | 07/01/1991–07/01/1992 | 9 |
| PO219001 | 07/01/1992–07/01/1993 | 10 |
| PO219002 | 07/01/1993–07/01/1994 | 11 |
| PO219003 | 07/01/1994–07/01/1995 | 12 |
| PO219004 | 07/01/1995–07/01/1996 | 13 |

46. The National Casualty Policies generally promise to "indemnify the Insured for all sums which the Insured shall become legally obligated to pay as damages resulting from a Wrongful Act(s) committed by an employee. The Wrongful Act must occur during the policy period." *E.g.*, Ex. 10 at p. 2.

47. The National Casualty Policies generally define "Wrongful Act" as "an occurrence which results in a claim against any person or employee of the State of Notice Carolina as provided in North Carolina General Statutes #143-300.2, 143-300.3, 143-300.4, 143-300.5, 143-300.6." *E.g.*, Ex. 10 at p. 6.

48. The National Casualty Policies generally define "Occurrence" as "an event, including continuous or repeated exposure to conditions, which results in damages, during the policy period, to any person or organization." *E.g.*, Ex. 10 at p. 6.

49. Except for the National Casualty Policy for the policy period July 1, 1995 to July 1, 1996 (the "1995–1996 National Casualty Policy"), each of the National Casualty Policies insures Snead and Allen. The 1995–1996 National Casualty Policy insures Allen.

50.     The National Casualty Policies generally define "Insured" as "the Named Insured and all employees, volunteers and Board Members and personnel as shown on the renewal" application and data and information.  *E.g.*, Ex. 10 at p. 6.

51.     "Employees" is generally defined in the National Casualty Policies as "all salaried full or part-time employees of the departments, boards, colleges, universities or other agencies of the State of North Carolina as shown in the renewal" application and data and information. "Employees also means volunteers and Board Members of these departments, boards, colleges, universities or other agencies while under their direction and within the scope of their authority." *E.g.*, Ex. 10 at p. 6.

52.     National Casualty bears the burden to establish, and has not established, that there are exclusions in the National Casualty Policies that apply to preclude or limit coverage.

53.     National Casualty bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the National Casualty Policies.

54.     Each of the National Casualty Policies contains an "ACTION AGAINST COMPANY" clause, which states:  "In the event of bankruptcy or insolvency of the INSURED, the Company shall not be relieved of the payment of such indemnity hereunder as would have been payable but for such bankruptcy or insolvency."  *E.g.*, Ex. 10 at p. 7.

**C.     General Star Issued Insurance Policies Covering The Periods Of July 1, 1996 To July 1, 2003.**

55.     Defendant General Star issued several primary and excess indemnity insurance policies covering Allen for liability imposed on him as a result of his acts and omissions while employed by the State of North Carolina (collectively, the "General Star Policies").  To the best

14

of Plaintiffs' knowledge, true and correct copies of at least portions of the General Star Policies are attached hereto as Exhibits 14 to 20.

56.     General Star issued the following policies:

| Policy Number | Policy Period | Exhibit Number |
|---|---|---|
| NYA83972 (Primary)<br><br>NXG342053 (Excess) | 07/01/1996–07/01/1997 | 14 |
| NYA839720A (Primary)<br><br>NXG342053A (Excess) | 07/01/1997–07/01/1998 | 15 |
| NYA839720B (Primary)<br><br>NXG342053B (Excess) | 07/01/1998–07/01/1999 | 16 |
| NYA839720C (Primary)<br><br>NXG342053C (Excess) | 07/01/1999–07/01/2000 | 17 |
| NYA839720D (Primary)<br><br>NXG342053D (Excess) | 07/01/2000–07/01/2001 | 18 |
| NYA839720E (Primary)<br><br>NXG342053E (Excess) | 07/01/2001–07/01/2002 | 19 |
| NJA679629 (Primary)<br><br>NXG342053F (Excess) | 07/01/2002–07/01/2003 | 20 |

57.     Each of the General Star Policies promises to "indemnify the INSURED for all sums which the INSURED shall become legally obligated to pay as damages resulting from a WRONGFUL ACT(S) committed by an employee.  The WRONGFUL ACT must occur during the POLICY PERIOD."  *E.g.*, Ex. 14 at p. 2.

58.     Each of the General Star Policies defines "WRONGFUL ACT" as "an occurrence which results in a claim against any person or employee of the State of Notice Carolina as provided in North Carolina General Statutes #143-300.2, 143-300.3, 143-300.4, 143-300.5, 143-300.6." *E.g.*, Ex. 14 at p. 5.

59.     Each of the General Star Policies, except for the General Star Policy for the policy period July 1, 2002 to July 1, 2003 (the "2002–2003 General Star Policy"), defines "OCCURRENCE" as "an event, including continuous or repeated exposure to conditions, which results in damages, during the POLICY PERIOD, to any person or organization." *E.g.*, Ex. 14 at p. 5. The 2002–2003 General Star Policy defines "OCCURRENCE" as "an event, including continuous or repeated exposure to substantially the same general harmful conditions, during the POLICY PERIOD, which results in damages, to any person or organization." Ex. 20 at p. 6.

60.     Each of the General Star Policies insures Allen.

61.     The General Star Policies define "INSURED" as "the NAMED INSURED and all EMPLOYEES, volunteers and Board Members and personnel as shown on the renewal data and information as submitted on behalf of the INSURED in the renewal instructions dated May 1, 1995." *E.g.*, Ex. 14 at p. 5.

62.     "EMPLOYEES" is generally defined in the General Star Policies as "all salaried full or part-time Employees of the departments, boards, colleges, universities or other agencies of the State of North Carolina as shown in the renewal data and information as submitted on behalf of the INSURED in the renewal instructions dated May 1, 1995. EMPLOYEES also means volunteers and Board Members of these departments, boards, colleges, universities or other agencies while under their direction and within the scope of their authority." *E.g.*, Ex. 14 at p. 5.

63.     General Star bears the burden to establish, and has not established, that there are exclusions in the General Star Policies that apply to preclude or limit coverage.

64.     General Star bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the General Star Policies.

65.     Each of the General Star Policies contains an "ACTION AGAINST COMPANY" clause, which states:  "In the event of bankruptcy or insolvency of the INSURED, the Company shall not be relieved of the payment of such indemnity hereunder as would have been payable but for such bankruptcy or insolvency."  *E.g.*, Ex. 14 at p. 6.

**D.      Clarendon Issued Insurance Policies Covering The Periods Of July 1, 2003 To July 1, 2007.**

66.     Defendant Clarendon issued several excess indemnity insurance policies covering Allen for liability imposed on him as a result of his acts and omissions while employed by the State of North Carolina (collectively, the "Clarendon Policies").  To the best of Plaintiffs' knowledge, true and correct copies of at least portions of the Clarendon Policies are attached hereto as Exhibits 21 to 24.

67.     Clarendon issued the following policies:

| Policy Number | Policy Period | Exhibit Number |
|---|---|---|
| XSR39306373 | 07/01/2003–07/01/2004 | 21 |
| XSR0041062 | 07/01/2004–07/01/2005 | 22 |
| XSR00411118 | 07/01/2005–07/01/2006 | 23 |
| XSR00411470 | 07/01/2006–07/01/2007 | 24 |

68.     Each of the Clarendon Policies promises to "indemnify the insured for all sums which the insured shall become legally obligated to pay as damages resulting from a wrongful act(s) committed by an employee.  The wrongful act must occur during the policy period."  *E.g.*, Ex. 21 at p. 2.

69.     Each of the Clarendon Policies defines "Wrongful Act" as "an occurrence, which results in a claim against any person or employee of the State of North Carolina as provided North

17

Carolina General Statutes #143-300.2, 143-300.3, 143-300.4, 143-300.5, 143-300.6." *E.g.*, Ex. 21 at p. 5.

70.    Each of the Clarendon Policies defines "Occurrence" as "an event, including continuous or repeated exposure to conditions, which results in damages, during the policy period, to any person or organization." *E.g.*, Ex. 21 at p. 5.

71.    Each of the Clarendon Policies insures Allen.

72.    The Clarendon Policies define "Insured" as "the named insured and all employees, volunteers and Board Members and personnel as shown on the renewal data and information as submitted on behalf of the insured in the renewal instructions dated April 17, 2003." *E.g.*, Ex. 21 at p. 5.

