IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-451-BO

| | | |
|---|---|---|
| J. DUANE GILLIAM, Guardian of the Estate of Leon Brown, RAYMOND C. TARLTON, Guardian Ad Litem for HENRY LEE MCCOLLUM, and KIMBERLY PINCHBECK, Limited Guardian and Conservator of the Estate of Henry Lee McCollum, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | |
| ELISA SALMON, Court-Appointed Receiver, Cross-Claimant against LEXINGTON INSURANCE COMPANY, | ) ) ) ) ) | **MEMORANDUM AND RECOMMENDATION** |
| v. | ) ) | |
| ROBESON COUNTY, TOWN OF RED SPRINGS, KENNETH SEALEY, both Individually and in his Official Capacity as the Sheriff of Robeson County, LARRY FLOYD, LEROY ALLEN, PAUL CANADAY, Administrator C.T.A. of the Estate of Luther Haggins, ROBERT PRICE, Administrator C.T.A. of the Estate of Joel Garth Locklear, Sr., CHARLOTTE NOEL FOX, Administrator of the Estate of Kenneth Snead, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| JEFFERSON INSURANCE COMPANY, NATIONAL CASUALTY COMPANY, GENERAL STAR NATIONAL INSURANCE COMPANY, and CLARENDON NATIONAL INSURANCE COMPANY, | ) ) ) ) ) | |
| Supplemental Defendants, | ) ) | |
| and | ) | |
| LEXINGTON INSURANCE COMPANY, | ) ) | |
| Supplemental Defendant and Cross-Claim Defendant. | ) ) ) | |

This matter is before the court for an in-camera review of certain documents withheld by supplemental defendant Lexington Insurance Company ("Lexington") on the basis of attorney-client privilege, the work-product doctrine, or both, to determine whether such documents are privileged or otherwise protected from discovery. Pursuant to the November 13, 2025 order [DE-701] of United States District Judge Terrence W. Boyle, this matter was referred to the undersigned to conduct the in-camera review and file a "memorandum and recommendations to [Judge Boyle] as to whether such documents are privileged or otherwise protected from discovery." [DE-701] at 2. The documents at issue have been provided to the court by Lexington and reviewed in-camera by the undersigned.

Based on the in-camera review and for the reasons provided below, the undersigned RECOMMENDS that Lexington's asserted attorney-client privilege, attorney work product, or both be upheld with respect to each of the documents that were subject to the in-camera review, except that the undersigned RECOMMENDS that the court DIRECT Lexington to provide to plaintiffs: (i) redacted copies of any withheld document, of which a duplicate version has already been provided to plaintiffs in redacted form; and (ii) a redacted copy of document "LEX_00018918" to the extent it has not already done so.

## I.  RELEVANT BACKGROUND

Henry Lee McCollum ("Mr. McCollum") and Leon Brown ("Mr. Brown," and together "plaintiffs") spent almost 31 years in prison after being convicted and sentenced to (i) death, in the case of Mr. McCollum, and (ii) life imprisonment, in the case of Mr. Brown, for the rape and murder of an 11-year old girl, who was killed on September 24, 1983.  [DE-260] at 2-3, 7;[1] [DE-

---

[1] The court summarized the facts, which are undisputed among the parties, in its order on various motions for summary judgment.  [DE-260] at 2-8.

70] at ¶ 1. Years after their convictions, DNA testing of physical evidence found at the scene of the crime revealed DNA matching another individual, Roscoe Artis, who was at that time serving a life sentence for the first-degree murder and rape of another individual. [DE-260] at 7-8. Plaintiffs' convictions were vacated on September 2, 2014, by a court that considered their motion for appropriate relief. *Id.* at 8; [DE-155-7] at 5. On June 5, 2015, Governor Pat McCrory issued full pardons of innocence to plaintiffs. [DE-260] at 8; [DE 147-14].

On August 31, 2015, plaintiffs filed claims arising under 42 U.S.C. § 1983 for false arrest, malicious prosecution, deprivation of due process, and municipal liability for custom, usages, practices, procedures, and policies as a result of which plaintiffs' constitutional rights were violated against numerous defendants, including Kenneth Snead ("Snead") and Leroy Allen ("Allen"), who had both been, at the relevant times, law enforcement agents employed by the North Carolina State Bureau of Investigation. [DE-1]. In 2016, a guardian was appointed to represent the interests of Mr. Brown ([DE-66]; [DE-85]),[2] and in 2017, a *guardian ad litem* was appointed to represent the interests of Mr. McCollum [DE-204].[3]

A jury trial was held on this matter with respect to defendant Snead and defendant Allen from May 10, 2021, until May 14, 2021 [DE-416 to -418, -424, -426]. On May 14, 2021, the jury returned a verdict finding (i) defendant Snead liable for violations of Mr. McCollum's and Mr. Brown's constitutional rights; and (ii) defendant Allen liable for violations of Mr. McCollum's constitutional rights. [DE-427] at 1.

---

[2] An initial guardian for Mr. Brown was appointed on March 14, 2016 [DE-66], and a substitute guardian was appointed on May 31, 2016 [DE-85].

[3] In April 2018, the court allowed the joinder of a limited guardian and conservator of the estate of Mr. McCollum as a party to this action on behalf of Mr. McCollum. Unless otherwise indicated, subsequent references to plaintiffs' activities in this case should be construed as including the participation of their respective guardians, as relevant.