73.    "Employees" is defined in the Clarendon Policies as "all salaried full or part-time Employees of the departments, boards, colleges, universities or other agencies of the State of North Carolina as shown in the renewal data and information as submitted on behalf of the insured in the renewal instructions dated April 17, 2003.  Employees also means volunteers and Board Members of these departments, boards, colleges, universities or other agencies while under their direction and within the scope of their authority." *E.g.*, Ex. 21 at p. 5.

74.    Clarendon bears the burden to establish, and has not established, that there are exclusions in the Clarendon Policies that apply to preclude or limit coverage.

75.    Clarendon bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the Clarendon Policies.

76.    Each of the Clarendon Policies contains an "ACTION AGAINST COMPANY" clause, which states:  "In the event of bankruptcy or insolvency of the insured, the Company shall

18

not be relieved of the payment of such indemnity hereunder as would have been payable but for such bankruptcy or insolvency." *E.g.*, Ex. 21 at p. 6.

 **E.** **Lexington Issued Insurance Policies Covering The Periods Of July 1, 2007 To July 1, 2008, July 1, 2010 To July 1, 2011, July 1, 2013 To July 1, 2014, And July 1, 2015 To July 1, 2016.**

 77. Lexington issued excess indemnity insurance policies covering Snead and/or Allen for liability imposed on him as a result of his acts and omissions while employed by the State of North Carolina (the "Lexington Policies").

 **1.** **Lexington Issued Three Occurrence-Based Policies.**

 78. Lexington issued the following occurrence-based policies:

| Policy Number | Policy Period | Exhibit Number |
|:---:|:---:|:---:|
| 3039073 | 07/01/2007–07/01/2008 | 25 |
| 031238619 | 07/01/2010–07/01/2011 | 26 |
| 01-118-75-55 | 07/01/2013–07/01/2014 | 27 |

 79. To the best of Plaintiffs' knowledge, true and correct copies of at least portions of the 2007–2008 Lexington Policy, 2010–2011 Lexington Policy, and 2013–2014 Lexington Policy are attached hereto as Exhibits 25 through 27.

 80. The 2007–2008 Lexington Policy, 2010–2011 Lexington Policy, and 2013–2014 Lexington Policy insure Allen.

 81. Under the 2007–2008 Lexington Policy and 2010–2011 Lexington Policy, Lexington promises to "indemnify the insured for all sums which the insured shall become legally obligated to pay as damages resulting from a wrongful act(s) committed by the employee" so long as the wrongful act "occur[s] during the policy period." *E.g.*, Ex. 25 at p. 2.

19

82.     Under the 2013–2014 Lexington Policy, Lexington promises to "indemnify any Covered Employee, for whom the State is providing the defense under Article 31A of the North Carolina General Statutes, for all sums which the Covered Employee shall become legally obligated to pay as damages resulting from an occurrence." Ex. 27 at p. 6.

83.     The 2013–2014 Lexington Policy defines "Covered Employee" as "all persons for whom the State of North Carolina provides a defense under Article 31A of the North Carolina General Statutes." Ex. 27 at p. 10. Accordingly, Allen is a Covered Employee under the 2013–2014 Lexington Policy because North Carolina provided him a defense under the Defense of State Employees Act.

84.     The 2007–2008 Lexington Policy and 2010–2011 Lexington Policy define "Wrongful Act" as "an occurrence, which results in a claim against any person or employee of the State of North Carolina as provided North Carolina General Statutes Sections #143-300.2, 143-300.3, 143-300.4, 143-300.5, 143-300.6." *E.g.*, Ex. 25 at p. 5.

85.     The 2007–2008 Lexington Policy and 2010–2011 Lexington Policy define "Occurrence" as "an event, including continuous or repeated exposure to conditions, which results in damages, during the policy period, to any person or organization." *E.g.*, Ex. 25 at p. 5.

86.     The 2013–2014 Lexington Policy defines "Occurrence" as "an event, including continuous or repeated exposure to conditions, which results in damages, during the policy period." Ex. 27 at p. 10.

87.     The 2007–2008 Lexington Policy and 2010–2011 Lexington Policy contain an "ACTION AGAINST COMPANY" clause, which states: "In the event of bankruptcy or insolvency of the insured, the Company shall not be relieved of the payment of such indemnity

20

hereunder as would have been payable but for such bankruptcy or insolvency." *E.g.*, Ex. 25 at p. 5.

88.     The 2013–2014 Lexington Policy contains an "ACTION AGAINST COMPANY" clause, which states:  "In the event of bankruptcy or insolvency of the State or a Covered Employee, the Company shall not be relieved of the payment of such indemnity hereunder as would have been payable but for such bankruptcy or insolvency."  Ex. 27 at p. 12.

## 2.     Lexington Also Issued Claims-Made Policies.

89.     Lexington issued Policy No. 01-424-26-26 for the policy period July 1, 2015 to July 1, 2016 (the "2015–2016 Lexington Policy").  To the best of Plaintiffs' knowledge, a true and correct copy of at least portions of the 2015–2016 Lexington Policy is attached hereto as Exhibit 28.

90.     The 2015–2016 Lexington Policy is triggered by a claim made in the policy period.

91.     The 2015–2016 Lexington Policy insures Snead and Allen.

92.     The State of North Carolina provided a defense for Snead and Allen, which, according to Section 143-300.3, is required when an employee requests coverage for an "act done or omission made in the scope and course of his employment as a State employee."

93.     The 2015–2016 Lexington Policy promises to "indemnify any Covered Employee, for whom the State is providing the defense under Article 31A of the North Carolina General statutes, for all sums which the Covered Employee shall become legally obligated to pay as damages resulting from an Occurrence."  Ex. 28 at p. 5.

94.     The 2015–2016 Lexington Policy defines "Occurrence" as "an event, or related series of events, including continuous or repeated exposure to conditions, which ***results in a claim*** during the policy period."  Ex. 28 at p. 9 (emphasis added).

21

95. The 2015–2016 Lexington Policy defines "Covered Employee" as "all persons for whom the State of North Carolina provides a defense under Article 31A of the North Carolina General Statutes." Ex. 28 at p. 9. Accordingly, Snead and Allen are each a Covered Employee under the 2015–2016 Lexington Policy because North Carolina provided each of them a defense under the Defense of State Employees Act.

96. The 2015–2016 Lexington Policy contains an "ACTION AGAINST COMPANY" clause, which states: "In the event of bankruptcy or insolvency of the State or a Covered Employee, the Company shall not be relieved of the payment of such indemnity hereunder as would have been payable but for such bankruptcy or insolvency." Ex. 28 at p. 10.

97. This action, originally filed on August 31, 2015, is a claim that was made during the policy period of the 2015–2016 Lexington Policy.

98. Lexington bears the burden to establish, and has not established, that there are exclusions in the Lexington Policies that apply to preclude or limit coverage.

99. Lexington bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the Lexington Policies.

**3. Lexington Engaged In Bad Faith And Unfair And Deceptive Trade Practices By Attempting In Secret And Without Notice To Snead, Allen, Or Plaintiffs To Rewrite The $10 Million 2015–2016 Lexington Claims-Made Policy To Make It A Worthless Occurrence-Based Policy.**

100. The 2015–2016 Lexington Policy was a renewal of a prior Lexington policy that incepted on July 1, 2014 (the "2014–2015 Lexington Policy").

101. The 2014–2015 Lexington Policy is triggered by a claim made in the policy period.

102. Except for the policy period, the terms of the 2015–2016 Lexington Policy are identical to the terms of the 2014–2015 Lexington Policy. Accordingly, the 2015–2016 Lexington Policy is triggered by a claim made in the policy period.

22

103.    The claims-made trigger language included in the 2014–2015 Lexington Policy and 2015–2016 Lexington Policy also appears in the two subsequent policies issued by Lexington: Policy No. 01-529-45-49, which incepted on July 1, 2016 (the "2016–2017 Lexington Policy"), and Policy No. 01-559-22-82, which incepted on July 1, 2017 (the "2017–2018 Lexington Policy").

104.    In sum, over the course of four consecutive years, Lexington issued four claims-made policies covering North Carolina State employees for claims made against them.

105.    On December 18, 2017, Lexington denied coverage under the 2015–2016 Lexington Policy in effect on August 28, 2015, which is the date that Plaintiffs filed this action, on the basis that the alleged wrongful acts in this action took place before the 2015–2016 Lexington Policy period.