On February 27, 2024, plaintiffs filed a motion for leave to file a supplemental complaint ("motion to supplement complaint") against debtor insurance companies to aid in execution of this court's final judgment against defendants Snead and Allen, and to garnish insurance proceeds. [DE-508]. Multiple insurance companies, including supplemental defendant Lexington, filed motions to intervene (*see* [DE-512, -517, -521, -523]), which the court granted [DE-534]. On June 1, 2024, the court granted plaintiffs' motion to supplement complaint [DE-564], and plaintiffs subsequently filed an amended supplemental complaint [DE-595].

In the amended supplemental complaint, plaintiffs claim that Lexington engaged in bad faith and unfair and deceptive trade practices by seeking to bar plaintiffs' attempt to garnish insurance proceeds under the policy. [DE-595] at 22. Specifically, plaintiffs contend that Lexington attempted, in secret and without notice to Snead, Allen, or plaintiffs, to rewrite, through a reformation agreement, Lexington's relevant claims-made policy with Public Officers & Employees Liability Insurance Commission ("POELIC"). *Id.* at 22-23.

Plaintiffs allege that Lexington issued numerous insurance policies covering certain state employees for relevant liability they incurred while employed by the State of North Carolina (the "Lexington policies"). [DE-595] at 19. Some of these policies are drafted as so-called "occurrence-based," defining an "occurrence" as "an event, . . . which results in *damages*, during the policy period, to any person or organization." *See id.* at ¶ 86 (emphasis added); *see also* [DE-595-27] at 6. Other policies are drafted as "claims-based," and define an "occurrence" as "an event, . . . which results in *a claim* during the policy period." [DE-595] at ¶ 94 (emphasis added); *see also* [DE-595-30] at 10. Plaintiffs assert that one of these claims-based policies covered the period from July 1, 2015 to July 1, 2016 (the "2015-2016 Lexington Policy"). [DE-595] at ¶ 91.

4

Specifically, the 2015-2016 Lexington Policy provides that Lexington "will indemnify any Covered Employee, for whom the State is providing the defense under Article 31A of the North Carolina General [S]tatutes, for all sums which the Covered Employee shall become legally obligated to pay as damages resulting from an Occurrence." [DE-595-30] at 6.

As originally drafted and executed, the 2015-2016 Lexington Policy further defines an "occurrence" as "an event, or related series of events, including continuous or repeated exposure to conditions, which results in *a claim* during the policy period." *Id.* at 10 (emphasis added). Plaintiffs contend that defendants Snead and Allen are "Covered Employees" pursuant to the 2015-2016 Lexington Policy. [DE-595] at ¶ 95. Plaintiffs note that the "claims-made" trigger language included in the 2015-2016 Lexington Policy also appears in other Lexington policies covering state employees for policy periods (i) from July 1, 2014 to July 1, 2015 (the "2014-2015 Lexington Policy"); (ii) from July 1, 2016 to July 1, 2017 (the "2016-2017 Lexington Policy"); and (iii) from July 1, 2017 to July 1, 2018 (the "2017-2018 Lexington Policy"). *Id.* at ¶¶ 100, 103.

Plaintiffs allege that "on November 15, 2016, the State (through [POELIC]) requested that Lexington agree to provide coverage for the above-captioned action under the 2015-2016 Lexington Policy, which was in effect on August 31, 2015, the date that [p]laintiffs filed the [instant] action." *Id.* at ¶ 105. According to plaintiffs, first on December 18, 2017, and again on July 7, 2018, Lexington denied coverage under the 2015-2016 Lexington Policy for the instant action because "the alleged wrongful acts in this action took place before the 2015-2016 Lexington Policy period." *Id.* at ¶¶ 106-07.

On February 7, 2019, the State of North Carolina sued Lexington in state court. *See State of North Carolina, et al. v. AIG Prop. Cas. Inc., et al.*, Case No. 19-CVS-001757 (N.C. Super. Ct.)

5

(the "First Declaratory Judgment Action"). On August 19, 2019, the State of North Carolina voluntarily dismissed Lexington from that action with no explanation. [DE-595] at ¶ 110. On January 14, 2022, Lexington filed a declaratory judgment action in state court. *See Lexington Insurance Co. v. State of North Carolina*, No. 22-CVS-00646 (N.C. Super. Ct.) (the "Second Declaratory Judgment Action"). The Second Declaratory Judgment Action remains pending and has been stayed in deference to the instant case. [DE-595] at ¶ 111.

Plaintiffs claim that in the Second Declaratory Judgment Action, Lexington asserted publicly for the first time that at some time in 2019, Lexington and POELIC had agreed to "reform" the 2015-2016 Lexington Policy. *Id.* at ¶ 113. Specifically, Lexington allegedly claims that "it had mistakenly drafted and issued the 2014-2015 Lexington Policy and 2015-2016 Lexington Policy as claims-made insurance policies." *Id.* at ¶ 114. In the Second Declaratory Judgment Action, Lexington allegedly submitted an undated document to which it referred as the "Agreement to Reform Insurance Policies" (the "Purported Reformation Agreement").[4] *Id.* at ¶ 115; [DE-595] at 31.