106.    On February 7, 2019, North Carolina sued Lexington in the action captioned *North Carolina v. AIG*, No. 19-CVS-001757 (Wake Cnty., N.C.) (the "First Declaratory Judgment Action").[9]

107.    Plaintiffs were also defendants and third-party plaintiffs in the First Declaratory Judgment Action, having been added by the State of North Carolina (the "State") as interested parties.

108.    On August 19, 2019, the State voluntarily dismissed Lexington from that action with no explanation.

---

[9] Plaintiffs in the First Declaratory Judgment Action were the State of North Carolina and the Public Officers & Employees Liability Insurance Commission.  The defendants were Jefferson, Lexington, Kimberly Pinchbeck as Limited Guardian and Conservator of the Estate of Plaintiff McCollum, and J. Duane Gilliam on behalf of and as Legal Guardian of Plaintiff Brown.

23

109.    On January 14, 2022, almost three years after the State had sued Lexington, Lexington filed its own declaratory judgment action in *Lexington Insurance Co. v. North Carolina*, No. 22 CVS 00646 (Wake Cnty., N.C.) (the "Second Declaratory Judgment Action").[10]    The Second Declaratory Judgment Action remains pending.  The Second Declaratory Judgment Action had previously been stayed in deference to this Action.  The State has not yet answered the complaint in the Second Declaratory Judgment Action.

110.    In the Second Declaratory Judgment Action, Lexington again asserted that it would never owe any coverage to Snead or Allen if either was held liable to Plaintiffs in the underlying Action.

111.    In the Second Declaratory Judgment Action, Lexington asserted publicly for the first time (approximately seven years after the 2015–2016 Lexington Policy was issued) that on some unspecified day in 2019, Lexington and Public Officers & Employees Liability Insurance Commission ("POELIC") had agreed to "reform" the 2015–2016 Lexington Policy.

112.    In the Second Declaratory Judgment Action, Lexington claimed that it had mistakenly drafted and issued the 2014–2015 Lexington Policy and 2015–2016 Lexington Policy as claims-made insurance policies.

113.    Lexington attached, as an exhibit to the Second Declaratory Judgment Action, an unsigned and undated document that it referred to as the "Agreement to Reform Insurance Policies" (the "Purported Reformation Agreement"), which is attached hereto as Exhibit 29.

114.    The Purported Reformation Agreement contains a space for the date:  "this _____ day of _____, 2019."  At the bottom of the Purported Reformation Agreement, there is an

---

[10] In addition to the State of North Carolina, defendants in this action were the Public Officers & Employees Liability Insurance Commission, Charlotte Fox as administratrix of the Estate of Snead, and Allen.

empty space for a signature with the typed name "Lawrence Fine[,] AIG Claims, Inc."  The document is not signed by Lawrence Fine or anyone representing AIG or Lexington.  Upon information and belief, Lawrence Fine was not a Lexington employee from 2014 to 2019, was not authorized to underwrite Lexington policies during the 2014 to 2019 time frame, and did not have any contemporaneous knowledge of Lexington's underwriting intent when it issued the Lexington policies from 2014 to 2019.

115.    The Purported Reformation Agreement recites that Lexington and POELIC agree that both the 2014–2015 Lexington Policy and 2015–2016 Lexington Policy contain a drafting mistake defining "Occurrence" to mean "an event, or related series of events, including continuous or repeated exposure to conditions, which results in a claim during the policy period."  To fix this "mistake," Lexington alleges that after this action was filed and the 2015–2016 Lexington Policy was triggered, through the Purported Reformation Agreement, Lexington was able to materially alter the actual terms of the 2015–2016 Lexington Policy as issued from a claims-made policy to an occurrence-based policy.

116.    This material alteration had the effect of rendering worthless to the actual insureds (Snead and Allen) the $10 million of limits that was otherwise available to them to cover any judgment entered against them and in favor of the Plaintiffs in this action.

117.    Snead and Allen were not parties to the Purported Reformation Agreement.

118.    The State, through POELIC, repeatedly requested—in letters dated November 15, 2016, December 14, 2018, and January 8, 2019—that Lexington agree to provide Snead and Allen coverage under the 2015–2016 Lexington Policy for this action.

119.    Lexington cannot establish that Snead or Allen understood that there was any mistake in the 2015–2016 Lexington Policy.  Similarly, Lexington cannot establish that POELIC

believed the 2015–2016 Lexington Policy contained any mistake. Not only did POELIC request coverage under the 2015–2016 Lexington Policy three separate times over the span of 25 months, but Lexington itself issued claims-made policies for four consecutive years in 2014, 2015, 2016 and 2017—even issuing two of those policies after this action was brought.

120. Lexington did not even assert as a defense in its December 18, 2017 denial letter that it had made a mistake. That denial letter was drafted nearly one year after coverage was requested.

## II. THE INSURERS' POLICIES RESPOND TO THE FINAL JUDGMENT.

### A. Because Of Wrongful Acts And Omissions, Plaintiffs McCollum And Brown Were Wrongfully Charged With The Rape And Murder Of Sabrina Buie.

121. On September 24, 1983, 11-year old Sabrina Buie of Red Springs, North Carolina went missing. Her body was found the following day in a field next to a convenience store in Red Springs. Authorities determined that she had injuries indicative of sexual assault, and died of suffocation as a result of foreign objects blocking her airway.

122. A Schlitz beer can inside a paper bag, a Newport brand cigarette butt, matches, a jar of Vaseline, and a gum wrapper were found at the crime scene. Nine latent fingerprints were lifted from the beer can, two of which were suitable for comparison and analysis.

123. Allen, who was then an officer of the North Carolina State Bureau of Investigation ("SBI"), was one of the first law enforcement agents to arrive at the crime scene.

124. The crime scene was processed by numerous members of law enforcement, including Allen. Allen sketched where items at the crime scene were found, personally recovered and vouchered pieces of physical evidence, and prepared a detailed crime scene report. In addition, Allen attended Sabrina Buie's autopsy the following day, September 27, 1983, and continued to

26

search the area, eventually locating her clothing on September 28, 1983 in the woods next to the field.

125. The field where Sabrina Buie's body was found was next to the home of Roscoe Artis. Sabrina Buie's body was found only 38 feet from the home of Roscoe Artis. At the time of Sabrina Buie's murder, Roscoe Artis was known to law enforcement based on a criminal record dating back to 1957. Artis's pattern of criminal conduct consisted almost exclusively of crimes against young women involving physical and sexual violence where he acted alone. At the time of the Buie investigation, Artis had a warrant out for his arrest for the murder of another young woman.

126. Three years before Sabrina Buie's murder, on August 25, 1980, Bernice Moss was found dead in Gastonia, North Carolina. She had been killed in a manner strikingly similar to the way Sabrina Buie was killed. Roscoe Artis was the last person seen with Bernice Moss before she died. He was considered a suspect and questioned, but not charged at that time.

127. On Monday, September 26, 1983, in connection with Sabrina Buie's death, law enforcement interviewed Lewis Sinclair, Jr., a 16-year old student at Red Springs High School. Over the course of several interviews spanning the next week, Lewis Sinclair, Jr. changed his story multiple times. He would sometimes implicate Plaintiffs McCollum and Brown in Buie's death but at other times say that he had no information regarding their involvement.

128. On October 6, 1983, the police administered a polygraph examination to Lewis Sinclair, Jr. The results showed that he was truthful when he stated that he did not know anything about the death of Sabrina Buie.

129. On September 27, 1983, Plaintiff McCollum was questioned by Joel Garth Locklear of the Robeson County Sheriff's Office regarding Sabrina Buie's death. Plaintiff

McCollum denied any involvement and was released. Deputy Locklear memorialized this interrogation in a written report.

130. On September 28, 1983, 17-year old Ethel Furmage told officers Joel Garth Locklear and Kenneth Sealey that she had heard from other kids at her high school that Plaintiff McCollum was involved in Sabrina Buie's death. She gave no details or sources of this information, nor did she have any personal knowledge that Plaintiff McCollum was involved in Sabrina Buie's death in any way. Five days later, Ethel Furmage would admit to SBI officers that she fabricated this tip.

131. Based upon this tip, however, Snead, Allen, and Sealey went to Plaintiff McCollum's home at approximately 9:10 p.m. on September 28, 1983, detained Plaintiff McCollum, and transported him to the Red Springs Police Department headquarters. He was then fingerprinted and placed in a room for interrogation.