On May 9, 2025, plaintiffs filed a motion to compel (the "motion to compel") [DE-665], with a supporting memorandum [DE-666], to which Lexington filed a response in opposition [DE-671]. Plaintiffs also filed seventeen attachments ([DE-665-1] to [DE-665-17]) in support of its motion to compel [DE-665], including two exhibits ([DE-667], [DE-668]) provisionally filed under seal. The motion seeks to compel Lexington to produce "all documents relating to its intent [(the "Intent-Related Documents")] in issuing insurance policies covering defendants . . . Snead and . . . Allen." [DE-665] at 2. In the alternate, plaintiffs request that the court undertake an in-

---

[4] The undersigned notes that various copies of the Purported Reformation Agreement have been filed in the docket of this case. [DE-595-31] at 7; [DE-664-1].

6

camera review of the Intent-Related Documents.  [DE-666] at 5.  The motion to compel included a privilege log [DE-665-3; Ex. 1] of the Intent-Related Documents that had been withheld by Lexington based on attorney-client privilege, work product doctrine, or both (the "Intent-Related Documents Privilege Log").[5]

On November 5, 2025, a hearing was held before Judge Boyle on multiple motions, including the motion to compel.  [DE-700].  Judge Boyle issued a written order [DE-701] on November 13, 2025, granting plaintiffs' unopposed request for the court to conduct an in-camera review of the Intent-Related Documents, and ordering Lexington to furnish to the court the Intent-Related Documents which Lexington withheld on the basis of attorney-client privilege and/or the work-product doctrine, as described in the privilege log at [DE-665-3, Ex. 1].  The in-camera review of the Intent-Related Documents was referred to the undersigned to conduct the review and "file his memorandum and recommendations to [Judge Boyle] as to whether such documents are privileged or otherwise protected from discovery within sixty (60) days of his receipt of the subject documents."  [DE-701] at 2.

On December 1, 2025, the undersigned received the Intent-Related Documents, consisting of 570 individual documents, which the undersigned finds to represent the complete set of Intent-Related Documents reviewed.[6]  Accompanying the documents was (1) a cover letter to the undersigned explaining in general terms the contents and format of the delivery, and (2) an index of the 570 subject documents (the "Lexington's In-Camera Review Index"),[7] including for each

---

[5] The undersigned notes that plaintiffs filed Lexington's privilege log dated November 15, 2024 [DE-665-9] and Lexington's Second Amended Privilege Log, dated March 10, 2025 [DE-665-12] in the docket of this case.  The undersigned has considered these privilege logs and any differences between them (*cf.* [DE-665-4]) for purposes of the in-camera review, as relevant.

[6]  The undersigned received the intent-related documents both (i) in electronic format on a password protected USB drive and (ii) in printed hard copy form.

[7] The cover letter notes that counsel of record were copied with respect to the cover letter and Lexington's In-

document, (a) the relevant Bates number, (b) whether it was redacted or withheld, and (c) whether the basis of the privilege was (i) attorney-client privilege, (ii) attorney work product or (iii) both; and (3).

The document titles in the Intent-Related Documents Privilege Log match the document titles in Lexington's In-Camera Review Index, although the production status with respect to one document differs as discussed in greater detail below.

## II. APPLICABLE LAW

The Federal Rules of Civil Procedure enable parties to obtain information by serving requests for discovery upon each other, including interrogatories and requests for production of documents. *See generally* Fed. R. Civ. P. 26-37. Rule 26 provides for a broad scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

The rules of discovery, including Rule 26, are to be given broad and liberal construction. *Herbert v. Lando*, 441 U.S. 153, 177 (1979); *Nemecek v. Bd. of Governors*, No. 2:98-CV-62-BO, 2000 WL 33672978, at *4 (E.D.N.C. Sept. 27, 2000). While Rule 26 does not define what is deemed relevant for purposes of the rule, relevance has been "broadly construed to encompass 'any possibility that the information sought may be relevant to the claim or defense of any party.'" *Equal Emp. Opportunity Comm'n v. Sheffield Fin. LLC*, No. 1:06-CV-889, 2007 WL 1726560, at

---

Camera Review Index.

*3 (M.D.N.C. June 13, 2007) (quoting *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 473 (N.D. Tex.)); *see also Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R. 238, 240 (E.D.N.C. 2010) ("During discovery, relevance is broadly construed 'to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'") (quoting *Oppenheimer Fund., Inc., v. Sanders*, 437 U.S. 340, 351 (1978)). The district court has broad discretion in determining relevance for discovery purposes. *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 489 (4th Cir. 1992). Rule 37 allows for the filing of a motion to compel where a party fails to respond to written discovery requests. Fed. R. Civ. P. 37(a)(3)(B). In addition, Rule 37 requires that the moving party be awarded expenses when a motion to compel discovery is granted except when the movant filed the motion without attempting in good faith beforehand to obtain the discovery without court intervention, the opposing party's opposition to the discovery was substantially justified, or other circumstances would make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A).

The court is also authorized to impose appropriate limitations on discovery. Rule 26 provides that the "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Such orders may prescribe, among other measures, "forbidding the disclosure or discovery" or "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." *Id.* (c)(1)(A), (c)(1)(D). A party moving for a protective order has the burden of making a particularized showing of why discovery should be denied, and conclusory or generalized statements in the motion fail to meet this burden. *Smith v. United Salt Co.*, No. 1:08CV00053, 2009 WL 2929343, at *5 (W.D. Va. Sept. 9, 2009).