132. Plaintiff McCollum, who at the time was 19 years old and intellectually disabled, was improperly interrogated by law enforcement agents continuously for several hours and was not permitted to see his mother or make any phone calls. Dr. Richard Leo, a false confessions expert, explained during the trial in this action that these conditions, coupled with an interrogee's intellectual disabilities, make it possible to pressure a person into falsely confessing to a crime that person did not commit.

133. The interrogating officers were the same law enforcement agents who had processed the crime scene and thus possessed knowledge of the details of the crime scene and the condition of Sabrina Buie's body.

134. Over the course of more than four and a half hours, law enforcement agents, including Snead and Allen, repeatedly accused Plaintiff McCollum of participating in the rape and

28

murder of Sabrina Buie, pressuring him to change his position whenever he said he was innocent. At no time was Plaintiff McCollum read his *Miranda* rights during his hours-long interrogation, nor was he permitted to speak with an attorney. Whenever he tried to remain silent, he was pressured by Snead, including being threatened with the death penalty, to change his story.

135.    While Plaintiff McCollum was being held in the interrogation room, his mother arrived at the police station, requesting to see Plaintiff McCollum. She had brought her 15-year old son, Plaintiff Brown, with her to the police station. Like Plaintiff McCollum, Plaintiff Brown is also intellectually disabled.

136.    Snead and Sealey then individually interrogated Plaintiff Brown, threatening him with arrest and the death penalty as well.

137.    Snead and Sealey then also relayed these threats to Plaintiff McCollum. Additionally, law enforcement agents repeatedly told Plaintiff McCollum that other eyewitnesses had placed him at the crime scene and implicated him in Sabrina Buie's death, and further told him forensic evidence existed implicating him as well.

138.    To the contrary, no physical evidence or independent witnesses existed linking either Plaintiff McCollum or Plaintiff Brown to the crime scene or to the crime itself.

139.    In fact, at the time they were questioned, Plaintiffs McCollum and Brown were conclusively eliminated as the sources of identifiable fingerprint evidence found at the crime scene.

140.    Allen, Snead, and Sealey expressed the view that Plaintiff McCollum had not acted alone when accusing him of the rape and murder of Sabrina Buie, specifically questioning Plaintiff McCollum about Plaintiff Brown. The officers repeatedly promised Plaintiff McCollum that if he

implicated others, and if he simply admitted he played a minor role in the offense, such as restraining the victim, the officers and the court system would be lenient with him.

141.     At 1:37 a.m. on September 29, 1983, Plaintiff McCollum signed two statements written by Snead and Sealey.   The statements contained the details of the crime scene, of the condition of evidence, and of the condition of the victim's body.   The statements also implicated Plaintiff Brown and three of Plaintiff McCollum's friends—Chris Brown, Darryl Suber, and Louis Moore.

142.     In the written statement that Snead and Sealey placed before Plaintiff McCollum, Plaintiff McCollum purportedly told police that he had simply held Sabrina Buie down while the others had raped and murdered her, that Darryl Suber had brought a knife to the scene and had stabbed Sabrina Buie, and that Darryl Suber had smoked the Newport cigarette found at the crime scene.   Mr. McCollum also purportedly told police that the victim's underwear was pink.

143.     But Sabrina Buie had not been stabbed—her autopsy revealed no such wounds. And her underpants were white, not pink, but when they were found, they were stained with blood, giving them a pink appearance.

144.     Snead and other officers then took Plaintiff Brown into custody at the Red Springs Police Department.   The same law enforcement agents then subjected Plaintiff Brown to continuous interrogation for over an hour, denying him access to his mother or to an attorney. Plaintiff Brown, like Plaintiff McCollum, was verbally threatened and told that if he did not confess, his mother and sister would go to jail.   As they had with Plaintiff McCollum, law enforcement lied to Plaintiff Brown by telling him that witnesses and evidence existed implicating him in Sabrina Buie's rape and murder.   Like Plaintiff McCollum, Plaintiff Brown signed a confession, written by the officers, admitting his involvement in Sabrina Buie's death.

30

145.     Law enforcement ruled out Chris Brown, Darryl Suber, and Louis Moore as having any participation in Sabrina Buie's death.  None of their fingerprints matched any fingerprints found at the crime scene, nor did any other witness place them at the crime scene or otherwise implicate them.  Additionally, Suber and Moore had corroborated alibis for the night of the crime and were never charged with any crimes.

146.     Plaintiffs McCollum and Brown were charged with rape, murder, and related offenses by the Robeson County District Attorney and were held in custody pending trial.

147.     On October 22, 1983, approximately one month after Plaintiffs McCollum and Brown were arrested and charged with Sabrina Buie's rape and murder, and while Plaintiffs McCollum and Brown were being held in the Robeson County Jail awaiting trial, 18-year old Joann Brockman was found dead behind a barn in Red Springs, North Carolina.  Roscoe Artis was a suspect in her murder.  Joann Brockman had been murdered in a manner strikingly similar to Sabrina Buie and Bernice Moss.  Witnesses told law enforcement that Joann Brockman had been seen in the presence of Roscoe Artis just before she went missing.  Allen was part of the SBI team investigating Joann Brockman's murder.

148.     On October 22, 1983, Roscoe Artis was arrested by officer Locklear.  When Artis was arrested, police noticed on his clothing blood that was later determined to be Joann Brockman's.  Artis admitted to murdering and sexually assaulting Brockman.  Artis was charged with the rape and murder of Brockman, and detained in the Robeson County Jail awaiting trial. On August 31, 1984, Artis was convicted in the Robeson County Superior Court for the rape and murder of Joann Brockman and was sentenced to death.  Roscoe Artis died on December 15, 2020 of natural causes while incarcerated.

31

149.    On October 2, 1984, one week before the start of the trial of *State of North Carolina v. Henry Lee McCollum and Leon Brown*, an arrest warrant was issued for Roscoe Artis charging him with the first-degree murder of Bernice Moss.

150.    Three days later, on or about October 5, 1984, Snead and other officers asked the SBI to conduct comparisons of the latent prints found at Sabrina Buie's crime scene to known fingerprints of Roscoe Artis and Lewis Sinclair, Jr.  Both Artis and Sinclair, Jr. were listed as "suspects" by the Red Springs Police Department.  The fingerprint comparison for Artis and Sinclair, Jr. was never completed.

151.    The trial of *State of North Carolina v. Henry Lee McCollum and Leon Brown* began on October 8, 1984.  Both Snead and Allen testified at the trial.  The joint trial ended in guilty verdicts.  Plaintiff McCollum and Plaintiff Brown were each sentenced to death, despite no physical evidence tying either of them to the crime.

152.    After the trial, the Red Springs Police Department, through Snead and other officers, cancelled the still-pending request for the fingerprint analysis of Artis and Sinclair and a comparison of their fingerprints with fingerprint evidence found at the scene of the crime.

153.    As a result of Snead's and Allen's continued wrongful conduct and omissions, including without limitation, their failure to disclose exculpatory information before Plaintiffs' initial trials, Plaintiffs were convicted of first-degree rape and first-degree murder on October 25, 1984 and were sentenced to death.

154.    On February 3, 1988, the North Carolina Supreme Court reversed Plaintiffs' convictions and sentences in *State v. McCollum,* 321 N.C. 557, 364 S.E.2d 112 (1988), and ordered a new trial as to each.

32

155.    Plaintiff McCollum was retried separately in 1991.  On November 15, 1991, Snead and Allen testified for North Carolina against Plaintiff McCollum.  On November 22, 1991, Plaintiff McCollum was again found guilty of first-degree murder and was again sentenced to death.  The North Carolina Supreme Court affirmed the conviction and sentence and the United States Supreme Court then denied certiorari.

156.    Plaintiff Brown was tried again in 1992.  On June 8, 1992, Snead testified for North Carolina against Plaintiff Brown.  On June 10, 1992, Plaintiff Brown was again found guilty of first-degree rape.  He was sentenced to life imprisonment without the possibility of parole.  His conviction and sentence were affirmed by the North Carolina Court of Appeals and then the North Carolina Supreme Court.