9

"Attorney-client privilege protects confidential communications between the client and the attorney." *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 250 (4th Cir. 2005). Because the attorney-client privilege "impedes the full and free discovery of the truth," it should "be narrowly construed, and recognized only to the very limited extent that [] excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Hawkins v. Stables*, 148 F.3d 379, 383 (4th Cir. 1998) (internal quotations and citations omitted). "The client [who] is the holder of the attorney-client privilege . . . can waive it either expressly, or through conduct." *Id.* at 384 n.4 (citations omitted). When a party claiming the attorney-client privilege "voluntarily disclose[s] confidential information on a given subject" to a third party, the disclosing party generally waives any attorney-client privilege that would attach to the information. *See Hanson v. U.S. Int'l Dev.*, 372 F.3d 286, 293–94 (4th Cir. 2004). Thus, "if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information . . . will not enjoy the privilege." *United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir. 1984). The proponent of the attorney-client privilege carries the burden of establishing the existence of the attorney-client relationship, the applicability of the privilege to the specific communication at issue, and the absence of waiver. *In re Grand Jury Subpoena*, 341 F.3d 331, 335 (4th Cir. 2003) (citing *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (per curiam)).

In order for the attorney-client privilege to apply, the following criteria must be met:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some

legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Under Seal (In re Grand Jury Subpoena)*, 341 F.3d at 335 (quoting *Jones*, 696 F.2d at 1072).

Notwithstanding the narrow scope of the attorney-client privilege, this court has previously found that under certain circumstances, "[a] document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds." *Santrade, Ltd. v. GE*, 150 F.R.D. 539, 545 (E.D.N.C. 1993). Specifically, "where the client is a corporation, documents subject to the privilege may be transmitted between non-attorneys to relay information requested by attorneys." *Id.* (citations omitted). Moreover, "documents subject to the privilege may be transmitted between non-attorneys (especially individuals involved in corporate decision-making) so that the corporation may be properly informed of legal advice and act appropriately." *Id.* Finally, the attorney-client privilege "includes communications involving corporate officers and agents who possess the information requested by the attorney or who will act on the legal advice." *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 390, 101 S. Ct. 677, 683 (1981)).

"'Distinct from the attorney-client privilege, the work-product doctrine belongs to the attorney and confers a qualified privilege on documents prepared by an attorney in anticipation of litigation.'" *Allen v. TV One, LLC*, No. CV DKC 15-1960, 2016 WL 7157420, at *6 (D. Md. Dec. 8, 2016) (quoting *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 231–32 (4th Cir. 2011)). Specifically, "[t]he work product doctrine, as codified in Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure, is based on the Supreme Court's seminal decision in *Hickman v. Taylor*, 329 U.S. 495 (1947), and protects against the disclosure of certain materials 'prepared in anticipation of litigation or for trial by or for [a] party or its representative (including the . . . party's attorney, consultant, surety, indemnitor, insurer, or agent).'" *Westchester Surplus Lines Ins. Co.*

*v. Clancy & Theys Const. Co.*, No. 5:12-CV-636-BO, 2013 WL 6058203, at *4 (E.D.N.C. Nov. 15, 2013) (quoting Fed. R. Civ. P. 26(b)(3)(A)). The proponent of work product protection has the burden of establishing its applicability. *Sandberg v. Va. Bankshares, Inc.*, 979 F.2d 332, 355 (4th Cir. 1992). "The party seeking protection must make this showing with a specific demonstration of facts supporting the requested protection, preferably through affidavits from knowledgeable persons." *E.I. Du Pont de Nemours and Co. v. Kolon Industries, Inc.*, No. 3:09CV58, 2010 WL 1489966, at *3 (E.D. Va. Apr. 13, 2010) (internal quotations omitted).

"The application of the work product doctrine is particularly difficult in the context of insurance claims." *Gilliard v. Great Lakes Reinsurance (U.K.) PLC*, No. 2:12–cv–00867–DCN, 2013 WL 1729509, at *2 (D.S.C. Apr. 22, 2013) (quoting *Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 536, 541–42 (N.D. W. Va. 2000)); *Schwarz & Schwarz of Va., L.L.C. v. Certain Underwriters at Lloyd's London*, No. 6:07cv00042, 2009 WL 1043929, at *2 (W.D. Va. Apr. 17, 2009) ("With respect to work product claims by insurance companies, '[t]he nature of the insurance business requires an investigation prior to the determination of the insured's claim.'") (quoting *State Farm Fire & Cas. Co. v. Perrigan*, 102 F.R.D. 235, 237 (W.D. Va. 1984)); *Miller v. Pruneda*, No. 3:02–CV–42, 2004 WL 3951292, at *5 (N.D. W. Va. Nov. 5, 2004) ("Because an insurance company is in the business of investigating claims, investigatory files are normally prepared in the ordinary course of the insurance company's business although the files were prepared with an eye toward reasonably foreseeable litigation."); *Pete Rinaldi's Fast Foods, Inc. v. Great Am. Ins. Cos.*, 123 F.R.D. 198, 202 (M.D.N.C. 1988) ("Because an insurance company has a duty in the ordinary course of business to investigate and evaluate claims made by its insureds, the claims files containing such documents usually cannot be entitled to work product

12

protection."). "[T]here is no bright-line test for when work product protection applies for insurance companies, and instead courts must undertake a case-by-case analysis." *Botkin v. Donegal Mut. Ins. Co.*, No. 5:10-CV-00077, 2011 WL 2447939, at *3 (W.D. Va. Jun. 15, 2011).