**B.    Snead And Allen Committed Additional Wrongful And Negligent Acts And Omissions During And After The Investigation Leading To Plaintiffs' Incarcerations.**

157.    Snead and Allen did not disclose to Plaintiffs' defense counsel before, during, or after the trials, the exculpatory information that Lewis Sinclair, Jr., who testified against Plaintiffs McCollum and Brown during the trials, had disavowed any knowledge linking Plaintiffs McCollum and Brown to Sabrina Buie's murder, as described more fully above.  Had this exculpatory information been disclosed before, during, or after the trials, Plaintiffs McCollum and Brown likely would not have been incarcerated or, if the disclosure had come after their incarceration, they likely would not have remained incarcerated.  Rather, Snead's and Allen's omissions—their individual decisions to not disclose this exculpatory information—after the arrest, and then at discrete points of time throughout Plaintiffs' prosecution and incarceration, caused Plaintiffs McCollum and Brown to suffer additional damages, as reflected in the jury's verdict and the Final Judgment.

33

158.    Snead and Allen did not disclose to Plaintiffs' defense counsel before, during, or after the trials, the exculpatory information that the tip implicating Plaintiffs McCollum and Brown was fabricated, as described more fully above.  Had this exculpatory information been disclosed before, during, or after the trials, Plaintiffs McCollum and Brown likely would not have been incarcerated or, if the disclosure had come after their incarceration, they likely would not have remained incarcerated.  Rather, Snead's and Allen's omissions—their individual decisions to not disclose this exculpatory information—after the arrest, and then at discrete points of time throughout Plaintiffs' prosecution and incarceration, caused Plaintiffs McCollum and Brown to suffer additional damages, as reflected in the jury's verdict and the Final Judgment.

159.    Snead and Allen did not disclose to Plaintiff McCollum's defense counsel before, during, or after the trials, the exculpatory information regarding the improper interrogation tactics that were used against Plaintiff McCollum to obtain a purported confession, as described more fully above.  Had this exculpatory information been disclosed before, during, or after the trials, Plaintiff McCollum likely would not have been incarcerated, or if the disclosure had come after his incarceration, he likely would not have remained incarcerated.  Rather, Snead's and Allen's omissions—their individual decisions to not disclose this exculpatory information—after the arrest, and then at discrete points of time throughout Plaintiff McCollum's prosecution and incarceration, caused Plaintiff McCollum to suffer additional damages, as reflected in the jury's verdict and the Final Judgment.

160.    Snead did not disclose to Plaintiff Brown's defense counsel before, during, or after the trials, the exculpatory information concerning the improper interrogation tactics that were used against Plaintiff Brown to obtain a purported confession, as described more fully above.  Had this exculpatory information been disclosed before, during, or after the trials, Plaintiff Brown likely

would not have been incarcerated or, if the disclosure had come after his incarceration, he likely would not have remained incarcerated. Rather, Snead's omissions—his individual decision to not disclose this exculpatory information—after the arrest, and then at discrete points of time throughout Plaintiff Brown's prosecution and incarceration, caused Plaintiff Brown to suffer additional damages, as reflected in the jury's verdict and the Final Judgment.

161. Snead and Allen did not disclose to Plaintiffs' defense counsel before, during, or after the trials, the exculpatory information concerning the discrepancies between Plaintiffs' wrongfully obtained confessions and the evidence recovered at the crime scene and learned from the autopsy, as described more fully above. Had this exculpatory information been disclosed before, during, or after the trials, Plaintiffs McCollum and Brown likely would not have been incarcerated or, if the disclosure had come after their incarceration, they likely would not have remained incarcerated. Rather, Snead's and Allen's omissions—their individual decisions to not disclose this exculpatory information—after the arrest, and then at discrete points of time throughout Plaintiffs' prosecution and incarceration, caused Plaintiffs McCollum and Brown to suffer additional damages, as reflected in the jury's verdict and the Final Judgment.

162. Allen did not disclose to Plaintiff McCollum's defense counsel before, during, or after the trials, the exculpatory information concerning the similarities between the crimes perpetrated against Sabrina Buie and Joann Brockman, as described more fully above. Had this exculpatory information been disclosed before, during, or after the trials, Plaintiff McCollum likely would not have been incarcerated or, if the disclosure had come after his incarceration, he likely would not have remained incarcerated. Rather, Allen's omissions—his individual decision to not disclose this exculpatory information—after the arrest, and then at discrete points of time

throughout Plaintiff McCollum's prosecution and incarceration, caused Plaintiff McCollum to suffer additional damages, as reflected in the jury's verdict and the Final Judgment.

163. Snead did not disclose to Plaintiffs' defense counsel before, during, or after the trials, the exculpatory information that he had requested and then failed to follow through with— the request for a fingerprint analysis comparing Roscoe Artis's fingerprints to the fingerprints found at the crime scene, as described more fully above. Had this exculpatory information been disclosed before, during, or after the trials, Plaintiffs McCollum and Brown likely would not have been incarcerated or, if the disclosure had come after their incarceration, they likely would not have remained incarcerated. Rather, Snead's omissions—his individual decision to not disclose this exculpatory information—after the arrest, and then at discrete points of time throughout Plaintiffs' prosecution and incarceration, caused Plaintiffs McCollum and Brown to suffer additional damages, as reflected in the jury's verdict and the Final Judgment.

164. Had the information explained in Paragraphs 155 to 161 above been known, it could have prevented Plaintiffs' wrongful incarcerations.

165. At no point before, during, or after Plaintiff McCollum's retrial or appeal did Snead or Allen disclose any of the above exculpatory evidence that eventually helped end Plaintiff McCollum's wrongful incarceration.

166. At no point before, during, or after Plaintiff Brown's retrial or appeal did Snead disclose any of the above exculpatory evidence that eventually helped end Plaintiff Brown's wrongful incarceration.

167. In total, as a result of Snead's and Allen's continued wrongful conduct and omissions, including without limitation, their many failures to disclose exculpatory information,

36

Plaintiffs McCollum and Brown remained wrongly incarcerated for thirty-one years and suffered multiple injuries during that period of time.

168.    When the North Carolina Innocence Inquiry Commission (the "Commission") uncovered the truth that Plaintiffs were innocent of the crime, it shined a light on Snead's and Allen's failure to disclose at multiple times during the course of Plaintiffs' wrongful incarcerations.  Plaintiff McCollum and Plaintiff Brown swiftly received full pardons and were released from prison.

### C.    Plaintiffs McCollum And Brown Were Exonerated After Thirty-One Years Of Wrongful Incarceration.

169.    In April 1995, Plaintiff McCollum filed a Motion for Appropriate Relief ("MAR"), as well as a discovery motion specifically requesting "any and all information in any form whatsoever, that derives from any person, that is exculpatory."  In response to the motion, the SBI specifically requested in August and September 1995 that Snead and Allen turn over documents relating to Sabrina Buie's murder.  Snead and Allen again failed to disclose material, exculpatory evidence.

170.    In 2009, Plaintiff Brown wrote a letter to the Commission requesting review of his case.  The Commission then opened a file and commenced an investigation into the case.

171.    In June 2010, the Commission obtained a court order directing the Red Springs Police Department to provide the Commission with the evidence and original reports from the case file.  The court order was served upon the police department, and SBI was ordered to preserve and produce all evidence relating to Plaintiff Brown's case by July 18, 2010.  Snead and Allen failed to disclose material, exculpatory evidence at this time.

37

172.     In March 2014, Plaintiff McCollum filed a discovery motion pursuant to N.C. Gen. Stat. § 15A-1415(f) seeking "discovery pertaining to all work performed by the SBI on his case." Snead and Allen failed to disclose material, exculpatory evidence at this time.

173.     Investigator Sharon Stellato requested the original boxes of evidence and reports several times over the next four years.  Finally, in 2014, Investigator Stellato obtained the original box of evidence, which contained the forensic evidence discussed above, including latent prints, hair samples, swabs, the cigarette butt, the beer can, and the other pieces of physical evidence, as well as original reports and crime scene photographs.

174.     The cigarette butt was tested by the North Carolina State Crime Laboratory and a DNA profile was developed.

175.     Both Plaintiff McCollum and Plaintiff Brown's DNA profiles were analyzed and compared to the DNA profile on the cigarette butt.  Both of them were conclusively excluded as the source of the DNA on the cigarette butt.

176.     Roscoe Artis's DNA profile was in the North Carolina Combined DNA Index System ("CODIS") database by virtue of his conviction for the rape and murder of Joann Brockman.  In 2014, the Commission requested a CODIS search of the DNA on the cigarette butt. An initial comparison of Artis's DNA on file in the CODIS database with the DNA profile from the cigarette butt indicated a high probability that Roscoe Artis was the source of the DNA on the cigarette butt.