Generally, an insurance company is permitted to assert that there existed a reasonable threat of litigation such that the information prepared from that point forward could be considered "in anticipation of litigation" only after the insurance company has made a decision with respect to the claim. *Pete Rinaldi's*, 123 F.R.D. at 202 ("[I]f the insurer argues it acted in anticipation of litigation before it formally denied the claim, it bears the burden of persuasion by presenting specific evidentiary proof of objective facts demonstrating a resolve to litigate."); *see also Botkin*, 2011 WL 2447939, at *3 (noting that the "pivotal point" in deciding when the activity changes from ordinary business to anticipation of litigation is "when the probability of litigation becomes 'substantial and imminent,' or stated otherwise, when litigation becomes 'fairly foreseeable'") (quoting *State Farm*, 102 F.R.D. at 237)); *Schwartz & Schwartz*, 2009 WL 1043929, at *3 (finding that work product production attached only after insurance company disclaimed coverage).

### III. ANALYSIS

Plaintiffs seek production of the so-called Intent-Related Documents by Lexington. [DE-665] at 2. Specifically, plaintiffs contend that the Intent-Related Documents include:

1. Drafts of the policies issued by Lexington and related emails discussing the changes made to those policies [([DE-665-3], Ex. 1, Document Nos. 1-74)];

2. Documents involving Lexington's investigation of the insurance claim concerning this lawsuit prior to Lexington's coverage denial, which includes, at a minimum, (i) documents dated prior to December 18, 2017, when Lexington initially denied coverage for the claim, and (ii) documents dated June 21, 2018 through July 6, 2018, when Lexington reopened its investigation of the claim [(*id.*, Ex. 1, Document Nos. 75-221)]; and

3.      Documents relating to Lexington's purported investigation into its underwriting files and its subsequent attempt to "reform" its claims-made policies to correct a purported "mutual mistake," including related communications [(*id.*, Ex. 1, Document Nos. 222-570)].

[DE-665] at 2.

Plaintiffs argue that "Lexington must produce the Intent-Related Documents because it has not met its burden to demonstrate a credible claim of protection." [DE-666] at 7. Plaintiffs further argue that "Lexington has waived any protection of the [i]ntent-[r]elated [d]ocuments because [(i)] it affirmatively placed the documents at issue by asserting a mutual-mistake defense, [(ii)] its post hoc allegations of 'mutual mistake' are false and fraudulent, and [(iii)] it engaged in bad-faith conduct in discovery." *Id.*

Lexington counters that it "has produced hundreds of documents regarding its intent to issue an occurrence based policy to POELIC in 2015 . . . , including internal communications, communications with the State and its broker, and every draft policy in Lexington's files— amounting to a production of more than 21,000 pages." [DE-671] at 5. Lexington further notes that "[a] party can sustain its burden through a properly prepared privilege log that identifies each document withheld, and contains information regarding the nature of the privilege/protection claimed, the name of the person making/receiving the communication, the date and place of the communication, and the document's general subject matter." *Id.*[8] (quoting *Am. Humanist Ass'n v. Perry*, No. 5:15-CT-3053-F, 2017 U.S. Dist. LEXIS 38600, at *8-9 (E.D.N.C. Mar. 17, 2017)).

The burden is on Lexington, as the party asserting the privilege, to demonstrate that it applies. *See In re N.C. Swine Farm Nuisance Litig.*, No. 5:15-CV-13-BR, 2017 WL 2313470, at

---

[8] As noted above, a Lexington privilege log dated November 15, 2024 [DE-665-9] and a second amended privilege log dated March 10, 2025 [DE-665-12] have been filed in the docket of this case.

*1 (E.D.N.C. 26 May 2017) ("A party asserting privilege has the burden of demonstrating its applicability.") (citing Jones, 696 F.2d at 1072). It must do so "specifically and factually." *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Tr.*, 230 F.R.D. 398, 409 (D. Md. 2005) (quoting *Byrnes v. Jetnet Corp.*, 111 F.R.D. 68, 71 (M.D.N.C. 1986)); *see also Williams v. Corelogic Rental Prop. Sols., LLC*, No. CV PX 16-58, 2016 WL 6277675, at *4 (D. Md. Oct. 26, 2016).