177.     Investigator Stellato interviewed Roscoe Artis on four occasions regarding the Sabrina Buie murder.  During those interviews, Artis recalled the Sabrina Buie murder, including that he was with Sabrina Buie on the night of her murder, and said he knew that Plaintiffs

38

McCollum and Brown were innocent. Artis also told the Commission that if the police had done their job correctly, Plaintiffs McCollum and Brown would never have been sent to prison.

178.    A new sample of Roscoe Artis's DNA (that he voluntarily provided) was sent to the North Carolina State Crime Laboratory for DNA analysis and comparison with the DNA profile generated from the cigarette butt. The results of that test demonstrated that Artis's DNA matched the DNA at the crime scene.

179.    On September 2, 2014, Investigator Stellato testified at a hearing upon the Motion for Appropriate Relief that was held in the Robeson County Superior Court. Without opposition from the District Attorney, L. J. Britt, III, the court vacated the convictions and sentences and ordered that Plaintiffs McCollum and Brown be immediately released from custody. They were released the following day, September 3, 2014.

180.    On June 5, 2015, North Carolina Governor Pat McCrory issued Pardons of Innocence to Plaintiffs McCollum and Brown, finding that they were actually innocent.

**D.      Plaintiffs McCollum And Brown Suffered Substantial Harm Due To Their Wrongful Incarcerations Stemming From Snead's And Allen's Wrongful Acts And Omissions.**

181.    As a result of Snead's and Allen's negligent acts and omissions, Plaintiffs McCollum and Brown were deprived of their liberty and freedom from September 28, 1983 until their release on September 3, 2014—a total of 30 years, 11 months, and 7 days in prison, for a crime they did not commit. A substantial portion of that time was spent on "Death Row" awaiting execution.

39

182.　As a result of Snead's and Allen's negligent acts and omissions, which caused Plaintiff McCollum's incarceration, Plaintiff McCollum suffered bodily injuries, including without limitation:

- Stage 5 level anxiety;

- Post-Traumatic Stress Disorder;

- Hallucinations;

- Severe depression;

- Chest pains;

- Stomach pains; and

- Spitting up and urinating blood.

183.　As a result of Snead's negligent acts and omissions, which caused Plaintiff Brown's incarceration, Plaintiff Brown suffered bodily injuries, including without limitation:

- Schizoaffective Disorder;

- Bipolar Disorder;

- Borderline Intellectual Functioning;

- Diabetes;

- Psychotic symptoms;

- Severe headaches; and

- Psychogenic alopecia due to acute anxiety.

184. Plaintiffs' injuries continued over the course of, and past, their incarcerations. Moreover, during their incarcerations, they were subjected to multiple discrete injuries.

185. Both Plaintiff McCollum and Plaintiff Brown were harassed and bullied by other inmates and by staff as a result of their intellectual disabilities, with both men having to defend themselves from attacks over the years in prison.

186. Plaintiff Brown was held in an adult facility and repeatedly sexually assaulted by other inmates, violently raped, and brutalized.

187. Because Plaintiff McCollum was an innocent man, the trauma he suffered from being incarcerated and sentenced to die was amplified. He felt shame and humiliation from purportedly "confessing" to a crime he did not commit and from yielding to the pressure to implicate Plaintiff Brown. Additionally, Plaintiff McCollum attempted suicide while in prison due to his distress, and was rescued by another inmate. That inmate was then executed, adding to Plaintiff McCollum's distress.

188. Furthermore, because Plaintiff Brown, too, was an innocent man, the trauma he suffered from being incarcerated and sentenced to die was amplified. Despite the prison's knowledge that his nonviolent but erratic behavior was due to his psychosis, Plaintiff Brown was punished with solitary confinement. Plaintiff Brown was also denied minimum security status because he refused to admit guilt for a crime that he did not commit. Plaintiff Brown also became eligible for parole in 2003, but repeatedly refused to admit guilt for a crime he did not commit, which nullified his efforts to obtain parole.

**III. PURSUANT TO THE FINAL JUDGMENT, PLAINTIFF MCCOLLUM, DUE TO THE ACTS AND OMISSIONS OF SNEAD AND ALLEN, AND PLAINTIFF BROWN, DUE TO THE ACTS AND OMISSIONS OF SNEAD, WERE AWARDED DAMAGES IN THIS ACTION.**

189.     On August 28, 2015, Plaintiffs McCollum and Brown filed this action against six law enforcement officers involved in their wrongful incarcerations. They asserted claims of false arrest, deprivation of due process, malicious prosecution, and municipal liability.

190.     Pursuant to the Defense of State Employees Act, North Carolina provided Snead and Allen a defense in this action.

191.     This action was a claim made during the policy period of the 2015–2016 Lexington Policy within the meaning of the 2015–2016 Lexington Policy.

192.     Although certain defendants in this action settled with Plaintiffs McCollum and Brown, Snead and Allen did not.

193.     Following a five-day jury trial where the facts above were presented and an appeal, Plaintiff McCollum and Plaintiff Brown were each awarded $25.25 million in compensatory damages.

194.     If the damages awarded in the Final Judgment are allocated to each year in which Plaintiffs suffered injury as a result of the wrongful acts and omissions presented to the jury and for which Snead and Allen were held liable, the Insurers are obligated to indemnify such damages subject to the term of their policies in an amount to be determined at trial.

195.     Alternatively, if Plaintiffs' damages are allocated only to years in which there was an affirmative act of negligence by Snead or Allen or a failure to act by Snead or Allen in response to a specific request, demand, or order to disclose exculpatory evidence to Plaintiffs, then such damages would be owed under the Policy or Policies in effect when Snead or Allen committed such act(s) or omission(s), with such amount(s) to be determined at trial.

42

196.     On April 20, 2023, this Court entered the Final Judgment.

## IV.   PLAINTIFFS MCCOLLUM AND BROWN ARE ENTITLED TO INSURANCE PROCEEDS FROM THE FINAL JUDGMENT.

197.     Because the Final Judgment is covered by the terms and conditions of the Jefferson Policies, and Jefferson is indebted to Snead and Allen, Plaintiff McCollum is entitled to recover from Jefferson under the Jefferson Policies in an amount to be determined at trial, subject to upward adjustment for additional post-judgment interest and punitive and treble damages.

198.     Because the Final Judgment is covered by the terms and conditions of the Jefferson Policies, and Jefferson is indebted to Snead, Plaintiff Brown is entitled to recover from Jefferson under the Jefferson Policies in an amount to be determined at trial, subject to upward adjustment for additional post-judgment interest and punitive and treble damages.

199.     Because the Final Judgment is covered by the terms and conditions of the National Casualty Policies, and National Casualty is indebted to Snead and Allen, Plaintiff McCollum is entitled to recover from National Casualty under the National Casualty Policies in an amount to be determined at trial, subject to upward adjustment for additional post-judgment interest and punitive and treble damages.

200.     Because the Final Judgment is covered by the terms and conditions of the National Casualty Policies, and National Casualty is indebted to Snead, Plaintiff Brown is entitled to recover from National Casualty under the National Casualty Policies in an amount to be determined at trial, subject to upward adjustment for additional post-judgment interest and punitive and treble damages.

43

201. Because the Final Judgment is covered by the terms and conditions of the General Star Policies, and General Star is indebted to Snead and Allen, Plaintiff McCollum is entitled to recover from General Star under the General Star Policies in an amount to be determined at trial, subject to upward adjustment for additional post-judgment interest and punitive and treble damages.

202. Because the Final Judgment is covered by the terms and conditions of the Clarendon Policies, and Clarendon is indebted to Snead and Allen, Plaintiff McCollum is entitled to recover from Clarendon under the Clarendon Policies in an amount to be determined at trial, subject to upward adjustment for additional post-judgment interest and punitive and treble damages.

203. Because the Final Judgment is covered by the terms and conditions of the Lexington Policies, and Lexington is indebted to Snead and Allen, Plaintiff McCollum is entitled to recover from Lexington under the Lexington Policies in an amount to be determined at trial, subject to upward adjustment for additional post-judgment interest and punitive and treble damages.

204. Because the Final Judgment is covered by the terms and conditions of the 2015–2016 Lexington Policy, and Lexington is indebted to Snead, Plaintiff Brown is entitled to recover from Lexington under the 2015–2016 Lexington Policy in an amount to be determined at trial, subject to upward adjustment for additional post-judgment interest and punitive and treble damages.