## A.     Redundant documents and other discrepancies

Before addressing plaintiffs' substantive arguments against Lexington's assertion of privilege, the undersigned notes certain discrepancies arising from Lexington's characterization of certain Intent-Related Documents. The Intent-Related Documents contain numerous documents, which are essentially duplicates of other Intent-Related Documents. The number of discrete Intent-Related Documents, which Lexington has withheld on the basis of attorney-client privilege and/or the work-product doctrine, is therefore less than the total number of Intent-Related Documents. The presence of such duplicates can, in most cases, be inferred in the privilege log from various documents described as "email messages," which contain the same sender, receivers, subject, and creation time. *See, e.g.*, [665-12] (LEX_00013243, LEX_00015271, LEX_00008689, LEX_00011002, LEX_00001304, LEX_00001355, LEX_00013627, LEX_00015062 – all containing the same "Created Date," "From," "To" and "Subject"). While such redundancies in electronically stored information are not surprising, the undersigned would expect the production status of such documents, as "withheld" or "redacted," to be the same across duplicate documents. This is, however, not consistently the case. *See, e.g., id.* ("LEX_00012800" marked as "Withheld" while "LEX_00014979" is marked as "Redacted," although such documents are

essentially duplicates of one another).

The review and findings herein are based on the information contained in the redacted versions of any such duplicates that contain this type of discrepancy. As Lexington can have no basis for withholding entire documents that were already produced to plaintiffs in redacted form, the undersigned RECOMMENDS that the court DIRECT Lexington to provide to plaintiffs redacted copies of any withheld document, of which a duplicate version has already been provided to plaintiffs in redacted form.

The undersigned further notes that while "LEX_00018918" is marked in the second amended privilege log ([DE-665-12] at 35) and Intent-Related Documents Privilege Log [DE-665-3] at 20) as having been "withheld," Lexington's In-Camera Review Index, which Lexington represents was also delivered to plaintiffs' counsel of record, indicates that "LEX_00018918" had been redacted. The undersigned conducted the below review based on such redacted version and finds redaction appropriate. Accordingly, the undersigned RECOMMENDS that the court DIRECT Lexington to provide a redacted copy of document "LEX_00018918" to plaintiffs to the extent it has not already done so.

## B.    Privilege of withheld documents

Plaintiffs claim that many of the documents they seek "including draft policies and related emails, and documents regarding Lexington's pre-denial investigation of the insurance claim— were prepared in the 'normal course of [Lexington's] business' as an insurance company." [DE-666] at 7-8 (quoting *U.S. Tobacco Coop., Inc. v. Certain Underwriters at Lloyd's*, 2021 WL 1341360, at *11 (E.D.N.C. Apr. 9, 2021)). Plaintiffs argue that such documents are not privileged notwithstanding the inclusion of lawyers on the email because Lexington has not shown that the

16

primary purpose of the communication was the request or provision of legal advice. *Id.* at 8.
Plaintiffs further argue that "the draft policies and related emails, the documents produced by
Lexington show that Lexington regularly shared edits and comments made to the drafts by its in-
house counsel with its insureds and their brokers, belying any claim that Lexington intended the
policy language to be confidential." [DE-666] at 8.

Lexington contends that "as set forth in [its] log, wherever the attorney-client privilege is
asserted, the description supports that the communication was for the purpose of giving or
receiving legal advice, even in the context of underwriting." [DE-671] at 7. Lexington also
contends that there are no "pre-denial investigative" documents, which "Lexington has improperly
withheld." *Id.* at 9. Lexington also claims that it "has not withheld any privileged communications
that were—or were intended to be—shared with third parties." *Id.* at 10. Lexington further claims
"[a]ny communications relating to the policy negotiation that Lexington has withheld involve legal
analysis and advice that was intended to, and did, remain confidential." [DE-671] at 11.

The Supreme Court has held that attorney-client privilege "protects only those disclosures
necessary to obtain informed legal advice which might not have been made absent the privilege."
*Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 1577, 48 L. Ed. 2d 39 (1976). The
Fourth Circuit has held that:

> Any disclosure inconsistent with maintaining the confidential nature of the
> attorney-client relationship waives the attorney-client privilege. Any voluntary
> disclosure by the client to a third party waives the privilege not only as to the
> specific communication disclosed, but often as to all other communications relating
> to the same subject matter.

*Jones*, 696 F.2d at 1072.

Yet the Fourth Circuit has found that attorney-client privilege is not waived in light of

17

"communications [which] may have assisted [clients] in answering questions in a public document." *In re Grand Jury Subpoena*, 341 F.3d at 336.

Having reviewed the Intent-Related Documents, the undersigned finds that the documents satisfy the criteria for attorney-client privilege, attorney work product, or both. Specifically, the undersigned finds that the Intent-Related Documents for which attorney-client privilege is asserted (i) contain or are acting upon (ii) communications between one or more lawyers, acting in such capacities, and the respective clients (iii) relating to facts which the lawyer was informed by the client or clients outside the presence of strangers (iv) for the purpose of securing opinions on law, legal services, assistance in some legal proceeding or a combination of the same. *Under Seal (In re Grand Jury Subpoena)*, 341 F.3d at 335. The Intent-Related Documents for which Lexington asserts attorney work product represent documents prepared by one or more attorneys, consultants, sureties, indemnitors, insurers, or agents in anticipation of litigation. *Cf. Solis*, 644 F.3d at 231–32. Additionally, the undersigned finds that the information provided in the Intent-Related Documents Privilege Log, including, as relevant, entries for creation date, file type, file name, sender, receivers, subject, basis of privilege, and narrative (*see* [DE-665-3]) is sufficiently specific and factual to satisfy the requisite requirements for asserting privilege. *See Neuberger Berman Real Estate Income Fund, Inc.*, 230 F.R.D. at 409.