## **FIRST CAUSE OF ACTION**
### **(Breach of Contract Against Jefferson By Plaintiff McCollum)**

205. Plaintiff McCollum restates, realleges, and incorporates by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

206. The Jefferson Policies are valid and enforceable contracts.

44

207. Plaintiff McCollum has satisfied or is excused from performing, or Jefferson has waived or is estopped from insistence upon performance of, all conditions of the Jefferson Policies, including, but not limited to, provision of timely notice of claim.

208. Pursuant to the Jefferson Policies, Jefferson agreed to provide insurance coverage for the liability imposed on Snead and Allen in the Final Judgment.

209. Jefferson is indebted to Snead and Allen.

210. Snead and Allen are indebted to Plaintiff McCollum.

211. As a judgment creditor of Snead and Allen, Plaintiff McCollum is entitled to collect the amounts owed by Jefferson under the Jefferson Policies.

212. Jefferson bears the burden to establish, and has not established, that there are exclusions in the Jefferson Policies that apply to preclude or limit coverage.

213. Jefferson bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the Jefferson Policies.

214. As set forth more fully above in this Supplement Complaint, Jefferson is contractually obligated under the Jefferson Policies to indemnify Snead and Allen for the amounts that they have been held liable to pay Plaintiff McCollum by virtue of the Final Judgment.

215. Jefferson has breached its contractual obligations to indemnify Snead and Allen for their liability to Plaintiff McCollum.

216. As a direct and proximate result of its breach of contract, Jefferson has deprived Plaintiff McCollum—as a judgment creditor of Snead and Allen—of the benefits of the insurance contracts, which entitles Plaintiff McCollum to money damages, including interest according to law.

## SECOND CAUSE OF ACTION
### (Breach of Contract Against Jefferson By Plaintiff Brown)

217.     Plaintiff Brown restates, realleges, and incorporates by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

218.     The Jefferson Policies are valid and enforceable contracts.

219.     Plaintiff Brown has satisfied or is excused from performing, or Jefferson has waived or is estopped from insistence upon performance of, all conditions of the Jefferson Policies, including, but not limited to, provision of timely notice of claim.

220.     Pursuant to the Jefferson Policies, Jefferson agreed to provide insurance coverage for the liability imposed on Snead in the Final Judgment.

221.     Jefferson is indebted to Snead.

222.     Snead is indebted to Plaintiff Brown.

223.     As a judgment creditor of Snead, Plaintiff Brown is entitled to collect the amount owed by Jefferson under the Jefferson Policies.

224.     Jefferson bears the burden to establish, and has not established, that there are exclusions in the Jefferson Policies that apply to preclude or limit coverage.

225.     Jefferson bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the Jefferson Policies.

226.     As set forth more fully above in this Supplement Complaint, Jefferson is contractually obligated under the Jefferson Policies to indemnify Snead for the amount that he has been held liable to pay Plaintiff Brown by virtue of the Final Judgment.

227.     Jefferson has breached its contractual obligations to indemnify Snead for his liability to Plaintiff Brown.

228.    As a direct and proximate result of its breach of contract, Jefferson has deprived Plaintiff Brown—as judgment creditor of Snead—of the benefits of the insurance contracts, which entitles Plaintiff Brown to money damages, including interest according to law.

## THIRD CAUSE OF ACTION
**(Breach of Contract Against National Casualty By Plaintiff McCollum)**

229.    Plaintiff McCollum restates, realleges, and incorporates by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

230.    The National Casualty Policies are valid and enforceable contracts.

231.    Plaintiff McCollum has satisfied or is excused from performing, or National Casualty has waived or is estopped from insistence upon performance of, all conditions of the National Casualty Policies, including, but not limited to, provision of timely notice of claim.

232.    Pursuant to the National Casualty Policies, National Casualty agreed to provide insurance coverage for the liability imposed on Snead and Allen in the Final Judgment.

233.    National Casualty is indebted to Snead and Allen.

234.    Snead and Allen are indebted to Plaintiff McCollum.

235.    As a judgment creditor of Snead and Allen, Plaintiff McCollum is entitled to collect the amount owed by National Casualty under the National Casualty Policies.

236.    National Casualty bears the burden to establish, and has not established, that there are exclusions in the National Casualty Policies that apply to preclude or limit coverage.

237.    National Casualty bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the National Casualty Policies.

47

238. As set forth more fully above in this Supplement Complaint, National Casualty is contractually obligated under the National Casualty Policies to indemnify Snead and Allen for the amounts that they have been held liable to pay Plaintiff McCollum by virtue of the Final Judgment.

239. National Casualty has breached its contractual obligations to indemnify Snead and Allen for their liability to Plaintiff McCollum.

240. As a direct and proximate result of its breach of contract, National Casualty has deprived Plaintiff McCollum—as judgment creditor of Snead and Allen—of the benefits of the insurance contracts, which entitles Plaintiff McCollum to money damages, including interest according to law.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract Against National Casualty By Plaintiff Brown)**

241. Plaintiff Brown restates, realleges, and incorporates by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

242. The National Casualty Policies are valid and enforceable contracts.

243. Plaintiff Brown has satisfied or is excused from performing, or National Casualty has waived or is estopped from insistence upon performance of, all conditions of the National Casualty Policies, including, but not limited to, provision of timely notice of claim.

244. Pursuant to the National Casualty Policies, National Casualty agreed to provide insurance coverage for the liability imposed on Snead in the Final Judgment.

245. National Casualty is indebted to Snead.

246. Snead is indebted to Plaintiff Brown.

247. As a judgment creditor of Snead, Plaintiff Brown is entitled to collect the amount owed by National Casualty under the National Casualty Policies, except under the 1995–1996 National Casualty Policy.

48

248.    National Casualty bears the burden to establish, and has not established, that there are exclusions in the National Casualty Policies that apply to preclude or limit coverage.

249.    National Casualty bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the National Casualty Policies.

250.    As set forth more fully above in this Supplement Complaint, National Casualty is contractually obligated under the National Casualty Policies, except under the 1995–1996 National Casualty Policy, to indemnify Snead for the amount that he has been held liable to pay Plaintiff Brown by virtue of the Final Judgment.

251.    National Casualty has breached its contractual obligations to indemnify Snead for his liability to Plaintiff Brown.

252.    As a direct and proximate result of its breach of contract, National Casualty has deprived Plaintiff Brown—as judgment creditor of Snead—of the benefits of the insurance contracts, which entitles Plaintiff Brown to money damages, including interest according to law.

## FIFTH CAUSE OF ACTION
### (Breach of Contract Against General Star By Plaintiff McCollum)

253.    Plaintiff McCollum restates, realleges, and incorporates by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

254.    The General Star Policies are valid and enforceable contracts.

255.    Plaintiff McCollum has satisfied or is excused from performing, or General Star has waived or is estopped from insistence upon performance of, all conditions of the General Star Policies, including, but not limited to, provision of timely notice of claim.

256.    Pursuant to the General Star Policies, General Star agreed to provide insurance coverage for the liability imposed on Allen in the Final Judgment.

49

257.     General Star is indebted to Allen.

258.     Allen is indebted to Plaintiff McCollum.

259.     As a judgment creditor of Allen, Plaintiff McCollum is entitled to collect the amount owed by General Star under the General Star Policies.

260.     General Star bears the burden to establish, and has not established, that there are exclusions in the General Star Policies that apply to preclude or limit coverage.

261.     General Star bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the General Star Policies.

262.     As set forth more fully above in this Supplement Complaint, General Star is contractually obligated under the General Star Policies to indemnify Allen for the amounts that he has been held liable to pay Plaintiff McCollum by virtue of the Final Judgment.

263.     General Star has breached its contractual obligations to indemnify Allen for his liability to Plaintiff McCollum.

264.     As a direct and proximate result of its breach of contract, General Star has deprived Plaintiff McCollum—as judgment creditor of Allen—of the benefits of the insurance contracts, which entitles Plaintiff McCollum to money damages, including interest according to law.

## SIXTH CAUSE OF ACTION
### (Breach of Contract Against Clarendon By Plaintiff McCollum)

265.     Plaintiff McCollum restates, realleges, and incorporates by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

266.     The Clarendon Policies are valid and enforceable contracts.

267.     Plaintiff McCollum has satisfied or is excused from performing, or Clarendon has waived or is estopped from insistence upon performance of, all conditions of the Clarendon Policies, including, but not limited to, provision of timely notice of claim.