With respect to plaintiffs' argument that "Lexington regularly shared edits and comments made to the drafts by its in-house counsel with its insureds and their brokers, belying any claim that Lexington intended the policy language to be confidential" ([DE-666] at 8), Lexington asserts that Lexington "has produced all draft policies [related to this matter] in its possession" ([DE-671] at 10, n.5). The communications that Lexington had with its counsel to assist it in drafting policies

18

remain confidential notwithstanding the fact that the draft policies were shared with third parties as the policies were intended to be public documents, while the communications were not. *See In re Grand Jury Subpoena*, 341 F.3d at 336 ("The underlying communications between Counsel and Appellant regarding his submission of Form I-485 are privileged, regardless of the fact that those communications may have assisted him in answering questions in a public document.").

Lexington notes that two of the Intent-Related Documents represent "policy binders related to another insured." [DE-671] at 10, n. 5; *cf. also* [DE-665-3] at LEX_00012456 (with file name "Abaxio Manu Policy v3 final clean.doc" described as "Draft policy renewal with revisions for in-house counsel review in connection with seeking advice on legal implications of proposed changes related to other insured"), *id.* at LEX_00012455 (with file name "Quote Letter - Abaxio 2014.pdf" described as "Underwriting letter with for in-house counsel review in connection with seeking advice on legal implications of proposed changes in draft policy related to other insured"). While this alone would not necessarily entitle them to attorney-client privilege, Lexington explains to plaintiffs in discovery-related correspondence that these documents represent "communications that were made in confidence between counsel and Lexington." [DE-665-14] at 2. This court has previously found that a client's communications with an attorney for the purpose of seeking legal advice do not lose their attorney-client privilege simply because they contain or transmit non-confidential information. *See Anderson v. Murphy-Brown, LLC (In re NC Swine Farm Nuisance Litig.)*, No. 5:15-CV-13-BR, 2017 U.S. Dist. LEXIS 81572, at *16-17 (E.D.N.C. May 26, 2017) ("[A] attorney-client privilege is not lost by the mere fact that the information communicated is otherwise available to the public, because [t]he privilege attaches not to the information but to the communication of the information.") (quoting *Gen. Elec. Co. v. United States*, No. 3:14-CV-00190

19

(JAM), 2015 U.S. Dist. LEXIS 122562, 2015 WL 5443479, at *2 (D. Conn. Sept. 15, 2015)).

The pre-denial investigative documents, including documents dated prior to December 18, 2017, as well as documents dated June 21, 2018 through July 6, 2018 (*see* [DE-665] at 2) were properly withheld on the basis of a valid attorney-client privilege.

## C. Documents "at issue" in mutual-mistake defense

Plaintiffs next argue that Lexington has waived any attorney-client protection by putting the substance of the documents "at issue" in this case. [DE-666] at 9.

This court has previously applied the "at issue" doctrine, which provides that

> [a] party is treated as having waived its privileges if: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Small v. Hunt*, 152 F.R.D. 509, 512 (E.D.N.C. 1994) (quoting *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.Wash.1975)).

This court further noted that "[w]here a party injects part of a communication as evidence, fairness demands that the opposing party be allowed to examine the whole picture." *Id.* (alteration in original) (quoting *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408, 413 (D. Del. 1992). Plaintiffs contend that "by claiming that it discovered the purported mutual mistake '[f]ollowing an investigation into Lexington's underwriting files and correspondence among Lexington, POELIC, and the State's insurance broker,' . . . Lexington placed the [withheld documents] squarely at issue" and that "[t]he [withheld documents] are evidence of what Lexington actually intended at the time it issued the policies—including whether it intended the policies to provide claims-made coverage." [DE-666] at 10.

20

The Fourth Circuit has held that the at-issue doctrine does not apply where the party claiming privilege "never asserted advice of counsel as an affirmative defense" or "indicated that they relied on advice of counsel." *Shaheen v. WellPoint Companies, Inc.*, 490 F. App'x 552, 557 (4th Cir. 2012). Lexington argues that the *Shaheen* requirement that the information at-issue involve advice of counsel superseded the more general requirement in *Small v. Hunt*. In support, Lexington cites numerous district court cases in the Fourth Circuit, which postdate *Shaheen* and also focus on an "advice of counsel" element. [DE-671] at 11 (collecting cases).

The more specific requirements in *Shaheen* that the party assert advice of counsel as an affirmative defense or indicate that they relied on advice of counsel, *Shaheen*, 490 F. App'x at 557, abrogates the more general requirements of this court articulated in *Small*, 152 F.R.D. at 512. The Fourth Circuit in *Shaheen* favorably quotes the Third Circuit as finding "[a]dvice is not in issue merely because it is relevant . . . The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." 490 F. App'x at 557 (quoting *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994)).

Here, Lexington does not attempt to prove its defense by citing "advice of counsel" or "by disclosing or describing an attorney client communication" *Shaheen*, 490 F. App'x at 557; *cf.* [DE-649] at 2, 13. Accordingly, the undersigned does not find that the "at-issue" exception applies to the Intent-Related Documents.