50

268. Pursuant to the Clarendon Policies, Clarendon agreed to provide insurance coverage for the liability imposed on Allen in the Final Judgment.

269. Clarendon is indebted to Allen.

270. Allen is indebted to Plaintiff McCollum.

271. As a judgment creditor of Allen, Plaintiff McCollum is entitled to collect the amount owed by Clarendon under the Clarendon Policies.

272. Clarendon bears the burden to establish, and has not established, that there are exclusions in the Clarendon Policies that apply to preclude or limit coverage.

273. Clarendon bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the Clarendon Policies.

274. As set forth more fully above in this Supplement Complaint, Clarendon is contractually obligated under the Clarendon Policies to indemnify Allen for the amounts that he has been held liable to pay Plaintiff McCollum by virtue of the Final Judgment.

275. Clarendon has breached its contractual obligations to indemnify Allen for his liability to Plaintiff McCollum.

276. As a direct and proximate result of its breach of contract, General Star has deprived Plaintiff McCollum—as judgment creditor of Allen—of the benefits of the insurance contracts, which entitles Plaintiff McCollum to money damages, including interest according to law.

### SEVENTH CAUSE OF ACTION
**(Breach of Contract Against Lexington By Plaintiff McCollum)**

277. Plaintiff McCollum restates, realleges, and incorporates by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

278. The Lexington Policies are valid and enforceable contracts.

51

279. Plaintiff McCollum has satisfied or is excused from performing, or Lexington has waived or is estopped from insistence upon performance of, all conditions of the Lexington Policies, including, but not limited to, provision of timely notice of claim.

280. Pursuant to the Lexington Policies, Lexington agreed to provide insurance coverage for the liability imposed on Snead and Allen in the Final Judgment.

281. Lexington is indebted to Snead and Allen.

282. Snead and Allen are indebted to Plaintiff McCollum.

283. As a judgment creditor of Snead and Allen, Plaintiff McCollum is entitled to collect the amount owed by Lexington under Lexington Policies.

284. Lexington bears the burden to establish, and has not established, that there are exclusions in the Lexington Policies that apply to preclude or limit coverage.

285. Lexington bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the Lexington Policies.

286. As set forth more fully above in this Supplement Complaint, Lexington is contractually obligated under the Lexington Policies to indemnify Snead and Allen for the amounts that they have been held liable to pay Plaintiff McCollum by virtue of the Final Judgment.

287. Lexington has breached its contractual obligations to indemnify Snead and Allen for their liability to Plaintiff McCollum.

288. As a direct and proximate result of its breach of contract, Lexington has deprived Plaintiff McCollum—as judgment creditor of Snead and Allen—of the benefits of the insurance contracts, which entitles Plaintiff McCollum to money damages, including interest according to law.

## EIGHTH CAUSE OF ACTION
### (Breach of Contract Against Lexington By Plaintiff Brown)

289.     Plaintiff Brown restates, realleges, and incorporates by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

290.     The 2015–2016 Lexington Policy is a valid and enforceable contract.

291.     Plaintiff Brown has satisfied or is excused from performing, or Lexington has waived or is estopped from insistence upon performance of, all conditions of the 2015–2016 Lexington Policy, including, but not limited to, provision of timely notice of claim.

292.     Pursuant to the 2015–2016 Lexington Policy, Lexington agreed to provide insurance coverage for the liability imposed on Snead in the Final Judgment.

293.     Lexington is indebted to Snead.

294.     Snead is indebted to Plaintiff Brown.

295.     As a judgment creditor of Snead, Plaintiff Brown is entitled to collect the amount owed by Lexington under the 2015–2016 Lexington Policy.

296.     Lexington bears the burden to establish, and has not established, that there are exclusions in the 2015–2016 Lexington Policy that apply to preclude or limit coverage.

297.     Lexington bears the burden to establish, and has not established, that there are any defenses under law that apply to preclude or limit coverage under the 2015–2016 Lexington Policy.

298.     As set forth more fully above in this Supplement Complaint, Lexington is contractually obligated under the 2015–2016 Lexington Policy to indemnify Snead for the amount that he has been held liable to pay Plaintiff Brown by virtue of the Final Judgment.

299.     Lexington has breached its contractual obligations to indemnify Snead for his liability to Plaintiff Brown.

300. As a direct and proximate result of its breach of contract, Lexington has deprived Plaintiff Brown—as judgment creditor of Snead—of the benefits of the insurance contracts, which entitles Plaintiff Brown to money damages, including interest according to law.

## NINTH CAUSE OF ACTION
### (Common Law Bad Faith Against Lexington)

301. Plaintiffs McCollum and Brown restate, reallege, and incorporate by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

302. As set forth more fully above, Lexington refused to provide coverage for the underlying action despite a valid claim for coverage.

303. As set forth more fully above, Lexington acted in bad faith in refusing to provide coverage and by engaging in its post-loss scheme to purportedly reform the 2015–2016 Lexington Policy from a claims-made policy into an occurrence-based policy.

304. As set forth more fully above, Lexington's conduct in refusing to provide coverage through the purported reformation scheme is aggravating and outrageous.

305. Lexington's acts of bad faith were the direct and proximate cause of Plaintiffs McCollum's and Brown's injuries.

## TENTH CAUSE OF ACTION
### (Unfair And Deceptive Trade Practices Pursuant To North Carolina General Statutes Section 75-1.1 Against Lexington)

306. Plaintiffs McCollum and Brown restate, reallege, and incorporate by reference all foregoing paragraphs of this Supplemental Complaint as if set forth herein their entirety.

307. As set forth more fully above, Lexington violated North Carolina General Statutes Section 75-1.1.

308. As set forth more fully above, Lexington engaged in an unfair and deceptive act in refusing to provide coverage and instead engaging in the purported reformation scheme, which

54

attempted to render worthless the $10 million in triggered claims-made coverage under the 2015–2016 Lexington Policy.

309.    Lexington's unfair and deceptive act was in and affected commerce.

310.    Lexington's unfair and deceptive act was the direct and proximate cause of Plaintiffs McCollum's and Brown's injuries.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs McCollum and Brown respectfully request the following relief:

A.    An award of damages in an amount to be determined at trial under the Jefferson Policies to Plaintiff McCollum;

B.    An award of damages in an amount to be determined at trial under the Jefferson Policies to Plaintiff Brown;

C.    An award of damages in an amount to be determined at trial under the National Casualty Policies to Plaintiff McCollum;

D.    An award of damages in an amount to be determined at trial under the National Casualty Policies, except under the 1995–1996 National Casualty Policy, to Plaintiff Brown;

E.    An award of damages in an amount to be determined at trial under the General Star Policies to Plaintiff McCollum;

F.    An award of damages in an amount to be determined at trial under the Clarendon Policies to Plaintiff McCollum;

G.    An award of damages in an amount to be determined at trial under the Lexington Policies to Plaintiff McCollum;

H.      An award of damages in an amount to be determined at trial under the 2015–2016 Lexington Policy to Plaintiff Brown;

I.      An award of punitive damages against Lexington in an amount to be determined at trial;

J.      An award of treble damages against Lexington in an amount to be determined at trial;

K.      Pre- and post-judgment interest as provided by law;

L.      An award of court costs and attorneys' fees and costs;

M.      Interest on such court costs and attorneys' fees and costs; and

N.      Such further and other relief as this Court may deem just and proper.

Dated this 27th day of February, 2024.

*/s/ Elliot S. Abrams*

**CHESHIRE PARKER SCHNEIDER, PLLC**

ELLIOT ABRAMS (N.C. State Bar No. 42639)
133 Fayetteville Street, Suite 400
Raleigh, North Carolina 27601
Telephone: (919) 833-3114
Email: elliot.abrams@cheshirepark.com

**COVINGTON & BURLING LLP**

SETH TUCKER (stucker@cov.com)
TYLER WEINBLATT (tweinblatt@cov.com)
JUDY BAHO (jbaho@cov.com)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000

DAVID A. LUTTINGER JR. (dluttinger@cov.com)
ALICIA OLIA (aolia@cov.com)
The New York Times Building
620 Eighth Avenue, New York, New York 10018
Telephone: (212) 841-1000

*Attorneys for Plaintiffs*