**D.     Crime-fraud exception**

Plaintiffs argue that "Lexington has also waived any protection of the "[i]ntent-[r]elated [d]ocuments" pursuant to the crime-fraud exception to the attorney-client privilege and work-

product doctrine." [DE-666] at 11. Specifically, plaintiffs argue that "[t]he documents that Lexington already produced show that Lexington wanted to issue a claims-made policy in the years before the 2015–2016 policy was issued as such, and intentionally continued to issue claims-made policies in 2015 and thereafter" and that "[o]nly after realizing it would have to pay up to $10 million in coverage on one of those policies did Lexington, with the assistance of its counsel, conjure up its fraudulent claim that the 2015–2016 policy should be 'reformed' to escape its coverage obligations." *Id.* at 13.

In order to pierce the protection of the attorney-client privilege, [plaintiffs] must make a *prima facie* showing of fraud, and must show that the communications for which discovery is sought were made in furtherance of the fraud. *Glaxo, Inc. v. Novopharm Ltd.*, 148 F.R.D. 535, 541 (E.D.N.C. 1993) (citing *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 155 (D. Del. 1977)). Plaintiffs contend that "Lexington's belated assertion that it never intended to issue claims-made policies is false and a fraud on [p]laintiffs, Lexington's insureds, and this Court." [DE-666] at 12.

Lexington counters that "[t]he State confirmed [its] intent [of purchasing occurrence-based coverage] when executing its agreement with Lexington, and then publicly reaffirmed it last year by admitting that it intended to purchase an occurrence-based policy." *Id.* at 13 (citing *Lexington Ins. Co. v. State of N.C., et al.*, No. 22-CV-000646 (Wake Cnty. Super. Ct. Jan. 14, 2022), State Defendants' Answer and Defenses, ¶ 53 (Apr. 26, 2024)).

"[A] prima facie showing need not be such as to actually prove the disputed fact, it must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted." *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir. 1976). "The evidence must be sufficient to require [the withholding party] to 'come

forward with [an] explanation . . . If the court finds the explanation satisfactory, the privilege remains.'" *Glaxo, Inc.*, 148 F.R.D. at 544 (second and third alteration in original) (quoting *In the Matter of Feldberg*, 862 F.2d 622, 625 (7th Cir.1988)).

"While [plaintiffs have] presented enough evidence to require [Lexington] to present an explanation, the court finds [Lexington's] explanation sufficient [at the current juncture in light of in-camera review of the Intent-Related Documents] to permit the privilege to stand." *Glaxo, Inc.*, 148 F.R.D. at 544.

To be clear, the undersigned makes no definitive findings on whether or not any party in this case has engaged in fraud. Rather, the undersigned simply notes that the in-camera review has not revealed any evidence that the Intent-Related Documents represent "communications . . . made in furtherance of . . . fraud." *Id.* at 541. The undersigned also makes no findings on the parties' respective intent in and the validity of the Purported Reformation Agreement as such questions are not within the scope of the instant review.

## E.     Bad faith exception

Plaintiffs claim that "Lexington 'waived any objections that [it] otherwise could have raised . . . based on attorney-client privilege or the work-product doctrine' as the result of its bad-faith conduct in discovery." [DE-666] at 13 (quoting *U.S. Tobacco Coop.*, 2021 WL 1341360, at *9). Plaintiffs argue that "the totality of the circumstances reflect an effort by Lexington to cover up the truth about its post-claim underwriting scheme to avoid meeting its coverage obligations." *Id.* Plaintiffs claim that certain edits to the description between Lexington's first privilege log and a second amended privilege log were made "apparently to evade [p]laintiffs' argument in a previous letter that Lexington has waived any protection by putting those documents 'at issue.'"

23

*Id.* at 14; *see also* [DE-665-3]. This court has previously found that attorney-client privilege and work-product doctrine can be waived "in cases involving unjustified delay, inexcusable conduct and bad faith." *U.S. Tobacco Coop., Inc.*, 2021 WL 1341360, at *13 (quoting *Smith v. James C. Hormel Sch. of Va. Inst. of Autism*, No. 3:08-CV-00030, 2010 WL 3702528, at *5 (W.D. Va. Sept. 14, 2010)). Lexington argues that "[p]laintiffs fail to establish any misconduct at all, much less any that is 'particularly egregious,'" as would be required to satisfy the bad faith waiver standard. [DE-671] at 14.

The court is not persuaded by plaintiffs' arguments here. As discussed in greater detail above, the "at issue" exception relates to whether a party "asserted advice of counsel as an affirmative defense" *Shaheen*, 490 F. App'x at 557, not the characterization of certain documents in a privilege log. Having thoroughly reviewed the Intent-Related Documents, the undersigned does not find evidence therein of bad faith in Lexington's conduct of discovery. Accordingly, the undersigned does not find that the bad faith exception applies.

## IV. CONCLUSION

Based on the in-camera review and for the reasons provided above, the undersigned RECOMMENDS that Lexington's attorney-client privilege, attorney work product, or both be upheld with respect to the documents that were subject to the in-camera review, except that the undersigned RECOMMENDS that the court DIRECT Lexington to provide to plaintiffs: (i) redacted copies of any withheld document, of which a duplicate version has already been provided to plaintiffs in redacted form; and (ii) a redacted copy of document "LEX_00018918," to the extent it has not already done so.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on the

24

respective parties or, if represented, their counsel. Each party shall have until **February 13, 2026**, to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).**

Submitted, this 30th day of January, 2025.

_____
Brian S. Meyers
United States Magistrate Judge

25